1  JOHN B. BULGOZDY (Cal. Bar No. 219897)
   Email: bulgozdyj@sec.gov
2  ADRIENNE D. GURLEY
   Email: gurleya@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   John W. Berry, Associate Regional Director
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11  SECURITIES AND EXCHANGE            Case No.
    COMMISSION,
12                                     **COMPLAINT**
              Plaintiff,
13
          vs.
14
15  EMILIO FRANCISCO; PDC CAPITAL
    GROUP, LLC; CAFFE PRIMO
16  INTERNATIONAL, INC.; SAL ASSISTED
    LIVING, LP; , SAL CARMICHAEL, LP; SAL
17  CITRUS HEIGHTS, LP; SAL KERN
    CANYON, LP; SAL PHOENIX, LP; SAL
18  WESTGATE, LP; SUMMERPLACE AT
    SARASOTA, LP; SUMMERPLACE AT
19  CLEARWATER, LP; SUMMERPLACE AT
    CORRELL PALMS, LP;TRC TUCSON, LP;
20  CLEAR CURRENTS WEST, LP; CAFFE
    PRIMO MANAGEMENT, LP;
21  CAFFE PRIMO MANAGEMENT 102, LP;
22  CAFFE PRIMO MANAGEMENT 103, LP;
    CAFFE PRIMO MANAGEMENT 104, LP;
23  CAFFE PRIMO MANAGEMENT 105, LP;
    CAFFE PRIMO MANAGEMENT 106, LP;
24  CAFFE PRIMO MANAGEMENT 107, LP; and
25  CAFFE PRIMO MANAGEMENT 108, LP,
26
              Defendants.
27
28

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendant Emilio Francisco resides in this district and defendant PDC Capital Group, LLC is headquartered in this district.

## SUMMARY

3.      Defendant Emilio Francisco and his company Defendant PDC Capital Group, LLC, have engaged in an ongoing fraudulent scheme to defraud at least 131 investors in 19 different offerings out of at least $9.5 million, beginning in January 2013 and continuing at least through September 2016.  Francisco and PDC Capital made offerings in assisted living facilities, Caffe Primo restaurants, and a packaging facility, primarily to investors in China, that purportedly qualify under the "EB-5 Immigrant Investor Program" administered by the U.S. Citizenship and Immigration Service ("USCIS").  Defendants raised approximately $72.05 million from the 131 investors, consisting of approximately $65.5 million in capital contributions to purchase units in limited partnerships, and $6.55 million in "administration fees" to pay expenses of the limited partnerships until the projects were built.  In several of

1

the offerings, Defendants expressly represented that an investor's entire $500,000 capital contribution would be used to develop a specific project, and that only administration fees would be available to pay expenses of the limited partnership until the project was completed.

4.     Approximately $19.2 million of investors' funds was sent directly to PDC Capital's accounts, which exceeded by about $12.65 million the total administration fees paid by investors.  Of that $12.65 million of diverted investor funds, Defendants PDC Capital and Francisco misappropriated at least $9.5 million of investors' capital contributions to support his luxury lifestyle including the purchase and maintenance of a yacht, and to support his businesses.  Francisco and PDC Capital misrepresented to investors that their capital contributions would be used for the designated purposes stated in the offering materials.  In addition, Francisco and PDC Capital commingled funds among different projects, contrary to representations in the offering materials that investors' funds would be used for the specific project in which they were investing.  Further, at least $1.5 million of investors' funds deposited into escrow for two offerings were not disbursed to the bank accounts of the limited partnerships that were to receive the funds.

5.     Defendants Francisco, PDC Capital Group, and Caffe Primo International, Inc. – another company Francisco controlled as CEO and part-owner – committed their fraud through the offerings for the Defendant limited partnerships.  At all relevant times, Defendant Francisco controlled the bank accounts, directly or indirectly, for all of the Defendants; controlled and approved the terms of the various offerings; and benefitted personally from the misuse and misappropriation of funds.  Defendants' conduct appears to be ongoing and they raised funds from investors as recently as September 2016.

6.     By engaging in this conduct, the Defendants have violated, and continue to violate, the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5

2

thereunder, 17 C.F.R. 240.10b-5.  Alternatively, Francisco and PDC Capital Group aided and abetted the violations by the limited partnership Defendants.  Finally, Francisco is liable as a control person for the violations of each of the corporate Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## THE DEFENDANTS

7.   **Emilio Francisco ("Francisco"**) resides in Newport Beach, California. He graduated from the University of California at Irvine, was awarded a J.D. by Western State University in 1976, and is an active member of the California Bar. Francisco is the CEO and Chairman of defendants PDC Capital Group, LLC ("PDC Capital") and Caffe Primo International, Inc. ("CPI").  Francisco also controls and/or serves as the CEO of other entities involved the fraudulent scheme, such as PDC Partners Management, Inc. ("PMI") which managed assisted living projects; FDC Partners Management, Inc. ("FDC") which also managed assisted living projects; and Summerplace Management, LLC ("SML"), which is the general partner of several of the assisted living projects.  Francisco was admitted to the California Bar in 1976, was placed on suspension in 1992, and in 2012 his license was suspended for nine months for a variety of types of misconduct.  Francisco also currently works as a marketing consultant for The Law Offices of Marilyn Thomassen & Associates ("MTA"), a California law firm owned by Marilyn Thomassen.  MTA and/or Marilyn Thomassen serve as the escrow agent for PDC Capital's EB-5 offerings, and serves as immigration counsel for a number of investors in PDC Capital's EB-5 offerings.

8.   **PDC Capital Group, LLC ("PDC Capital")** is a Delaware limited liability company, headquartered in Costa Mesa, California.  PDC Capital was formed by Emilio Francisco in 2012 and is controlled by him as CEO.  PDC Capital was formed as a vehicle for managing EB-5 program investments.

9.   **Caffe Primo International, Inc. ("CPI")** is a Delaware corporation, which is owned by PDC Capital and Global Restaurant Partners, Inc.  Francisco is

the CEO of CPI.  CPI is a general partner of the defendant Caffe Primo Management limited partnerships.

10.    **SAL Assisted Living, LP ("SAL Assisted Living")** is a Nevada limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Lincoln, California, and invests through the entity Summerplace at Lincoln, LLC.  SML is the general partner of SAL Assisted Living.

11.    **SAL Carmichael, LP ("SAL Carmichael")** is a Delaware limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Carmichael, California, through the entity SAL Carmichael LLC.  SML is the general partner of SAL Carmichael.

12.    **SAL Citrus Heights, LP ("SAL Citrus Heights")** is a Delaware limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Citrus Heights, California, through the entity SAL Citrus Heights, LLC.  SML is the general partner of SAL Citrus Heights.

13.    **SAL Kern Canyon, LP ("SAL Kern Canyon")** is a California limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Stockton, California, through the entity SAL Kern Canyon, LLC.  SML is the general partner of SAL Kern Canyon.

14.    **SAL Phoenix, LP ("SAL Phoenix")** is a Delaware limited partnership headquartered in Salem, Oregon, which was formed to invest in the construction and operation of an assisted living facility in Glendale, Arizona.  Sante GP Zanjero LLC and SML are the general partners of SAL Phoenix.

15.    **SAL Westgate, LP ("SAL Westgate")** is a Delaware limited partnership headquartered in Costa Mesa, California, which was formed to invest in

the construction and operation of an assisted living facility in West Sacramento, California, through the entity SAL Westgate, LLC.  SML is the general partner of SAL Westgate.

16.     **Summerplace at Sarasota, LP ("Sarasota")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Sarasota, Florida, through the entity Summerplace at Sarasota, LLC.  FDC is the general partner of Sarasota, and Francisco controlled its bank accounts at least through the end of 2015.

17.     **Summerplace at Clearwater, LP ("Clearwater")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Clearwater, Florida, through the entity Summerplace at Clearwater, LLC.  FDC is the general partner of Clearwater.

18.     **Summerplace at Correll Palms, LP ("Correll Palms")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Titusville, Florida, through the entity Summerplace at Correll Palms, LLC.  FDC is the general partner of Correll Palms.

19.     **TRC Tucson, LP ("TRC Tucson")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Tucson, Arizona, which is owned by SET Real CO, LLC.  SML and Sante GP Tucson are the general partners of TRC Tucson.

20.     **Clear Currents West, LP ("Clear Currents LP")** is a Delaware limited partnership headquartered in Costa Mesa, California.  It was formed for the purpose of investing in Clear Currents West, LLC, which will renovate a production facility for Clear Currents environmentally friendly agriculture and cleaning products.   The general partner is Clear Currents West Management, LLC.

21.     Defendants engaged in eight offerings under the EB-5 program for the construction and operation of individual "Caffe Primo" restaurants.  Each offering had the same structure:  the limited partnership ("LP") is the issuer of securities, CPI

5

is the general partner, Francisco is an original limited partner, and Primo Hospitality Group Management, Inc. is a non-voting general partner.  Each LP invested in a corresponding limited liability company ("LLC") which built and operated the Caffe Primo restaurants.

     a.    **Caffe Primo Management, LP ("Caffe Primo Management")** is a California limited partnership formed for the purpose of investing in Caffe Primo Management 101, LLC.

     b.    **Caffe Primo Management 102, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 102, LLC.

     c.    **Caffe Primo Management 103, LP** is a California limited partnership formed for the purpose of investing in Caffe Primo Management 102, LLC.

     d.    **Caffe Primo Management 104, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 104, LLC.

     e.    **Caffe Primo Management 105, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 105, LLC.

     f.    **Caffe Primo Management 106, LP** is a Delaware limited partnership  formed for the purpose of investing in Caffe Primo Management 106, LLC.

     g.    **Caffe Primo Management 107, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 107, LLC.

     h.    **Caffe Primo Management 108, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 108, LLC.

### THE FRAUDULENT SCHEME

**A.    The EB-5 Program**

22.    The EB-5 Immigrant Investor Program sets aside EB-5 visas for participants who invest in commercial enterprises in the United States which create jobs and meet certain other conditions.

23.    Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in a "commercial enterprise" in the United States may petition the USCIS (called an "I-526 Petition") and receive conditional permanent residency status for a two-year period.  USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

24.    The EB-5 Immigrant Investor Program requires a showing that the foreign investor has placed the required amount of capital at risk for "the purpose of generating a return" on the capital placed at risk.  The foreign investor must invest at least $500,000 in a "Targeted Employment Area" and thereby create at least ten full-time jobs for United States workers.  If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa and live and work in the United States permanently.

**B.    The Fraudulent Offerings**

25.    PDC Capital was formed in 2012 to put together real estate transactions and develop properties.  PDC Capital is described as a marketing company and solicits investors primarily in China to invest in EB-5 projects.

26.    From about January 2013 to at least September 2016, Defendants have raised approximately $72.05 million from at least 131 investors through offerings in the Defendant EB-5 project limited partnerships.

27.    Defendants solicited investors in the offering through PDC Capital's website.

28.    Defendants also solicited investors in China through PDC Capital's

7

marketing staff in China, who work with Chinese marketing agencies to solicit EB-5 investors. PDC Capital representatives train the sales agents about how to describe the investments, and the marketing agents receive commissions of varying amounts.

29.    At times, PDC Capital representatives meet directly with investors at seminars in China.

30.    Defendant Francisco approves all marketing and offering materials that are provided to investors.

### 1.    Offerings in Assisted Living Facilities and Clear Currents LP

31.    During the relevant period, Defendants Francisco and PDC Capital offered and sold securities in the ten limited partnerships that were to finance, build, and operate assisted living facilities in California, Florida, and Arizona, specifically Defendants (1) SAL Assisted Living, (2) SAL Carmichael, (3) SAL Citrus Heights, (4) SAL Kern Canyon, (5) SAL Phoenix, (6) SAL Westgate, (7) Sarasota, (8) Clearwater, (9) Correll Palms, and (10) TRC Tucson (the "Assisted Living LPs").

32.    In addition, Defendants Francisco and PDC Capital also offered securities in Defendant Clear Currents LP, which was to renovate a production facility for Clear Currents' environmentally friendly agriculture and cleaning products. In all material respects, the offering for the Clear Currents LP followed the structure and operation of the offerings for the Assisted Living LPs, as alleged below.

33.    The Assisted Living LPs used similar mechanisms for the offer and sale of securities. In exchange for a $500,000 capital contribution and a $45,000-$50,000 administration fee, or a total investment ranging from $545,000 to $550,000, an investor receives an interest in one of the Assisted Living LPs. Investors are required to deposit their entire investment consisting of both the capital contribution and the administration fee into special escrow accounts managed by a law firm that has an ongoing relationship with Defendant Francisco. The Assisted Living LPs then lent the offering proceeds to a limited liability company created specifically for

1   that EB-5 offering (the "Project LLC").

2       34.    The PPMs state that units in the limited partnerships being offered for

3   sale are "securities" and reference provisions of the federal securities laws.  The

4   offerings solicit minimum investments of $500,000 as a capital contribution for one

5   limited partnership unit.  The PPMs state that investors' capital contributions are

6   pooled for the purposes of the particular project.   The PPMs also provide that the

7   limited partnership would be run "exclusively" by the General Partners who have

8   "broad powers" over the day-to-day management of the partnerships' affairs, and

9   that the investors (the limited partners) generally have no power to participate in the

10  management of the limited partnership.  The PPMs also represent that success of the

11  limited partnership is substantially dependent on the performance of the General

12  Partners and management.

13      35.    Defendant PDC Capital, through its sales agents, provides investors with

14  offering materials which include a private placement memorandum ("PPM"), an

15  investor questionnaire, a limited partnership agreement ("LP Agreement"), a spousal

16  consent form, a subscription agreement, an escrow agreement, a term sheet, and in

17  some cases, a sample promissory note (between the Assisted Living Offering LP and

18  the Project LLC).

19      36.    Each of PDC Capital's investors signed an escrow agreement, which

20  governs how the investor's funds will be released.  Typically, the escrow agreement

21  allows for the release of all investor funds to the limited partnership once an investor

22  was accepted and approved by the partnership.  One exception is the SAL

23  Carmichael offering, which states that 80% of an investor's subscription proceeds

24  would be released upon approval of the first investors I-526 petition, with the

25  remaining 20% released when the last investor's I-526 petition was approved.

26      37.    The Assisted Living LPs vary somewhat from offering to offering in

27  terms of the scope of the project.  The PPMs state that the Project LLC will either

28  "develop, construct, lease and operate (and eventually sell)," or "build out and

renovate," a memory care or assisted living facility.  The PPMs or accompanying term sheets also describe the number of jobs that each project is expected to generate based on the number of partnership units offered.  For example the SAL Kern Canyon offering was for 10 partnership units, and the term sheet represents that the project will create 130 direct jobs.

38.    The PPMs represent how the investors' funds were to be used. Typically, the offering documents state that the proceeds from the offering "except for all administration fees, will be loaned to the Project LLC to fund the purchase of the land as well as some of the components of the Development."  Each PPM also states that the EB-5 investor funds would constitute a portion of the project's funding, with owner contributions and/or construction loans providing the rest of the funding.

39.    The Assisted Living LP PPMs also contain disclosures concerning compensation to the General Partners.  In general, any remuneration paid by the limited partnership to the General Partners is to be paid out of administration fees, loan interest proceeds, or through dividends paid from the project company to the limited partnership as its parents, so as to comply with USCIS requirements.

40.    The PPMs state that investors would receive an accrued distribution on their investment with a rate of return of 1.5% to 2%, and after five years, repayment of their $500,000 investment with any accrued interest.

41.    Defendant Francisco and one of his associates provided the information that was included in the PPMs and other offering documents for each of the Assisted Living LPs, and Clear Currents LP.  Defendant Francisco was responsible for determining what information from the PPMs would be highlighted in PowerPoint presentations to investors.

42.    Defendant Francisco controlled the bank accounts of the Assisted Living LPs and Clear Currents LP, directly or indirectly through PDC Capital.

## 2.      Caffe Primo Offerings

43.      During the relevant period, Defendants Francisco and PDC Capital offered and sold securities in eight limited partnerships that were to finance, build, and operate Caffe Primo restaurants, specifically Defendants (1) Caffe Primo Management, LP; (2) Caffe Primo Management 102, LP; (3) Caffe Primo Management 103, LP; (4) Caffe Primo Management 104, LP; (5) Caffe Primo Management 105, LP; (6) Caffe Primo Management 106, LP; (7) Caffe Primo Management 107, LP; and (8) Caffe Primo Management 108, LP (the "Caffe Primo LPs").

44.      As with the offerings of the Assisted Living LPs, the Caffe Primo LPs offered securities in the form of limited partnership units in exchange for a $500,000 capital contribution and a $45,000-$50,000 administration fee, or a total investment ranging from $545,000 to $550,000.  The Caffe Primo LPs were then to lend funds to an associated limited liability company ("Caffe Primo LLCs") for that particular offering and restaurant.  For example, Caffe Primo Management 108, LP was to lend money to Caffe Primo 108, LLC, for the construction and operation of the restaurants associated with that offering.

45.      Defendants PDC Capital and Francisco, directly or indirectly, provided the following offering documents to investors in the offerings of the Caffe Primo LPs:  a private placement memorandum ("PPM"), an investor questionnaire, a limited partnership agreement, a spousal consent form, a subscription agreement, an escrow agreement, a joinder agreement, and a promissory note.

46.      The PPMs for the Caffe Primo LPs offer investors the opportunity to purchase limited partnership units in a particular Caffe Primo LP.  The PPMs refer to the limited partnership units as "securities" and refer to provisions of the federal securities laws.  Each unit requires the investment of at least $500,000 for a capital contribution.  The investors' funds are pooled, and used to develop the particular Caffe Primo in which they were investing.  The PPMs state that the General Partners

11

will conduct the day-to-day management of the limited partnership, as fiduciaries.

47.    The offering materials state that investors would receive a preferred rate of return of 1.5% per year, with any remaining distributions to the General Partner. After 5 years, investors will receive distributions until their capital contribution is returned.  In addition, once the capital contribution is returned, investors may continue to share in a percentage of any remaining distributions.

48.    The PPMs for the Caffe Primo LPs typically state that the investors' funds will be used to build and operate a Caffe Primo restaurant in California.  The offering documents state that the funds will be used to "build out and launch," and for "legal and fees," "corporation operations and administrations," and for "ongoing support and professional services," which includes, among other items, travel, marketing, and supplies for the particular limited partnership.  The PPMs also disclose that investors' proceeds can be used for finder's fees and commissions, and that PDC Capital will contribute $300,000 to the project.

49.    Defendant Francisco is the signatory on the subscription agreements for the Caffe Primo LPs, and the bank accounts for the Caffe Primo LPs are controlled by PDC Capital.

### 3.    Defendants' Misrepresentation and Misuse of Investor Funds

50.    Investors sent their capital contributions of $500,000 and administration fees of $45,000-$50,000 to the lawyers' escrow account.  An investor's entire capital contribution of $500,000 was to be provided to the limited partnership making the offering to be used to develop the specific EB-5 project described in the particular offering's PPM.  The capital contribution could not be used to support PDC Capital's operations.

51.    Only the administration fee could be used for other expenses, including those of PDC Capital.  Defendant Francisco admitted that PDC Capital was not entitled to use any of the capital contributions to support PDC Capital's operations and was limited to using administration fees.

52.     Defendant Francisco has sole responsibility for how PDC Capital, the Assisted Living LPs, the Project LLCs, Clear Currents LP, and the Caffe Primo LPs spent money.  Defendant Francisco was aware of all of the movement of money, no disbursements or transfers took places without his knowledge, and he had approval authority along with one other PDC Capital employee for all the accounts of PDC Capital, the Assisted Living LPs, the Project LLCs, Clear Currents LP, and the Caffe Primo LPs.

53.     Once a project is built and operating, PDC Capital and the investors, depending on the offering, may earn continuing income associated with the project under the terms of the offering documents.  To date, none of the facilities associated with the Assisted Living LPs are completed and operating.  As of November 2016, construction may have started on one of the facilities.  Some of the Caffe Primo restaurants are in operation, however, Defendant CPI's 2015 tax return showed it had total income of $1,583 for that year.

54.     Approximately 131 investors paid into escrow about $6.55 million in administration fees for the Assisted Living LPs offerings, Clear Currents LP, and the Caffe Primo LPs offerings.

55.     Approximately $19.2 million of investors' funds was sent directly to PDC Capital's accounts from the lawyers' escrow accounts.  Thus, at least $12.65 million of investors' capital contributions were improperly diverted to PDC Capital.

56.     Of that $12.65 million, Defendants PDC Capital and Francisco misappropriated at least $9.5 million to finance Francisco's luxury lifestyle, including the purchase and maintenance of a yacht, and to support his businesses.

57.     In addition, Defendants Francisco and PDC Capital diverted investors' funds from one project to another on multiple occasions.  Defendant Francisco admitted that he was not permitted to move investors' funds from one project to another because doing so would run afoul of the USCIS requirements for the EB-5 program.  The PPMs also represented that investors' funds would be pooled and

13

used for the particular project that was the subject of the offering.  Nonetheless, Francisco and PDC Capital frequently moved investors' funds among various projects.

58.     For example, an investor in TRC Tucson wired a $500,000 capital contribution to the lawyer's escrow account on November 3, 2015.  The funds were transferred among two other accounts controlled by the lawyer, before the entire capital contribution was disbursed on November 12, 2015 and November 13, 2015, to seven other recipients including PDC Capital.  None of the funds from the TRC Tucson investor were disbursed to bank accounts of TRC Tucson.

59.     In addition, for at least two Caffe Primo offerings, the total amount of the investors' capital contributions were not transferred to the associated limited partnership bank account.  Caffe Primo Management 107, LP raised a total of $1.65 million from three investors, but only $1 million was transferred from the lawyer's escrow accounts to the Caffe Primo 107 bank account.  Caffe Primo Management 108, LP raised a total of $1.65 million from three investors, but only $500,000 was transferred from the lawyer's escrow accounts to the Caffe Primo 108 bank account. At least $1.5 million of the investors' funds were diverted from the Caffe Primo offerings.

60.     By misappropriating a substantial portion of the investors' capital contributions, Defendants materially misled investors that the entire capital contribution would be used to fund the specific projects, provide the promised returns, and create the requisite ten jobs.

61.     By diverting funds to different offerings or projects, Defendants materially misled investors that their entire capital contributions would be used to fund the specific projects, provide the promised returns, and create the requisite jobs.

### 4.     Defendants' Ongoing Conduct and Explanation

62.     Defendant Francisco admitted that as of May 16, 2016, no construction had started on any of the projects associated with the Assisted Living LPs.

63.    In May 2016, Defendant Francisco explained that any loans between Project LLCs consisted of his own funds, and that he had up to $1 million of his personal funds invested with PDC Capital.  Francisco claimed that any funds that moved between projects were his own money, and not the investors' capital contributions.  In fact, bank records show that Francisco had contributed at most about $115,000 to PDC Capital.

64.    In May 2016, after Defendant Francisco provided testimony to the SEC, PDC Capital closed all of its existing bank accounts, and opened new bank accounts at a different bank.

65.    As of at least September 2016, Defendants continued to raise money from investors.

66.    Defendants' offerings and sales of limited partnership interests were made using means and instrumentalities of interstate commerce.  Investor funds were wired to the escrow accounts, and wired from the escrow accounts to PDC Capital's accounts, as well as accounts of the projects.  In addition, projects were located in Arizona and Florida, and several of the Defendants are Delaware limited partnerships.  Defendants also used means and instrumentalities of interstate commerce to transmit offering documents and other materials to sales agents and prospective investors in China, and used instrumentalities such as email to communicate with investors.

67.    At all relevant times, Defendant Francisco acted with scienter. Francisco's state of mind is imputed to the companies he controls, including Defendants PDC Capital, CPI, the Assisted Living LPs, Clear Currents LP, and the Caffe Primo LPs.

68.    Alternatively, at all relevant times, Defendant Francisco was negligent.

///

///

///

1

2

3

4

## **FIRST CLAIM FOR RELIEF**

### **Fraud in the Offer or Sale of Securities**

### **Violations of Section 17(a) of the Securities Act**

### **(against all Defendants)**

5        69.    The SEC realleges and incorporates by reference paragraphs 1 through

6  68 above.

7        70.    As alleged above, Defendants engaged in a scheme to defraud investors

8  by making false statements concerning the limitation on use of proceeds, as well as

9  the manner in which proceeds would be used, including engaging in transactions

10 designed to obscure the diversion of funds, to enrich themselves at the expense of

11 investors.

12       71.    As alleged above, Defendants obtained money by means of untrue

13 statements of material fact concerning the use of proceeds of the Assisted Living LPs,

14 Clear Currents LP and Caffe Primo LPs offering.

15       72.    As alleged above, Defendants engaged in transactions and a course of

16 business obtained money from investors by means of false statements in the PPMs

17 about the use of investor proceeds and limitations on the use of investors' capital

18 contributions.

19       73.    At all relevant times, Defendant Francisco acted with scienter to enrich

20 himself at the expense of the defrauded investors.  In the alternative, Defendant

21 Francisco was negligent.  Defendant Francisco's state of mind is imputed to the

22 entities he controlled, including PDC Capital, CPI, and the Assisted Living LPs,

23 Clear Currents LP and Caffe Primo LPs.

24       74.    By engaging in the conduct described above, Defendants Francisco and

25 PDC Capital, with regard to the Assisted Living LPs and Clear Currents LP, directly

26 or indirectly, in the offer or sale of securities, and by the use of means or instruments

27 of transportation or communication in interstate commerce or by use of the mails

28 directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b)

1  obtained money or property by means of untrue statements of a material fact or by

2  omitting to state a material fact necessary in order to make the statements made, in

3  light of the circumstances under which they were made, not misleading; and (c)

4  engaged in transactions, practices, or courses of business which operated or would

5  operate as a fraud or deceit upon the purchaser.

6       75.    By engaging in the conduct described above, Defendants Francisco and

7  PDC Capital, and CPI, with regard to the Caffe Primo LPs, directly or indirectly, in

8  the offer or sale of securities, and by the use of means or instruments of transportation

9  or communication in interstate commerce or by use of the mails directly or indirectly:

10  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or

11  property by means of untrue statements of a material fact or by omitting to state a

12  material fact necessary in order to make the statements made, in light of the

13  circumstances under which they were made, not misleading; and (c) engaged in

14  transactions, practices, or courses of business which operated or would operate as a

15  fraud or deceit upon the purchaser.

16       76.    Each of the Defendants knew, or was reckless in not knowing, that he or

17  it employed devices, schemes and artifices to defraud.  Each of the Defendants knew,

18  or was reckless or negligent in not knowing, that he or it obtained money or property

19  by means of untrue statements of a material fact or by omitting to state a material fact

20  necessary in order to make the statements made, in light of the circumstances under

21  which they were made, not misleading; and engaged in transactions, practices, or

22  courses of business which operated or would operate as a fraud or deceit upon the

23  purchaser.

24       77.    By engaging in the conduct described above, each of the Defendants

25  violated, and unless restrained and enjoined will continue to violate, Sections

26  17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1),

27  77q(a)(2), & 77q(a)(3).

28  ///

## <u>SECOND CLAIM FOR RELIEF</u>

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rules 10b-5(a) and 10b-5(c) Thereunder**

**(against all Defendants as primary violators, and,**

**alternatively, against Francisco as a control person**

**under Section 20(a) of the Exchange Act)**

78.   The SEC realleges and incorporates by reference paragraphs 1 through 68 above.

79.   As alleged above, Defendants engaged in a scheme to defraud investors by making false statements concerning the limitation on use of proceeds, as well as the manner in which proceeds would be used, including engaging in transactions designed to obscure the diversion of funds, to enrich themselves at the expense of investors.

80.   As alleged above, Defendants engaged in transactions and a course of business obtained money from investors by means of false statements in the PPMs about the use of investor proceeds and limitations on the use of investors' capital contributions.

81.   At all relevant times, Defendant Francisco acted with scienter to enrich himself at the expense of the defrauded investors.  Defendant Francisco's state of mind is imputed to the entities he controlled, including PDC Capital, CPI, and the Assisted Living LPs, Clear Currents LP and Caffe Primo LPs.

82.   By engaging in the conduct described above, Defendants Francisco and PDC Capital, with regard to the Assisted Living LPs and Clear Currents LP, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would

18

1  operate as a fraud or deceit upon the purchaser.

2         83.    By engaging in the conduct described above, Defendants Francisco and

3  PDC Capital, and CPI, with regard to the Caffe Primo LPs, directly or indirectly, in

4  the offer or sale of securities, and by the use of means or instruments of transportation

5  or communication in interstate commerce or by use of the mails directly or indirectly:

6  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in

7  transactions, practices, or courses of business which operated or would operate as a

8  fraud or deceit upon the purchaser.

9         84.    Each of the defendants knew, or was reckless in not knowing, that he or

10  it employed devices, schemes and artifices to defraud; and engaged in acts, practices

11  or courses of conduct that operated as a fraud on the investing public by the conduct

12  described in detail above.

13         85.    By engaging in the conduct described above, each of the defendants

14  violated, and unless restrained and enjoined will continue to violate, Section 10(b) of

15  the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. §§

16  240.10b-5(a) & 240.10b-5(c).

17         86.    Defendant Francisco was a control person of Defendants PDC Capital

18  and CPI because he possessed, directly or indirectly, the power to direct or cause the

19  direction of the management and policies of each of these entities.  Accordingly,

20  pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant

21  Francisco is liable to same extent as each of these Defendants for those Defendants'

22  violations of Section 10(b) and Rules 10b-5(a) and (c) thereunder.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5(b) Thereunder**

**(against Defendants Francisco, PDC Capital, the Assisted Living LPs (SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson). Clear Currents LP, and the Caffe Primo LPs (Caffe Primo Management, and Caffe Primo Management 102-108) as primary violators, and, alternatively, against Francisco as a control person under Section 20(a) of the Exchange Act)**

87.    The SEC realleges and incorporates by reference paragraphs 1 through 68 above.

88.    As alleged above, Defendants obtained money by means of untrue statements of material fact concerning the use of proceeds of the Assisted Living LPs and Caffe Primo LPs offering.

89.    At all relevant times, Defendant Francisco acted with scienter to enrich himself at the expense of the defrauded investors.  Defendant Francisco's state of mind is imputed to the entities he controlled, including PDC Capital, and the Assisted Living LPs, Clear Currents LP, and Caffe Primo LPs.

90.    Defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson, Clear Currents LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact

20

or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

91.     Defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson, Clear Currents LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and each of them, knew, or was reckless in not knowing, that he or it made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

92.     By engaging in the conduct described above, defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson, Clear Currents LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108 violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

93.     Defendant Francisco was a control person of defendants, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson, Clear Currents LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108  because he possessed, directly or indirectly, the power to direct or

1   cause the direction of the management and policies of each of these entities.

2   Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),

3   defendant Francisco is liable to same extent as each of the entity Defendants for those

4   Defendants' violations of Section 10(b) and Rule 10b-5(b) thereunder.

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the**

**Exchange Act and Rule 10b-5(b)**

**(Defendants Francisco and PDC Capital)**

94.    The SEC realleges and incorporates by reference paragraphs 1 through 68 above.

95.    Defendants Francisco and PDC Capital provided substantial assistance to the Assisted Living LPs, the Caffe Primo LPs, and Clear Current in their violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in connection with the securities offerings of the Assisted Living LPs, the Caffe Primo LPs, and Clear Currents LP.

96.    Be engaging in the conduct described above, Defendants Francisco and PDC Capital aided and abetted, and unless enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(b), pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily and permanently enjoining Defendants

Francisco, PDC Capital, CPI, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Sarasota, Clearwater, Correll Palms, TRC Tucson, Clear Currents, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily and permanently enjoining Defendants Francisco, PDC Capital, CPI, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Assisted Living, SAL Westgate, SAL Phoenix, TRC Tucson, Sarasota, Clearwater, Correll Palms, Clear Currents LP, Caffe Primo Management, LP, Caffe Primo Management 102, LP, Caffe Primo Management 103, LP, Caffe Primo Management 104, LP, Caffe Primo Management 105, LP, Caffe Primo Management 106, LP, Caffe Primo Management 107, LP, Caffe Primo Management 108, LP, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, from, directly or indirectly, participating in the offer or sale of any security which constitutes an investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service ("USCIS").

### IV.

Issue in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order

and a preliminary injunction freezing the funds and assets of Defendants; ordering repatriation of any funds or assets transferred overseas; prohibiting each of the Defendants from destroying documents; permitting expedited discovery, ordering accountings by each of the Defendants, and appointing a receiver over the Defendant entities.

## V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, and to repatriate any funds or assets they caused to be sent overseas.

## VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  December 27, 2016

/s/ John B. Bulgozdy
John B. Bulgozdy
Adrienne D. Gurley
Attorneys for Plaintiff
Securities and Exchange Commission
