JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email:  bulgozdyj@sec.gov
ADRIENNE D. GURLEY
Email:  gurleya@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
John W. Berry, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES  AND  EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>      vs.<br><br>EMILIO FRANCISCO; PDC CAPITAL GROUP, LLC; CAFFE PRIMO INTERNATIONAL, INC.; SAL ASSISTED LIVING, LP; , SAL CARMICHAEL, LP; SAL CITRUS HEIGHTS, LP; SAL KERN CANYON, LP; SAL PHOENIX, LP; SAL WESTGATE, LP; SUMMERPLACE AT SARASOTA, LP; SUMMERPLACE AT CLEARWATER, LP; SUMMERPLACE AT CORRELL PALMS, LP;TRC TUCSON, LP; CLEAR  CURRENTS  WEST, LP; CAFFE PRIMO MANAGEMENT, LP; CAFFE PRIMO MANAGEMENT 102, LP; CAFFE PRIMO MANAGEMENT 103, LP; CAFFE PRIMO MANAGEMENT 104, LP; CAFFE PRIMO MANAGEMENT 105, LP; CAFFE PRIMO MANAGEMENT 106, LP; CAFFE PRIMO MANAGEMENT 107, LP; and CAFFE PRIMO MANAGEMENT 108, LP,<br><br>             Defendants. | Case No. 8:16-cv-02257-CJC-DFM<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendant Emilio Francisco resides in this district and defendant PDC Capital Group, LLC is headquartered in this district.

## SUMMARY

3.      Defendants Emilio Francisco and PDC Capital Group, LLC, engaged in an ongoing fraudulent scheme to defraud at least 135 investors in 19 different offerings out of at least $9.5 million, beginning in January 2013 and continuing at least through September 2016.  Francisco and PDC Capital made offerings in assisted living facilities, Caffe Primo restaurants, and a packaging facility, primarily to investors in China, that purportedly qualify under the "EB-5 Immigrant Investor Program" administered by the U.S. Citizenship and Immigration Service ("USCIS"). Through the concurrent and consecutive offerings, Defendants raised approximately $72.6 million from the 135 investors, consisting of approximately $66.8 million in capital contributions to purchase units in limited partnerships, and at least $5.797 million in "administration fees" to pay expenses of the limited partnerships until the

projects were built.  In the offerings, Francisco, PDC Capital, and the respective offering entities expressly represented that an investor's entire $500,000 capital contribution deposited in escrow would be used to develop a specific project, and that only administration fees would be available to pay expenses of the limited partnership until the project was completed.

4.     Contrary to the representations to investors, approximately $19.2 million of investors' funds in escrow accounts were sent to accounts controlled by Francisco and PDC Capital.  The amount transferred from the escrow accounts to PDC Capital accounts controlled by Francisco exceeded by about $13.4 million the total administration fees paid by investors.  Of that $13.4 million of diverted investor funds, Defendants Francisco and PDC Capital misappropriated at least $9.5 million of investors' capital contributions to support the business, pay marketing expenses for the offerings, and support a luxury lifestyle which included the purchase and maintenance of a yacht.  Francisco and PDC Capital engaged in a scheme to defraud investors, and misrepresented to investors that their capital contributions would be used for the designated purposes stated in the offering materials.  In addition, Francisco and PDC Capital commingled funds among different projects; contrary to representations in the offering materials that investors' funds would be used for the specific project in which they were investing.

5.     Defendants Francisco, PDC Capital Group, and Caffe Primo International, Inc. committed their fraud through the offerings for the Defendant limited partnerships.  At all relevant times, Defendant Francisco controlled the bank accounts, directly or indirectly, for all of the Defendants; controlled and approved the terms of the various offerings; and benefitted personally from the misuse and misappropriation of funds.

6.     By engaging in this conduct, the Defendants have violated, and continue to violate, the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5

thereunder, 17 C.F.R. 240.10b-5.  Alternatively, Francisco and PDC Capital Group aided and abetted the violations by the limited partnership Defendants.  Finally, Francisco is liable as a control person for the violations of each of the corporate Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## THE DEFENDANTS

7.      **Emilio Francisco ("Francisco")** resides in Newport Beach, California. He graduated from the University of California at Irvine, was awarded a J.D. by Western State University in 1976, and is an active member of the California Bar. Francisco was the CEO and Chairman of defendants PDC Capital Group, LLC ("PDC Capital") and Caffe Primo International, Inc. ("CPI").  Francisco also controlled other entities involved the fraudulent scheme, including but not limited to a company named PDC Partners Management, Inc. ("PMI") which managed assisted living projects; FDC Partners Management, Inc. ("FDC") which also managed assisted living projects; and Summerplace Management, LLC ("SML"), which is the general partner of several of the assisted living projects.  Francisco was admitted to the California Bar in 1976, was placed on suspension in 1992, and in 2012 his license was suspended for nine months for a variety of types of misconduct. Francisco also is as a marketing consultant for The Law Offices of Marilyn Thomassen & Associates ("MTA"), a California law firm owned by Marilyn Thomassen.  MTA and/or Marilyn Thomassen served as the escrow agent for PDC Capital's EB-5 offerings, and as immigration counsel for a number of investors in PDC Capital's EB-5 offerings.

8.      **PDC Capital Group, LLC ("PDC Capital")** is a Delaware limited liability company, headquartered in Costa Mesa, California.  PDC Capital was formed by Emilio Francisco in 2012 and was controlled by him as CEO, until it was placed into receivership on January 5, 2017.  PDC Capital was formed as a vehicle for managing EB-5 program investments.

9.      **Caffe Primo International, Inc. ("CPI")** is a Delaware corporation,

which is owned by PDC Capital and Global Restaurant Partners, Inc.  Francisco was the CEO of CPI until it was placed into receivership on January 5, 2017.  CPI is a general partner of the defendant Caffe Primo Management limited partnerships.

10.     **SAL Assisted Living, LP ("SAL Lincoln")** is a Nevada limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Lincoln, California, and invests through the entity Summerplace at Lincoln, LLC.  SML is the general partner of SAL Assisted Living.

11.     **SAL Carmichael, LP ("SAL Carmichael")** is a Delaware limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Carmichael, California, through the entity SAL Carmichael LLC.  SML is the general partner of SAL Carmichael.

12.     **SAL Citrus Heights, LP ("SAL Citrus Heights")** is a Delaware limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Citrus Heights, California, through the entity SAL Citrus Heights, LLC.  SML is the general partner of SAL Citrus Heights.

13.     **SAL Kern Canyon, LP ("SAL Kern Canyon")** is a California limited partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in Stockton, California, through the entity SAL Kern Canyon, LLC.  SML is the general partner of SAL Kern Canyon.

14.     **SAL Phoenix, LP ("SAL Phoenix")** is a Delaware limited partnership headquartered in Salem, Oregon, which was formed to invest in the construction and operation of an assisted living facility in Glendale, Arizona.  Sante GP Zanjero LLC and SML are the general partners of SAL Phoenix.

15.     **SAL Westgate, LP ("SAL Westgate")** is a Delaware limited

partnership headquartered in Costa Mesa, California, which was formed to invest in the construction and operation of an assisted living facility in West Sacramento, California, through the entity SAL Westgate, LLC.  SML is the general partner of SAL Westgate.

16.     **Summerplace at Sarasota, LP ("Summerplace at Sarasota")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Sarasota, Florida, through the entity Summerplace at Sarasota, LLC.  FDC is the general partner of Sarasota, and Francisco controlled its bank accounts at least through the end of 2015.

17.     **Summerplace at Clearwater, LP ("Summerplace at Clearwater")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Clearwater, Florida, through the entity Summerplace at Clearwater, LLC.  FDC is the general partner of Clearwater.

18.     **Summerplace at Correll Palms, LP ("Summerplace at Correll Palms")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Titusville, Florida, through the entity Summerplace at Correll Palms, LLC.  FDC is the general partner of Correll Palms.

19.     **TRC Tucson, LP ("TRC Tucson")** is a Delaware limited partnership formed to invest in the construction and operation of an assisted living facility in Tucson, Arizona, which is owned by SET Real CO, LLC.  SML and Sante GP Tucson are the general partners of TRC Tucson.

20.     **Clear Currents West, LP ("Clear Currents West LP")** is a Delaware limited partnership headquartered in Costa Mesa, California.  It was formed for the purpose of investing in Clear Currents West, LLC, which will renovate a production facility for Clear Currents environmentally friendly agriculture and cleaning products.  The general partner is Clear Currents West Management, LLC.

21.     Defendants PDC Capital and Francisco engaged in eight offerings under the EB-5 program for the construction and operation of individual "Caffe Primo"

restaurants.  Each offering had the same structure:  the limited partnership ("LP") is the issuer of securities, CPI is the general partner, Francisco is an original limited partner, and Primo Hospitality Group Management, Inc. is a non-voting general partner.  Each LP invested in a corresponding limited liability company ("LLC") which built and operated the Caffe Primo restaurants.

      a.     **Caffe Primo Management, LP ("Caffe Primo Management")** is a California limited partnership formed for the purpose of investing in Caffe Primo Management 101, LLC.

      b.     **Caffe Primo Management 102, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 102, LLC.

      c.     **Caffe Primo Management 103, LP** is a California limited partnership formed for the purpose of investing in Caffe Primo Management 102, LLC.

      d.     **Caffe Primo Management 104, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 104, LLC.

      e.     **Caffe Primo Management 105, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 105, LLC.

      f.     **Caffe Primo Management 106, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 106, LLC.

      g.     **Caffe Primo Management 107, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo Management 107, LLC.

      h.     **Caffe Primo Management 108, LP** is a Delaware limited partnership formed for the purpose of investing in Caffe Primo

Management 108, LLC.

## THE FRAUDULENT SCHEME

### A.  The EB-5 Program

22.    The EB-5 Immigrant Investor Program sets aside EB-5 visas for participants who invest in commercial enterprises in the United States which create jobs and meet certain other conditions.

23.    Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in a "commercial enterprise" in the United States may petition the USCIS (called an "I-526 Petition") and receive conditional permanent residency status for a two-year period. USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

24.    The EB-5 Immigrant Investor Program requires a showing that the foreign investor has placed the required amount of capital at risk for "the purpose of generating a return" on the capital placed at risk. The foreign investor must invest at least $500,000 in a "Targeted Employment Area" and thereby create at least ten full-time jobs for United States workers. If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa and live and work in the United States permanently.

### B.  The Fraudulent Offerings

25.    PDC Capital was formed in 2012 to put together real estate transactions and develop properties.

26.    PDC Capital described itself as a marketing company and solicited investors primarily in China to invest in EB-5 projects.

27.    From about January 2013 to at least September 2016, Francisco and PDC Capital raised approximately $72.6 million from at least 135 investors through offerings in the Defendant EB-5 project limited partnerships. Of that amount, approximately $66.84 million consisted of capital contributions, and approximately

$5.797 million consisted administration fees.

28.    Francisco and PDC Capital solicited investors in the offerings through PDC Capital's website.

29.    Francisco and PDC Capital also solicited investors in China through PDC Capital's marketing staff in China, who worked with Chinese marketing agencies to solicit EB-5 investors.  Francisco and PDC Capital representatives trained and supervised the sales agents about how to describe the investments, and the marketing agents received commissions of varying amounts.

30.    At times, PDC Capital representatives met directly with investors at seminars in China.

31.    Defendant Francisco approved all marketing and offering materials that were provided to investors.

32.    Defendants' offerings and sales of limited partnership interests were made using means and instrumentalities of interstate commerce.  Investor funds were wired to the escrow accounts, and wired from the escrow accounts to PDC Capital's accounts, as well as accounts of the projects.  In addition, projects were located in Arizona and Florida, and several of the Defendants are Delaware limited partnerships.  Defendants also used means and instrumentalities of interstate commerce to transmit offering documents and other materials to sales agents and prospective investors in China, and used instrumentalities such as email to communicate with investors.

1.    **Offerings in Assisted Living Facilities and Clear Currents West LP**

33.    During the relevant period, Francisco and PDC Capital offered and sold securities in the ten limited partnerships that were to finance, build, and operate assisted living facilities in California, Florida, and Arizona, specifically Defendants (1) SAL Assisted Living, (2) SAL Carmichael, (3) SAL Citrus Heights, (4) SAL Kern Canyon, (5) SAL Phoenix, (6) SAL Westgate, (7) Summerplace at Sarasota,

(8) Summerplace at Clearwater, (9) Summerplace at Correll Palms, and (10) TRC Tucson (the "Assisted Living LPs").

34.     In addition, Francisco and PDC Capital also offered securities in Defendant Clear Currents West LP, which was to renovate a production facility for Clear Currents' environmentally friendly agriculture and cleaning products.  In all material respects, the offering for the Clear Currents West LP followed the structure and operation of the offerings for the Assisted Living LPs, as alleged below.

35.     Francisco and PDC Capital, through PDC Capital's sales agents, provided investors with offering materials which included a private placement memorandum ("PPM") for the particular offering, an investor questionnaire, a limited partnership agreement ("LP Agreement"), a spousal consent form, a subscription agreement, an escrow agreement, a term sheet, and in some cases, a sample promissory note (between the Assisted Living Offering LP and the Project LLC).

36.     Francisco and PDC Capital used a similar structure for the offer and sale of securities in the Assisted Living LPs and Clear Currents West LP.  In exchange for a $500,000 capital contribution and a $45,000-$50,000 administration fee, or a total investment ranging from $545,000 to $550,000, an investor received a limited partnership interest in the particular Assisted Living LP that was the subject of the offering, or Clear Currents West LP for that offering.  Investors were required to deposit their entire investment consisting of both the capital contribution and the administration fee into escrow accounts managed by a law firm that has an ongoing relationship with Defendant Francisco.  Under the explicit terms of the offering documents, including the PPM for each offering, the subscription agreement for each investor, and the escrow agreement for each investor, the escrow agent was to release the funds directly to the specific Assisted Living LP associated with the offering, which in turn was to lend the entire amount of the capital contribution from the investor to the limited liability company created specifically for that EB-5

offering (the "Project LLC").  The Clear Currents West LP PPM also provides that the funds would be used for that specific project.

37.    The PPMs state that units in the limited partnerships being offered for sale are "securities" and reference provisions of the federal securities laws.  The offerings solicited minimum investments of $500,000 as a capital contribution for one limited partnership unit.  The PPMs state that investors' capital contributions are pooled for the purposes of the particular project.   The PPMs provide that the limited partnership would be run "exclusively" by the General Partners who have "broad powers" over the day-to-day management of the partnerships' affairs, and that the investors (the limited partners) generally have no power to participate in the management of the limited partnership.  The PPMs represent that success of the limited partnership is substantially dependent on the performance of the General Partners and management.  The PPMs state that the General Partners are fiduciaries.

38.    Each of the investors in the Assisted Living LPs and Clear Currents West LP was required to sign a subscription agreement and be accepted by the partnership.  Each investor represented in the subscription agreement that they had received and reviewed the PPM and related documents.  The subscription agreement recited that the entire capital contribution of $500,000 would be loaned to or invested in the specific project company that was the subject of the investment.

39.    Each of the investors in the Assisted Living LPs and Clear Currents West LP was required to sign an escrow agreement, which governed the escrow and release of the investor's funds.  The escrow agreement for the Assisted Living LPs and Clear Currents West LP provide for the release of all investor funds to the limited partnership once an investor was accepted and approved by the partnership.  One exception is the SAL Carmichael offering, which states that 80% of an investor's subscription proceeds would be released upon approval of the first investors I-526 petition, with the remaining 20% released when the last investor's I-526 petition was approved.

40.     The PPMs for the Assisted Living LPs and Clear Currents West LP represent how the investors' funds were to be used.  As alleged more specifically below, the offering documents state that the proceeds from the offering were to be used for the specific project, "except for all administration fees."

41.     The Assisted Living LP PPMs and Clear Currents West LP also contain disclosures concerning compensation to the General Partners.  As alleged more specifically below, the PPMs represent that any remuneration paid by the limited partnership to the General Partners will only be paid out of administration fees, loan interest proceeds, or through dividends paid from the project company to the limited partnership as its parents, so as to comply with USCIS requirements.

42.     The PPMs state that investors would receive an accrued distribution on their investment with a rate of return of 1.5% to 2%, and after five years, repayment of their $500,000 investment with any accrued interest.

43.     Defendant Francisco approved the information that was included in the PPMs and other offering documents for each of the Assisted Living LPs, and Clear Currents West LP.  Defendant Francisco was responsible for determining what information from the PPMs would be highlighted in PowerPoint presentations to investors.

44.     Defendant Francisco controlled the bank accounts of the Assisted Living LPs and Clear Currents LP.

## 2.     Caffe Primo Offerings

45.     During the relevant period, Defendants Francisco and PDC Capital offered and sold securities in eight limited partnerships that were to finance, build, and operate Caffe Primo restaurants in California, specifically Defendants (1) Caffe Primo Management, LP; (2) Caffe Primo Management 102, LP; (3) Caffe Primo Management 103, LP; (4) Caffe Primo Management 104, LP; (5) Caffe Primo Management 105, LP; (6) Caffe Primo Management 106, LP; (7) Caffe Primo Management 107, LP; and (8) Caffe Primo Management 108, LP (the "Caffe Primo

11

LPs").

46.     The Caffe Primo LPs offered securities in the form of limited partnership units in exchange for a $500,000 capital contribution and a $45,000 administration fee, or a total investment of $545,000.  The Caffe Primo LPs were then to lend funds to an associated limited liability company ("Caffe Primo LLCs") for that particular offering and restaurant.  For example, Caffe Primo Management 108, LP was to lend money to Caffe Primo 108, LLC, for the construction and operation of the restaurants associated with that offering.

47.     Defendants PDC Capital and Francisco provided the following offering documents to investors in the offerings of the Caffe Primo LPs:  a private placement memorandum ("PPM"), an investor questionnaire, a limited partnership agreement, a spousal consent form, a subscription agreement, an escrow agreement, a joinder agreement, and a promissory note.

48.     The PPMs for the Caffe Primo LPs offered investors the opportunity to purchase limited partnership units in a particular Caffe Primo LP.  The PPMs refer to the limited partnership units as "securities" and refer to provisions of the federal securities laws.  Each unit requires the investment of at least $500,000 for a capital contribution.  The investors' funds are pooled, and used to develop the particular Caffe Primo in which they were investing.  The PPMs state that the General Partners will conduct the day-to-day management of the limited partnership, as fiduciaries.

49.     The offering materials state that investors would receive a preferred rate of return of 1.5% per year, with any remaining distributions to the General Partner. After 5 years, investors will receive distributions until their capital contribution is returned.  In addition, once the capital contribution is returned, investors may continue to share in a percentage of any remaining distributions.

50.     The PPMs for the Caffe Primo LPs typically state that the investors' funds will be used to build and operate a Caffe Primo restaurant in California.  The offering documents state that the funds will be used to "build out and launch," and

for "legal and fees," "corporation operations and administrations," and for "ongoing

support and professional services," which includes, among other items, travel,

marketing, and supplies for the particular limited partnership. The PPMs also

disclose that investors' proceeds can be used for finder's fees and commissions, and

for the majority of the offerings for the Caffe Primo LPs, that PDC Capital will

contribute $300,000 to the project.

51.    Defendant Francisco was the signatory on the subscription agreements

for the Caffe Primo LPs accepting investors into the limited partnerships. In

addition, Francisco and PDC Capital controlled the bank accounts for the Caffe

Primo LPs.

52.    Defendant Francisco also controlled, or was able to direct, the investor

funds in the escrow accounts.

**C.     Defendants' Fraudulent Scheme**

53.    Investors sent their capital contributions of $500,000 and administration

fees of $45,000-$50,000 to the lawyers' escrow accounts. An investor's entire

capital contribution of $500,000 was to be provided to the limited partnership

making the offering to be used to develop the specific EB-5 project described in the

particular offering's PPM. The capital contribution could not be used to support

PDC Capital's operations.

54.    Only the administration fee could be used for other expenses, including

those of PDC Capital. Defendant Francisco admitted that PDC Capital was not

entitled to use any of the capital contributions to support PDC Capital's operations

and was limited to using administration fees.

55.    Defendant Francisco has sole responsibility for how PDC Capital, the

Assisted Living LPs, the Project LLCs, Clear Currents LP, and the Caffe Primo LPs

spent money. Defendant Francisco was aware of all of the movement of money, no

disbursements or transfers took places without his knowledge, and he had approval

authority along with one other PDC Capital employee for all the accounts of PDC

Capital, the Assisted Living LPs, the Project LLCs, Clear Currents LP, and the Caffe Primo LPs.

56.   To date, only one of the facilities associated with the Assisted Living LPs is completed.   Only four of the eight Caffe Primo restaurants opened. Defendant CPI's 2015 tax return showed it had total income of $1,583 for that year.

57.   Francisco and PDC Capital directed investors to deposit their capital contributions and administration fees into a number of different escrow accounts associated with MTA, which were held at three different banks at different times. The investors' capital contributions and administration fees were then transferred, in whole or in part, from the escrow accounts directly to PDC Capital accounts, misappropriated and sent to the accounts of other offerings, or directed to other MTA escrow accounts, where they were commingled and misappropriated.

58.   In this manner, at least $19.2 million of investors' funds, including at least $13.4 million of investors' capital contributions, were misappropriated by Francisco and PDC Capital.  Francisco and PDC Capital used the misappropriated funds to support PDC Capital's marketing effort for the concurrent and consecutive offerings, and to support Francisco's luxury lifestyle.

59.   PDC Capital's general ledger shows that of the at least $19.2 million it received from the various MTA escrow accounts, at least $5.4 million was spent on marketing, and another $1.2 million was spent to support the office in China.  Thus, marketing expenses of over $6.6 million completely consumed the administration fees of approximately $5.797 million collected from investors from all of the offerings.

60.   PDC Capital's general ledger shows that approximately $2.2 million of investor funds transferred to PDC Capital's accounts was used to pay various credit cards, including personal expenses.  Approximately $1.035 million of investor funds was used to pay the expenses on two boats.  Another approximately $213,000 of investor funds was used to pay rent at the exclusive Balboa Bay Club.  Such

expenditures were for personal expenses of Francisco to support his luxury lifestyle.

61.     Defendants Francisco and PDC Capital commingled investors' funds and did not use the investors' funds for the specific projects, as they represented they would to the investors.  Defendant Francisco admitted that he was not permitted to move investors' funds from one project to another because doing so would run afoul of the USCIS requirements for the EB-5 program.  The PPMs represented that investors' funds would be pooled and used for the particular project that was the subject of the offering.  There was no disclosure that funds would be commingled with other projects.  Nonetheless, Francisco and PDC Capital frequently moved investors' funds among various projects.

62.     For example, an investor in TRC Tucson wired a $500,000 capital contribution to the lawyer's escrow account on November 3, 2015.  The funds were transferred among two other accounts controlled by the lawyer, before the entire capital contribution was disbursed on November 12, 2015 and November 13, 2015, to seven other recipients including PDC Capital.  None of the funds from the TRC Tucson investor were disbursed to bank accounts of TRC Tucson.

63.     In addition, for at least two Caffe Primo offerings, the total amount of the investors' capital contributions were not transferred to the associated limited partnership bank account.  Caffe Primo Management 107, LP raised a total of $1.65 million from three investors, but only $1 million was transferred from the lawyer's escrow accounts to the Caffe Primo 107 bank account.  Caffe Primo Management 108, LP raised a total of $1.65 million from three investors, but only $500,000 was transferred from the lawyer's escrow accounts to the Caffe Primo 108 bank account.  At least $1.5 million of the investors' funds were diverted from the Caffe Primo offerings.

64.     Francisco also diverted corporate profits of the offering entities to his personal benefit and to other companies.  Summerplace at Sarasota purchased land in Florida, and then sold a portion of the land.  Summerplace at Sarasota did not receive

any of the proceeds from the sale, and instead $6.483 million from the sale was directed to FDC Capital Partners, which:  (1) used about $2.2 million buy an ammunitions company in Montana for itself, (2) kept $250,000 for its own uses, and (3) transferred the balance of approximately $4 million to MTA accounts, where the funds were disbursed to other assisted living and Caffe Primo projects.

65.     By misappropriating a substantial portion of the investors' capital contributions, Defendants materially misled investors that the entire capital contribution would be used to fund the specific projects, provide the promised returns, and create the requisite ten jobs.

66.     By diverting funds to different offerings or projects, Defendants materially misled investors that their entire capital contributions would be used to fund the specific projects, provide the promised returns, and create the requisite jobs.

67.     At all relevant times in engaging in this scheme to defraud, Francisco acted with a high level of scienter.  Francisco's scienter is imputed to the companies he controlled, including PDC Capital, CPI, the Assisted Living LPs, Clear Currents, and the Caffe Primo LPs.

68.     In the alternative, Francisco was at least negligent.

## MISREPRESENTATIONS AND OMISSIONS

69.     During the relevant period, Defendants Francisco and PDC Capital offered and sold securities in the ten limited partnerships that were to finance, build, and operate assisted living facilities in California, Florida, and Arizona, specifically Defendants (1) SAL Assisted Living, (2) SAL Carmichael, (3) SAL Citrus Heights, (4) SAL Kern Canyon, (5) SAL Phoenix, (6) SAL Westgate, (7) Summerplace at Sarasota, (8) Summerplace at Clearwater, (9) Summerplace at Correll Palms, and (10) TRC Tucson (the Assisted Living LPs).

70.     During the relevant period, Defendants Francisco and PDC Capital offered and sold securities in Clear Currents West LP.

71.     During the relevant period, Defendants Francisco and PDC Capital

offered and sold securities in eight limited partnerships that were to finance, build, and operate Caffe Primo restaurants in California, specifically Caffe Primo Management offerings number 101 through 108 (the Caffe Primo LPs).

72.     Defendants Francisco, PDC Capital, CPI, the Assisted Living LPs, Clear Currents West LP, and the Caffe Primo LPs, made specific representations concerning the use of the investors' capital contributions and administrations fees, as alleged specifically below for each offering.

73.     Contrary to the representations to investors as alleged below, Defendants Francisco and PDC Capital did not use the investors' capital contributions as represented, and misappropriated a substantial portion of the investors' capital contributions.

74.     By misappropriating a substantial portion of the investors' capital contributions, Defendants materially misled investors that the entire capital contribution would be used to fund the specific projects, provide the promised returns, and create the requisite number of jobs.

75.     By diverting funds to different offerings or projects, Defendants materially misled investors that their entire capital contributions would be used to fund the specific projects, provide the promised returns, and create the requisite jobs.

76.     By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and personal expenses of Francisco, Defendants materially misled investors that their compensation would be limited to administration fees, and omitted material information concerning the use of investors' capital contributions.

77.     In connection with each of the offerings as alleged below, Francisco acted with scienter.

78.     In connection with each of the offerings as alleged below, Francisco knew, or was reckless in not knowing, that the representations and statements made in the offering documents to investors were false and misleading, and omitted

material information, concerning the use of the investor proceeds and capital contributions, and PDC Capital's payment to itself of substantial monies to fund its operations and Francisco's luxury lifestyle, as specifically alleged below.

79.     Alternatively, for each of the offerings as alleged below, at all relevant times, Defendant Francisco was at least negligent.

80.     Francisco's state of mind is imputed to the companies he controls, including Defendants PDC Capital, CPI, the Assisted Living LPs, Clear Currents West LP, and the Caffe Primo LPs.

### SAL Lincoln Offering

81.     During the period from March 2013 through May 2014, Defendants raised at least $5.45 million in capital contributions and administrative fees from investors in the SAL Lincoln offering.

82.     Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Lincoln offering. The offering documents included a Confidential Private Placement Memorandum of SAL Assisted Living, LP dated February 21, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Assisting Living, LP; and an Escrow Agreement, Subscriber to SAL Assisted Living, LP.

83.     Francisco approved the offering documents before they were provided to prospective investors.

84.     The PPM states that the offering was for a maximum of 12 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

85.     The PPM represents the purpose of the offering was to raise funds to make loans to Summerplace at Lincoln, LLC, a wholly owned subsidiary of the offering company (the "Project Company"). The PPM states that the "Project Company currently owns the rights and title to a property located near Bella Breeze and E. Joiner Parkway in the City of Lincoln, California, [] consisting of

approximately 7.1 gross acres of land." The PPM states: "The Project Company is contemplating an initial phase that will develop construct [sic], lease and operate (and eventually sell) a 190 unit, 228 bed assisted living and memory care facility, in the city of Lincoln, California."

86.    The PPM states that the general partner of SAL Lincoln is Summerplace Management, LLC. The PPM states that PDC Capital is the controlling member of Summerplace Management, LLC. The management of the Project Company is identified as PDC Capital Group and FCM Capital Partners.

87.    The PPM represents that the proceeds of the offering would be used solely to make loans to the Project Company for the purpose of developing the SAL Lincoln project:

      a.    "Proceeds from this Offering, except for all Administrative fees, will be loaned to the Project Company to fund the purchase of the land as well as some of the components of the Development."

      b.    "The total development budget for the development is approximately US $36.75 million and will be financed by approximately US$6 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $27,750,000 (See table below), and an owner contribution of approximately $3,000,000."

      c.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit. The Administration Fee shall not be returned to the Limited Partner. The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner(s)."

      d.    "Any remuneration paid by the Partnership to the General

Partner(s) pursuant to the Limited Partnership Agreement shall be paid out of Administration fees, loan interest proceeds, or through dividends paid from the Project Company to the Partnership as its parent, so as to comply with USCIS requirements."

e.    "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the Partnership may pay compensation and fees to the General Partner(s), officers, employees, agents, the Regional Center (once it is approved) and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber or dividends received from the Project Company.  Thereafter, these fees may only be taken from any interest received by the Partnership on the EB-5 Loan to the Project Company and any dividends paid to the Partnership by the Project Company."

88.    The PPM also represents that the General Partners were fiduciaries: "Each General Partner(s) are accountable to the Partnership as a fiduciary, and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under

1    similar circumstances."

2    89.    The Subscription Agreement for Limited Partnership Units of SAL

3    Assisting Living, LP (the SAL Lincoln offering), required the investor to

4    acknowledge receipt of the PPM.  Each investor who subscribed signed a

5    Subscription Agreement and acknowledged that they received and reviewed the PPM.

6    90.    The Subscription Agreement for the SAL Lincoln offering describes the

7    deposit and release of the Subscription Price.  First, with regard to the deposit of the

8    investor funds, it states in pertinent part:  "The Subscription Price tendered by a

9    prospective Limited Partner will be deposited in an escrow account (the "Escrow

10   Account") established with (the "Escrow Agreement").  The subscription Price for

11   that prospective Limited Partner paid by such Limited Partner will be released to the

12   Partnership upon the acceptance of the subscriber as a Limited Partner of the

13   Partnership."

14   91.    With regard to release of the funds, the Subscription Agreement states:

15   "the entire amount of the Capital Contribution for each Unit will be loaned to the

16   Project Company by the Partnership."

17   92.    The Escrow Agreement, Subscriber to SAL Assisted Living, LP

18   represents:  "Upon the Escrow Agent received the Subscription Price from the

19   Subscriber, the Escrow Agent shall, within three (3) business days following receipt

20   thereof, release the Subscription Price to the account of SAL in accordance with the

21   Subscription Agreement and the related Private Placement Memorandum."

22   93.    In fact, Defendants Francisco, PDC Capital, and SAL Lincoln did not

23   use the investors' capital contributions as represented.

24   94.    By misappropriating a substantial portion of the investors' capital

25   contributions, Defendants Francisco, PDC Capital, and SAL Lincoln materially

26   misled investors that the entire capital contribution would be used to fund the specific

27   project, provide the promised returns, and create the requisite ten jobs.

28   95.    By misappropriating a substantial portion of the investors' capital

contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Lincoln materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### SAL Carmichael Offering

96.    During the period from July 2013 through February 2014, Defendants raised at least $5.09 million in capital contributions and administrative fees from investors in the SAL Carmichael offering.

97.    Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Carmichael offering.  The offering documents included a Confidential Private Placement Memorandum of SAL Carmichael, LP dated July 23, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Carmichael, LP; and an Escrow Agreement, Subscriber to SAL Carmichael, LP.

98.    Francisco approved the offering documents before they were provided to prospective investors.

99.    The PPM states that the offering was for a maximum of 10 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

100.    The PPM states that the general partner of SAL Carmichael is Summerplace Management, LLC.  The PPM states that PDC Capital is the controlling member of Summerplace Management, LLC.  The management of the "Project Company" LLC is identified as PDC Capital Group and FCM Capital Partners.

101.    The PPM represents that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Carmichael project:

      a.      "Proceeds from this Offering, except for all Administrative fees, will be loaned to the Project Company to fund the purchase of the

land as well as some of the components of the Development."

    b.     "The total costs for the development are approximately US $25.6 million and will be financed by approximately US$5 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $18,120,038 (See table below), and an owner contribution of approximately $2.49 million."

    102.    The PPM represents that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $45,000 Administration Fee paid by each investor:

    a.     "Any remuneration paid by the Partnership to the General Partner(s) pursuant to the Limited Partnership Agreement shall be paid out of Administration fees or loan interest proceeds so as to comply with USCIS requirements."

    b.     "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the Partnership may pay compensation and fees to the General Partner(s), officers, employees, agents, the Regional Center and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber.  Thereafter, these fees may only

be taken from any interest received by the Partnership on the Loan to the Project Company."

103.   The PPM also represents that the General Partners were fiduciaries: "Each General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner is obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

104.   The Subscription Agreement for Limited Partnership Units of SAL Carmichael, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.  Specifically, in the Subscription Agreement the investor represented:  "Prospective Investor has received and carefully reviewed (i) the Private Placement Memorandum, and (ii) the Partnership Agreement."

105.   The Subscription Agreement for the SAL Carmichael offering describes the deposit and release of the Subscription Price.  First, with regard to the deposit of the investor funds, it states in pertinent part:  "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account (the "Escrow Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner shall be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership."

106.   With regard to release of the funds, the Subscription Agreement states: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

107.    The Escrow Agreement, Subscriber to SAL Carmichael, LP limits the amounts to be released:  "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent shall hold said funds until one SAL Series Investor's I-526 petition has been approved, at which time the Escrow Agent shall release eighty percent (80%) of the investor's subscription proceeds.  The remaining twenty (20%) shall be released when the last Summerplace at Carmichael investor's I-526 has been filed and approved on the project."

108.    In fact, Defendants Francisco, PDC Capital, and SAL Carmichael did not use the investors' capital contributions as represented.

109.    By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and SAL Carmichael materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

110.    By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Carmichael materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### SAL Citrus Heights Offering

111.    During the period from December 2013 through December 2015, Defendants raised at least $6.050 million in Capital Contributions and Administration Fees from investors in the SAL Citrus Heights offering.

112.    Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Citrus Heights offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of SAL Citrus Heights, LP dated August 16, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Citrus Heights, LP; and an Escrow

Agreement, Subscriber to SAL Citrus Heights, LP.

113.   Francisco approved the offering documents before they were provided to prospective investors.

114.   The Term Sheet attached to the PPM states that the offering was for a maximum of 13 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.  The offering termination date was December 31, 2014.

115.   The PPM represents the purpose of the offering was to raise funds to make loans to SAL Citrus Heights, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM states that the "Project Company currently owns the rights and title to a property located at 8220 Sunrise Blvd., Citrus Heights, CA [] consisting of approximately four and a half (4.5) gross acres of land." The PPM stated:  "The Project Company plans to develop, construct, lease and operate (and eventually sell) a 127 bed assisted living and memory care facility, in the city of Citrus Heights, California, 23 miles north of Sacramento."

116.   The PPM identifies the management of the offering company, SAL Citrus Heights.  Summerplace Management, LLC is identified as the general partner. PDC Capital is identified as the controlling member of Summerplace Management. The management of the Project Company was identified as FCM Development Group, LLC and PDC Capital Group.

117.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Citrus Heights project:

    a.    "Proceeds from this Offering, except for all Administrative fees, will be loaned to the Project Company to fund the purchase of the land as well as some of the components of the Development."

    b.    "The total development budget for the development is approximately US $23.5 million and will be financed by

approximately US$6.5 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $13 million (See table below), and an ownership contribution from PDC Capital Group, or an affiliate of $4 million."

118.    For the SAL Citrus Heights offering, the PPM and Term Sheet represent that the General Partner had already made a $4 million capital contribution: "At the date of this Memorandum, the Partnership has General Partner [sic], or an affiliate, who has contributed $4,000,000 for its interest in the Partnership."

119.    The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

    a.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  The Administration Fee shall not be returned to the Limited Partner.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner."

    b.    "Any remuneration paid by the Partnership to the General Partner pursuant to the Limited Partnership Agreement shall be paid out of Administration fees or loan interest proceeds so as to comply with USCIS requirements."

    c.    "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership

will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the Partnership may pay compensation and fees to the General Partner, officers, employees, agents, the Regional Center and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber.  Thereafter, these fees may only be taken from any interest received by the Partnership on the Loan to the Project Company."

120.   The PPM also represents that the General Partners were fiduciaries: "Each General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner is obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

121.   The Subscription Agreement for Limited Partnership Units of SAL Citrus Heights, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

122.   The Subscription Agreement for SAL Citrus Heights identified the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account ("Escrow Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The subscription Price for that prospective Limited Partner

paid by such Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

123.   The Subscription Agreement for SAL Citrus Heights repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

124.   The Escrow Agreement similarly states that the funds would be released to SAL Citrus Heights:  "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent shall, following receipt thereof, release one hundred percent (100%) of the Subscription Price and Administration Fee to the account of SAL [Citrus Heights] when the prospective investor has been accepted and approved by the Partnership."

125.   In fact, Defendants Francisco, PDC Capital, and SAL Citrus Heights did not use the investors' capital contributions as represented.

126.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and SAL Citrus Heights materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

127.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Citrus Heights materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### SAL Kern Canyon Offering

128.   During the period from November 2013 through February 2015,

29

Defendants raised at least $5.45 million in Capital Contributions and Administration Fees from investors in the SAL Kern Canyon offering.

129.   Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Kern Canyon offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of SAL Citrus Heights, LP dated August 21, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Citrus Heights, LP; and an Escrow Agreement, Subscriber to SAL Citrus Heights, LP.

130.   Francisco approved the offering documents before they were provided to prospective investors.  In fact, the PPM attributes all statements made in it to the General Partner, Summerplace Management, LLC, which in turn was controlled by PDC Capital Group.

131.   The Term Sheet attached to the PPM states that the offering was for a maximum of 10 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.  The offering termination date was January 1, 2015.

132.   The PPM represents the purpose of the offering was to raise funds to make loans to SAL Kern Canyon, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM states that the "Project Company currently owns the rights and title to a property located near the intersection of Masterson Street and Highway 178 in the City of Bakersfield, California (the "Property")."  The PPM states:  "The Project Company is contemplating an initial phase that will develop construct, lease and operate (and eventually sell) a 170 unit, 205 bed assisted living and memory care facility, in the city of Bakersfield, California.  The initial phase will be implemented over a period of twenty-four (24) months."

133.   In early 2014, investors were notified that the project location had been changed to 2902 AG Spanos Blvd., Stockton, California.  The project became a "1-

story 46 unit Memory Care facility, combined with a 2-story 90 unit Assisted Living facility, at a total of 136 unit and 154 bed for this project."  The notice was signed by Emilio Francisco, President of Summerplace Management.

134.   The PPM identifies the management of the offering company, SAL Kern Canyon.  Summerplace Management, LLC is identified as the general partner.  PDC Capital is identified as the controlling member of Summerplace Management, LLC. The management of the Project Company is identified as FCM Capital Partners and PDC Capital Group.

135.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Kern Canyon project:

    a.    "Proceeds from this Offering, except for all Administrative fees, will be loaned to the Project Company to fund the purchase of the land as well as some of the components of the Development."

    b.    "The total development budget for the development is approximately US $28 million and will be financed by approximately US$5 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $20 million (See table below), and an owner contribution of approximately $2.7 million."

136.   The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

    a.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  The Administration Fee shall not be

returned to the Limited Partner.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner."

b.    "Any remuneration paid by the Partnership to the General Partner pursuant to the Limited Partnership Agreement shall be paid out of Administration fees or loan interest proceeds so as to comply with USCIS requirements."

c.    "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the partnership will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the Partnership may pay compensation and fees to the General Partner, officers, employees, agents, the Regional Center and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber.  Thereafter, these fees may only be taken from any interest received by the Partnership on the Loan to the Project Company."

137.   The PPM also represents that the General Partners were fiduciaries: "Each General Partner(s)s [sic] are accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including

reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

138.   The Subscription Agreement for Limited Partnership Units of SAL Kern Canyon, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

139.   The Subscription Agreement for SAL Kern Canyon identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account (the "Escrow Account") pursuant to an escrow agreement ("Escrow Agreement").  The subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

140.   The Subscription Agreement for SAL Kern Canyon repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

141.   In fact, Defendants Francisco, PDC Capital, and SAL Kern Canyon did not use the investors' capital contributions as represented.

142.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and SAL Kern Canyon materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

143.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Kern Canyon materially

33

misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### SAL Phoenix Offering

144.   During the period from June 2014 through November 2015, Defendants raised at least $8.24 million in Capital Contributions and Administration Fees from investors in the SAL Phoenix offering.

145.   SAL Phoenix raised $7.5 million in capital contributions from investors, but only approximately $4.678 million was provided to the Project Company.  The remaining amounts were misappropriated by PDC Capital and Francisco.

146.   Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Phoenix offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of SAL Phoenix, LP dated August 29, 2014 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Phoenix, LP; and an Escrow Agreement, Subscriber to SAL Phoenix, LP.

147.   Francisco approved the offering documents before they were provided to prospective investors.

148.   The Term Sheet attached to the PPM states that the offering was for a maximum of 15 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

149.   The PPM represents the purpose of the offering was to raise funds to make loans to SAL Kern Canyon, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM states that the "objective of the Partnership is to (a) acquire the real property located at 7410 N. Zanjero Blvd., Glendale, Arizona or an alternative location, in the discretion of the General Partners (the "Land"); (b) develop the Land into an independent living, assisted living and/or memory care facility (the "Facility"); (c) obtain one or more mortgage loans to

finance the construction, development and operation of the Facility;  and (d) operate the Facility."

150.    The PPM identifies the management of the offering company, SAL Phoenix.  Summerplace Management, LLC and a second entity are identified as the general partners.  PDC Partners Management, Inc. is identified as the manager of Summerplace Management, LLC.  Francisco is identified as the President of PDC Partners Management.  The Term Sheet states that Summerplace Management  is also the general partner of SAL Citrus Heights, LP; SAL Carmichael, LP; SAL Assisted Living, LP; SAL Kern Canyon, LP; SAL Columbia River, LP; SAL Lincoln, LP; SAL Westgate, LP; and SAL Rancho Cordova, LP.

151.    The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Phoenix project:

  a.    "The subscription proceeds in escrow (inclusive of Administration Fees) will be delivered directly to the Partnership's corporate account and be available for use by the Partnership at its discretion.  The Administration Fee will be used to pay various expenses of the Partnership."

  b.    "The total development budget for the development is approximately US $31,500,000  and will be financed by approximately US$7.5 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $21 million (See table below), and an owner contribution of approximately $3,000,000."

152.    The PPM and Term Sheet represent that the $500,000  subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000

Administration Fee paid by each investor:

    a.    "The Administration Fee is in addition to the cost of each Class A Limited Partnership Unit and shall not be considered in determining the value of the Class A Limited Partnership Unit.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner(s)."

    b.    "Any remuneration paid by the Partnership to the General Partner(s) pursuant to the Limited Partnership Agreement shall be paid out of Administration fees, or through distributions paid from the Project Company to the Partnership as its parent, so as to comply with USCIS requirements."

    c.    "Compensation and Fees:  Except as provided below and in the Partnership Agreement, the Partnership does not anticipate payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering. The Partnership will reimburse Summerplace and its affiliates for all reasonable expenses, costs and fees paid or incurred by it in connection with the Offering of the Class A Limited Partnership Units, including consultant, legal, accounting and other fees and disbursements, promotional expenses, travel, printing and other expenses reasonably incurred, up to a maximum aggregate amount of $50,000, as provide in the Partnership Agreement.  After the Offering, the Partnership may pay compensation and fees to the General Partner(s), officers, employees, agents and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber or distribution received from the Partnership Subsidiaries."

153.   The PPM also represents that the General Partners were fiduciaries:

"Each General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its (their) managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

154.   The Subscription Agreement for Limited Partnership Units of SAL Phoenix, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

155.   The Subscription Agreement for SAL Phoenix identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price and Administration Fee tendered by a prospective Limited Partner will be deposited in an escrow account ("Escrow Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Class A Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

156.   The Subscription Agreement for SAL Phoenix repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution:  "The entire amount of the Capital Contribution for each Unit will be invested in the Partnership to further the purpose of the Partnership."

157.   The Escrow Agreement similarly provides that the Capital Contribution would be used by the SAL Phoenix partnership:  "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent

shall, following receipt thereof, and by the written instruction of SAL or the General Partner of SAL, release one hundred percent (100%) of the Subscription Price and Administration Fee to the account of SAL in accordance with the Subscription Agreement and the related Private Placement Memorandum."

158.   In fact, Defendants Francisco, PDC Capital, and SAL Phoenix did not use the investors' capital contributions as represented.

159.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and SAL Phoenix materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

160.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Phoenix materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### SAL Westgate Offering

161.   During the period from June 2014 through November 2015, Defendants raised at least $5.44 million in Capital Contributions and Administration Fees from investors in the SAL Westgate offering.

162.   Defendant PDC Capital provided offering documents to prospective investors concerning the SAL Westgate offering.  The offering documents included a Confidential Private Placement Memorandum and Term Sheet of SAL Westgate, LP dated August 21, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of SAL Westgate, LP; and an Escrow Agreement, Subscriber to SAL Westgate, LP.

163.   Francisco approved the offering documents for the SAL Westgate offering before they were provided to prospective investors.

164.   The PPM and Term Sheet state that the offering was for a maximum of 10 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

165.   The PPM represents the purpose of the offering was to raise funds to make loans to SAL Westgate, LLC, a wholly owned subsidiary of the offering company (the "Project Company"). The PPM and Term Sheet state that the Project Company "currently owns the rights and title to a property located at the intersection of Jefferson Boulevard and Gateway Drive in West Sacramento, California," and the plan was to "develop the Property and construct, lease and operate (and eventually sell) a 170 unit, 205 bed assisted living and memory care facility, in the City of West Sacramento, California."

166.   The PPM and Term Sheet identify the management of the offering company, SAL Westgate. Summerplace Management, LLC is the general partner. PDC Capital is identified as controlling Summerplace Management, LLC.

167.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Westgate project:

    a.    "Proceeds from this Offering, except for all Administration Fees, will be loaned to the Project Company to fund the purchase of the land as well as some of the components of the Development."

    b.    "The total development budget for the Development is approximately US $27.5 million and will be financed by approximately US$5 million funded by the subscription proceeds of this Offering (the "EB-5 Loan" or "EB-5 Loans"), proceeds from debt financing (see "Financing of Development") which is approximately US $19 million (See table below), and an owner contribution of approximately $3.5 million."

168.   For the SAL Westgate offering, the PPM and Term Sheet represent that

the General Partner had already made a $3.5 million capital contribution: "At the date of this Memorandum, the Partnership has one General Partner(s) who have contributed a total of (See attached Term Sheet) for its interest in the Partnership." The Term Sheet then listed the General Partner's contribution as $3.5 million.

169.   The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

a.   "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  The Administration Fee shall not be returned to the Limited Partner.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner(s)."

b.   "Any remuneration paid by the Partnership to the General Partner(s) pursuant to the Limited Partnership Agreement shall be paid out of Administration fees, loan interest proceeds, or through dividends paid from the Project Company to the Partnership as its parent, so as to comply with USCIS requirements."

c.   "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the

Partnership may pay compensation and fees to the General Partner(s), officers, employees, agents, the Regional Center (once it is approved) and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber or dividends received from the Project Company.  Thereafter, these fees may only be taken from any interest received by the Partnership on the Loan to the Project Company and dividends paid to the Partnership by the Project Company."

170.   The PPM also represents that the General Partners were fiduciaries: "Each General Partner(s) are accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

171.   The Subscription Agreement for Limited Partnership Units of SAL Westgate, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

172.   The Subscription Agreement for SAL Westgate identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account (the "Escrow Account") established pursuant to an escrow agreement (the "Escrow Agreement").  The Subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the satisfaction of the terms

41

of the Escrow Agreement."

173.   The Subscription Agreement for SAL Westgate repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

174.   The Escrow Agreement similarly provides that the Capital Contribution would be used by the SAL Westgate partnership: "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent shall release one hundred percent (100%) of the Subscription Price and Administration Fee to the account of SAL [Westgate], when the prospective investor has been accepted and approved by the Partnership."

175.   In fact, Defendants Francisco, PDC Capital, and SAL Westgate did not use the investors' capital contributions as represented.

176.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and SAL Westgate materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

177.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and SAL Westgate materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### Summerplace at Sarasota Offering

178.   During the period from September 2015 through December 2016, Defendants raised at least $12.051 million in Capital Contributions and Administration Fees from investors in the Summerplace at Sarasota offering.

179.   Defendant Summerplace at Sarasota raised capital contributions of $11

million from investors.  Of that amount, only about $4.9 million was paid to the Project LLC, and the remaining $6.1 million was misappropriated and diverted to other projects and/or PDC Capital and Francisco.

180.   Defendant PDC Capital provided offering documents to prospective investors concerning the Summerplace at Sarasota offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of Summerplace at Sarasota, LP dated June 25, 2015 ("PPM"); a Subscription Agreement for Limited Partnership Units of Summerplace at Sarasota, LP; and an Escrow Agreement, Subscriber to Summerplace at Sarasota, LP.

181.   Francisco approved the offering documents for the Summerplace at Sarasota offering before they were provided to prospective investors.

182.   The PPM and Term Sheet state that the offering was for a maximum of 60 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

183.   The PPM states that offers were "made only by the delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities to Accredited Investors pursuant to Regulation S under the Securities Act and applicable securities laws...."

184.   The PPM represents the purpose of the offering was to raise funds to make loans to Summerplace at Sarasota, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM and Term Sheet state that the Project Company "currently owns the rights to purchase a property located at 5710 Draw Lane, Sarasota, Florida (the "Property"), consisting of approximately 14 acres of land," and the plan was to "develop, construct, lease and operate (and eventually sell) a 294 units [sic] assisted living, memory care, independent living facility (the "Project") in Sarasota, Florida."

185.   The PPM and Term Sheet identify the management of the offering company, Summerplace at Sarasota, as FDC Partners Management, Inc., a newly

formed company with no operating history, formed to manage the partnership and oversee the development of the Project.

186.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Westgate project:

      a.    "The Partnership shall have all of the power and authority granted under the Act to a Delaware limited partnership to engage in all activities incidental to the Business, including, but not limited to financing the Project Company with qualifying EB-5 investments. ... The Limited Partnership's Loan shall be a loan from the Partnership to the Project Company evidenced by a promissory note from the Project Company to the Partnership ("Promissory Note")."

      b.    "The total project costs for the development are approximately US $77,900,000.00.  This costs [sic] will be financed by:  approximately US$30,000,000 million [sic] funded by the subscription proceeds of this Offering (the "EB-5 Loan"); proceeds from debt financing (see "Financing the Development") that are approximately US $38,650,000.00 (See table below); $9,250,000.00 land and entitlement."

187.   For the Summerplace at Sarasota offering, the PPM and Term Sheet represent that the General Partner had already made a $9.25 million capital contribution:  "At the date of this Memorandum, the Partnership has General Partner, or an affiliate, who has contributed (See attached Term Sheet) for its interest in the Partnership."  The Term Sheet then states that the "General Partner or its affiliates Capital Contribution" was "$9,250,000.00 (Nine Million Two Hundred Fifty Thousand)."

188.   The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such

remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

    a.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  Under no circumstances shall the Administration Fee be returned to the Subscriber.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner."

    b.    "Any remuneration paid by the Partnership to the General Partner pursuant to the Partnership Agreement shall be paid out of Administration Fees or Limited Partnership's Loan interest proceeds so as to comply with USCIS requirements."

    c.    The section titled Expenses includes a provision for a Partnership Management Fee, which provides in part: "The Partnership Management Fee shall be derived from any interest payments received by the Partnership as well as Administration Fees paid by investors.  In no circumstance shall the Partnership Management Fee be derived from any funds received from investors using the EB-5 option to enter the United States.  The Partnership Management Fee shall not exceed one percent of the Limited Partnership Interests amount annually."

    d.    The section titled Expenses includes a provision for Organization and Offering Expenses; Placement Fees, which provides: "U.S. immigration laws prohibit the payment of organizational, offering expenses and placement fees from the minimum capital commitment under the Immigration Investor Regional Center Program.  In order to subscribe for limited partnership interest, a subscriber must pay an additional Administration Fee.  Except as provided below and in the

Limited Partnership Agreement, the Partnership does not anticipate payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership will pay the Administration Fee received from each Subscriber to American Immigration Law Center, to be held in escrow and to be available for the Partnership to withdraw, in order to pay certain offering expenses including but not limited to organizational, marketing, migration agents compensation, and placement fees."

e.      "The subscription proceeds in escrow (inclusive of Administration Fees) will be delivered directly to the Partnership's corporate account and be available for use by the Partnership at its discretion."

189.   The PPM also represents that the General Partner is a fiduciary.  "The General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner is obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

190.   The Subscription Agreement for Limited Partnership Units of Summerplace at Sarasota, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

191.   The Subscription Agreement for Summerplace at Sarasota identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price, Administration Fee, and the subscription documents tendered by a prospective Limited Partner will be deposited in an escrow account ("Escrow

Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The Subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

192.   The Subscription Agreement for Summerplace at Sarasota repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

193.   The Escrow Agreement similarly provides that the Capital Contribution would be used by the Summerplace at Sarasota partnership: "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from the Subscriber, the Escrow Agent shall, following receipt thereof, release one hundred percent (100%) of the Subscription Price and the entire Administration Fee to the account of the Partnership when the prospective investor has been accepted and approved by the Partnership."

194.   In fact, Defendants Francisco, PDC Capital, and Summerplace at Sarasota did not use the investors' capital contributions as represented.

195.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and Summerplace at Sarasota materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

196.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and Summerplace at Sarasota materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### Summerplace at Clearwater Offering

197.   During the period from August 2015 through September 2015, Defendants raised at least $550,000 in Capital Contributions and Administration Fees from one investor in the Summerplace at Clearwater offering.

198.   Defendant PDC Capital provided offering documents to prospective investors concerning the Summerplace at Clearwater offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of Summerplace at Clearwater, LP dated August 6, 2015 ("PPM"); a Subscription Agreement for Limited Partnership Units of Summerplace at Clearwater, LP; and an Escrow Agreement, Subscriber to Summerplace at Clearwater, LP.

199.   Francisco approved the offering documents for the Summerplace at Clearwater offering before they were provided to prospective investors.

200.   The PPM and Term Sheet state that the offering was for a maximum of 16 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

201.   The PPM states that offers were "made only by the delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities to Accredited Investors pursuant to Regulation S under the Securities Act and applicable securities laws...."

202.   The PPM represents the purpose of the offering was to raise funds to make loans to Summerplace at Clearwater, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM and Term Sheet state that the Project Company "currently owns the rights to purchase a property located at 1515 S. Highland Avenue (Pinellas County), in Clearwater, Florida (the "Property"), consisting of approximately 5,46 [sic] acres of land," and the plan was to "develop, construct, lease and operate (and eventually sell) a 136 units [sic] assisted living and memory care facility (the "Project") in Clearwater, Florida."

203.   The PPM and Term Sheet identify FDC Partners Management, Inc., a newly formed company with no operating history, as the manager of Summerplace at Clearwater.

204.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Westgate project:

a.     "The Partnership shall have all of the power and authority granted under the Act to a Delaware limited partnership to engage in all activities incidental to the Business, including, but not limited to financing the Project Company with qualifying EB-5 investments. ... The Limited Partnership's Loan shall be a loan from the Partnership to the Project Company evidenced by a promissory note from the Project Company to the Partnership ("Promissory Note")."

b.     "The total project costs for the development are approximately US $21,497,679.00.  This costs [sic] will be financed by:  approximately US$8,000,000 million [sic] funded by the subscription proceeds of this Offering (the "EB-5 Loan"); proceeds from debt financing (see "Financing the Development") that are approximately US $11,348,000.00 (See table below); $2,149,679.00 land and entitlement."

205.   For the Summerplace at Clearwater offering, the PPM and Term Sheet represent that the General Partner had already made a $2,149,679.00 capital contribution:  "At the date of this Memorandum, the Partnership has General Partner, or an affiliate, who has contributed (See attached Term Sheet) for its interest in the Partnership."  The Term Sheet then states that the "General Partner or its affiliates Capital Contribution" was "$2,149,679.00 (Two Million One Hundred Fourty [sic] Nine Thousand and Six Hundred Seventy Nine)."

206.   The PPM and Term Sheet represent that the $500,000 subscription price

49

would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

      a.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  Under no circumstances shall the Administration Fee be returned to the Subscriber.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner."

      b.    "Any remuneration paid by the Partnership to the General Partner pursuant to the Partnership Agreement shall be paid out of Administration Fees or Limited Partnership's Loan interest proceeds so as to comply with USCIS requirements."

      c.    The section titled Expenses includes a provision for a Partnership Management Fee, which provides in part: "The Partnership Management Fee shall be derived from any interest payments received by the Partnership as well as Administration Fees paid by investors.  In no circumstance shall the Partnership Management Fee be derived from any funds received from investors using the EB-5 option to enter the United States.  The Partnership Management Fee shall not exceed one percent of the Limited Partnership Interests amount annually."

      d.    The section titled Expenses includes a provision for Organization and Offering Expenses; Placement Fees, which provides: "U.S. immigration laws prohibit the payment of organizational, offering expenses and placement fees from the minimum capital commitment under the Immigration Investor Regional Center Program.  In order to subscribe for limited partnership interest, a subscriber must pay an

additional Administration Fee.  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the Partnership will pay the Administration Fee received from each Subscriber to American Immigration Law Center, to be held in escrow and to be available for the Partnership to withdraw, in order to pay certain offering expenses including but not limited to organizational, marketing, migration agents compensation, and placement fees."

  e. "The subscription proceeds in escrow (inclusive of Administration Fees) will be delivered directly to the Partnership's corporate account and be available for use by the Partnership at its discretion."

207. The PPM also represents that the General Partner is a fiduciary.  "The General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner is obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

208. The Subscription Agreement for Limited Partnership Units of Summerplace at Clearwater, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

209. The Subscription Agreement for Summerplace at Clearwater identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price, Administration Fee, and the subscription documents tendered by a

prospective Limited Partner will be deposited in an escrow account ("Escrow Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The Subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

210.   The Subscription Agreement for Summerplace at Clearwater repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

211.   The Escrow Agreement similarly provides that the Capital Contribution would be used by the Summerplace at Clearwater partnership:  "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from the Subscriber, the Escrow Agent shall, following receipt thereof, release one hundred percent (100%) of the Subscription Price and the entire Administration Fee to the account of the Partnership when the prospective investor has been accepted and approved by the Partnership."

212.   In fact, Defendants Francisco, PDC Capital, and Summerplace at Clearwater did not use the investors' capital contributions as represented.

213.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and Summerplace at Clearwater materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

214.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and Summerplace at Clearwater materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the

investors' capital contribution.

## Summerplace at Correll Palms Offering

215.   During the period from July 2015 through July 2016, Defendants raised at least $1.655 million in Capital Contributions and Administration Fees from investors in the Summerplace at Correll Palms offering.

216.   Defendant PDC Capital provided offering documents to prospective investors concerning the Summerplace at Correll Palms offering.  The offering documents included a Confidential Private Placement Memorandum with attached Term Sheet of Summerplace at Correll Palms, LP dated July 27, 2015 ("PPM"); a Subscription Agreement for Limited Partnership Units of Summerplace at Correll Palms, LP; and an Escrow Agreement, Subscriber to Summerplace at Correll Palms, LP.

217.   Francisco approved the offering documents for the Summerplace at Correll Palms offering before they were provided to prospective investors.

218.   The PPM and Term Sheet state that the offering was for a maximum of 20 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

219.   The PPM states that offers were "made only by the delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities to Accredited Investors pursuant to Regulation S under the Securities Act and applicable securities laws...."

220.   The PPM represents the purpose of the offering was to raise funds to make loans to Summerplace at Correll Palms, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM and Term Sheet state that the partnership is "a single purpose entity which was formed solely and exclusively for the purposes of: (a) acquiring the real property located at 1220 North Washington Ave., Titusville, Florida or an alternative location (see below) (the "Land"); (b) developing the Land into an independent living, assisted living and/or memory care

facility (the "Facility"); (c) obtaining one or more loans to finance the construction, development and operation of the Facility; and (d) operating the Facility."

221.   The PPM and Term Sheet identify FDC Partners Management, Inc., a newly formed company with no operating history, as the manager of the offering company, Summerplace at Correll Palms.

222.   The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the SAL Westgate project:

  a.   "The Partnership shall have all of the power and authority granted under the Act to a Delaware limited partnership to engage in all activities incidental to the Business, including, but not limited to financing the Project Company with qualifying EB-5 investments. ... The Limited Partnership's Loan shall be a loan from the Partnership to the Project Company evidenced by a promissory note from the Project Company to the Partnership ("Promissory Note")."

  b.   "The total development budget for the development is approximately US $27,372,537 and will be financed by approximately US$10 million funded by the subscription proceeds of this Offering (the "EB-5 Investment" or "EB-5 Investments"); proceeds from debt financing (see "Financing the Development") which is approximately US $14,635,283 (See table below), and an owner equity contribution of approximately US$2,737,254."

223.   The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

  a.   "The Administration Fee is in addition to the cost of each Class A Limited Partnership Unit and shall not be considered in determining

the value of the Class A Limited Partnership Unit.  The
Administration Fee shall be used to pay various expenses of the
Partnership, in the discretion of the General Partner(s)."

b.      "Any remuneration paid by the Partnership to the General
Partner(s) pursuant to the Partnership Agreement shall be paid out of
Administration fees, or through distributions paid from the Project
Company to the Partnership as its parent, so as to comply with
USCIS requirements."

c.      The section titled Compensation and Fees includes a provision for
a Partnership Management Fee, which provides in part:  "The
Partnership Management Fee shall be derived from any payments
received by the Partnership as well as Administration Fees paid by
investors.  In no circumstance shall the Partnership Management Fee
be derived from any funds received from investors using the EB-5
option to enter the United States.  The Partnership Management Fee
shall not exceed one percent of the Limited Partnership Interests
amount annually."

d.      The section titled Organizational and Offering Expenses;
Placement Fees states: "U.S. immigration laws prohibit the payment
of organizational, offering expenses and placement fees from the
minimum capital commitment under the Immigration Investor
Regional Center Program.  In order to subscribe for Class A Limited
Partnership Units, a subscriber must pay an additional Administration
Fee.  Except as provided below and in the Partnership Agreement, the
Partnership does not anticipate payment of compensation and fees to
any General Partner, officer, Affiliate or any relative of any of the
foregoing in connection with the Offering.  In connection with the
Offering, the Partnership will pay the Administration Fee received

from each Subscriber to American Immigration Law Center, to be held in escrow and to be available for the Partnership to withdraw, in order to pay certain offering expenses including but not limited to organizational, marketing, migration agents compensation, and placement fees."

224.   The PPM also represents that the General Partner is a fiduciary.  "Each General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its (their) managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

225.   The Subscription Agreement for Limited Partnership Units of Summerplace at Correll Palms, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

226.   The Subscription Agreement for Summerplace at Correll Palms identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price, Administration Fee, and the subscription documents tendered by a prospective Limited Partner will be deposited in an escrow account ("Escrow Account") pursuant to the attached escrow agreement ("Escrow Agreement").  The Subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

227.   The Subscription Agreement for Summerplace at Correll Palms repeats

the representation in the PPM concerning the use of the entire $500,000 capital contribution: "The entire amount of the Capital Contribution for each Unit will be invested in the Partnership to further the purpose of the Partnership."

228.   The Escrow Agreement similarly provides that the Capital Contribution would be used by the Summerplace at Correll Palms partnership: "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from the Subscriber, the Escrow Agent shall, following receipt thereof, release the Subscription Price and the entire Administration Fee to the account of the Partnership when the prospective investor has been accepted and approved by the Partnership."

229.   In fact, Defendants Francisco, PDC Capital, and Summerplace at Correll Palms did not use the investors' capital contributions as represented.

230.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and Summerplace at Correll Palms materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

231.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and Summerplace at Correll Palms materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

**TRC Tucson Offering**

232.   During the period from September 2014 through September 2016, Defendants raised at least $8.24 million in Capital Contributions and Administration Fees from investors in the TRC Tucson offering.

233.   Defendant PDC Capital provided offering documents to prospective investors concerning the TRC Tucson offering.  The offering documents included a

Confidential Private Placement Memorandum with attached Term Sheet of TRC Tucson, LP dated September 23, 2014 ("PPM"); a Subscription Agreement for Class A Limited Partnership Units of TRC Tucson, LP; and an Escrow Agreement, Subscriber to TRC Tucson, LP.

234.   Francisco approved the offering documents for the TRC Tucson offering before they were provided to prospective investors.

235.   The PPM and Term Sheet state that the offering was for a maximum of 18 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $50,000 per limited partnership unit.

236.   The PPM states that offers were "made only by the delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities to Accredited Investors pursuant to Regulation S under the Securities Act and applicable securities laws...."

237.   The PPM represents the purpose of the offering was to raise funds to make loans to SET Real CO, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM and Term Sheet state that the partnership is "a single purpose entity which was formed solely and exclusively for the purposes of: (a) acquiring the real property located at 2040 N. Wilmot Road, Tucson, Arizona or an alternative location (see below) (the "Land"); (b) developing the Land into a transitional rehabilitation center (the "Facility"); (c) obtaining one or more mortgage loans to finance the construction, development and operation of the Facility; and (d) operating the Facility."

238.   The PPM and Term Sheet identify the general partners of TRC Tucson as Summerplace Management, LLC and Sante GP Tucson, LLC.  PDC Partners Management, Inc. is identified as the manager of Summerplace Management.  Francisco is identified as the President of PDC Partners Management and the Chief Executive Officer of Summerplace Management.

239.   The PPM and Term Sheet represent that the proceeds of the $500,000

subscription price would be used solely to develop the TRC Tucson project: "The total development budget for the development is approximately US $24,000,000 and will be financed by approximately US$9.0 million funded by the subscription proceeds of this Offering (the "EB-5 Investment" or "EB-5 Investments"); proceeds from debt financing (see "Financing the Development") which is approximately US $13,000,000 (See table below), and an owner equity contribution of approximately US$2,000,000."

240.    The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

   a.      "The Administration Fee is in addition to the cost of each Class A Limited Partnership Unit and shall not be considered in determining the value of the Class A Limited Partnership Unit.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner(s)."

   b.      "Any remuneration paid by the Partnership to the General Partner(s) pursuant to the Partnership Agreement shall be paid out of Administration fees, or through distributions paid from the Project Company to the Partnership as its parent, so as to comply with USCIS requirements."

   c.      The section titled Compensation and Fees states:  "Except as provided below and in the Partnership Agreement, the Partnership does not anticipate payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  The Partnership will reimburse Summerplace and its affiliates for all reasonable expenses, costs and fees paid or incurred by it in connection with the Offering of the

Class A Limited Partnership Units, including consultant, legal, accounting and other fees and disbursements, promotional expenses, travel, printing and other expenses reasonably incurred, up to a maximum aggregate amount of $50,000, as provided in the Partnership Agreement. After the Offering, the Partnership may pay compensation and fees to the General Partner(s), officers, employees, agents and other persons for their services to the partnership if paid from the Administration Fee received from each subscriber or distributions received from the Partnership Subsidiaries."

241.   The PPM also represents that the General Partner is a fiduciary. "Each General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership. In general, the General Partner(s) are obligated to perform its (their) managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

242.   The Subscription Agreement for Limited Partnership Units of TRC Tucson, LP required the investor to acknowledge receipt of the PPM. Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

243.   The Subscription Agreement for TRC Tucson identifies the $500,000 Subscription Price and the separate $50,000 Administration Fee. With regard to deposit of funds from the investor, the Subscription Agreement states: "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account (the "Escrow Account") established with (the "Escrow Agreement"). The subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Class A Limited Partner will

be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership."

244.   The Subscription Agreement for TRC Tucson repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

245.   The Escrow Agreement similarly provided that the Capital Contribution would be used by the TRC Tucson partnership: "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent shall, following receipt thereof, and by the written instruction of TRC or the General Partner of TRC, release one hundred percent (100%) of the Subscription Price and Administration Fee to the account of TRC in accordance with the Subscription Agreement and the related Private Placement Memorandum."

246.   In fact, Defendants Francisco, PDC Capital, and TRC Tucson did not use the investors' capital contributions as represented.

247.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and TRC Tucson materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

248.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, and TRC Tucson materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

### **The Clear Currents West LP Offering**

249.   During the period from January 2014 through December 2014, Defendants raised at least $1.99 million in Capital Contributions and Administration

61

Fees from investors in the Clear Currents West offering.

250.   Defendant PDC Capital provided offering documents to prospective investors concerning the Clear Currents West offering.  The offering documents included a Confidential Private Placement Memorandum of Clear Currents West, LP dated October 22, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Clear Currents West, LP; and an Escrow Agreement, Subscriber to Clear Currents West, LP.

251.   Francisco approved the offering documents before they were provided to prospective investors.

252.   The PPM states that the offering was for a maximum of 10 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

253.   The PPM states that offers were "made only by the delivery of this Memorandum and in a manner which meets the requirements for a non-public offering of securities to Accredited Investors pursuant to Regulation S under the Securities Act and applicable securities laws ...."

254.   The PPM represents the purpose of the offering was to raise funds to make loans to Clear Currents West, LLC, a wholly owned subsidiary of the offering company (the "Project Company").  The PPM states that the "Project Company currently is in the process of leasing land located at 4801 Feather River Boulevard, Oroville, California."  The PPM states:  "The industrial facility, which is located in a free enterprise zone and heavy duty corridor, will be built out and renovated for use as a production facility for Clear Currents environmentally friendly agriculture and cleaning products."

255.   The PPM identifies Clear Currents West, LLC as the general partner of the offering company, Clear Currents West.  PDC Capital is listed as the majority owner of Clear Currents West, LLC.  In addition, several individual employees of Clear Currents West were identified as part of the management.

256.    The PPM and Term Sheet represent that the proceeds of the $500,000 subscription price would be used solely to make loans to the Project Company for the purpose of developing the Clear Currents West project:

      a.    "Proceeds from this Offering, except for all Administrative fees, will be loaned to the Project Company to fund the build out and renovation of the facility as well as some of the initial operational costs."

      b.    "The total development budget for the development is approximately US $12 million and will be financed by approximately US$12 million funded by the subscription proceeds of this Offering (the "Loan" or "Loans"), proceeds and an owner contribution of approximately $7 million."

257.    The PPM and Term Sheet represent that the $500,000 subscription price would not be used to pay fees and expenses of the partnership, and that any such remuneration to the General Partner would be paid only from the $50,000 Administration Fee paid by each investor:

      a.    "The Administration Fee is in addition to the cost of each Limited Partnership Unit and shall not be considered in determining the value of the Limited Partnership Unit.  The Administration Fee shall be returned to the Limited Partner if the investor's I-526 petition has been finally deniled [sic] by USCIS.  The Administration Fee shall be used to pay various expenses of the Partnership, in the discretion of the General Partner(s)."

      b.    "Any remuneration paid by the Partnership to the General Partner(s) pursuant to the Limited Partnership Agreement shall be paid out of Administration fees, loan interest proceeds, or through dividends paid from the Project Company to the Partnership as its parent, so as to comply with USCIS requirements."

c.      "Compensation and Fees:  Except as provided below and in the Limited Partnership Agreement, the Partnership does not anticipate the payment of compensation and fees to any General Partner, officer, Affiliate or any relative of any of the foregoing in connection with the Offering.  In connection with the Offering, the partnership will pay the Administration Fee received from each Subscriber to Attorney M. Thomassen, to be held in escrow and to be available for the Partnership to withdraw, in order to pay for certain offering expenses and immigration services.  After the Offering, the Partnership may pay compensation and fees to the General Partner, officers, employees, agents, the Regional Center (once it is approved) and other persons for their services to the Partnership if paid from the Administration Fee received from each subscriber or dividends received from the Project Company.  Thereafter, these fees may only be taken from any interest received by the Partnership on the Loan to the Project Company and any dividends paid to the Partnership by the Project Company."

258.   The PPM also represents that the General Partners are fiduciaries: "Each General Partner(s)s [sic] are accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the Partnership.  In general, the General Partner(s) are obligated to perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Partnership and the Limited Partners, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances."

259.   The Subscription Agreement for Limited Partnership Units of Clear Currents West, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that

they received and reviewed the PPM.

260.   The Subscription Agreement for Clear Currents West identifies the $500,000 Subscription Price and the separate $45,000 Administration Fee.  With regard to deposit of funds from the investor, the Subscription Agreement states:  "The Subscription Price tendered by a prospective Limited Partner will be deposited in an escrow account (the "Escrow Account") established with (the "Escrow Agreement").  The subscription Price for that prospective Limited Partner, the amount of Capital Contribution, and the Administration Fee paid by such Limited Partner will be released to the Partnership upon the acceptance of the Prospective Investor as a Limited Partner of the Partnership."

261.   The Subscription Agreement for Clear Currents West repeats the representation in the PPM concerning the use of the entire $500,000 capital contribution:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

262.   The Escrow Agreement for Clear Currents West also provides that all the funds would go the offeror:  "Upon the Escrow Agent receiving the Subscription Price and Administration Fee from Subscriber, the Escrow Agent shall, following receipt thereof, release the Subscription Price and Administration Fee to the account of Clear Currents in accordance with the Subscription Agreement and the related Private Placement Memorandum."

263.   In fact, Defendants Francisco, PDC Capital, and Clear Currents West did not use the investors' capital contributions as represented.

264.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, and Clear Currents West materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

265.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses

of Francisco, Defendants Francisco, PDC Capital, and Clear Currents West materially misled investors that their compensation would be limited to the administration fees, and omitted material information concerning the use of the investors' capital contribution.

## Caffe Primo Management 101 Offering

266.   During the period from April 2013 through December 2013, Defendants raised at least $1.54 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management offering.

267.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management offering.  The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management, LP dated February 27, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

268.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

269.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

270.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partners that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and

successfully completing the required immigration procedures.  The Qualifying Investment will be loaned to the Project Company (Caffe Primo 101 LLC, [sic] which is to build and operate a restaurant in California."

271.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and all appeals and options have been exhausted."

272.   The PPM states:  "The Capital Contribution Amount tendered by a prospective investor will be held in the Escrow Account until the second unit is sold. The Capital Contribution Amount of each prospective investor will then be released from the non-interest bearing Escrow Account to the Limited Partnership."

273.   The PPM identifies the management of the offering company, Caffe Primo Management, as Caffe Primo International and Primo Hospitality Group Management, Inc.  Caffe Primo 101, LLC is identified as a wholly-owned subsidiary of Caffe Primo Management, LP.

274.   The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used.  The PPM identifies four categories for use of the $1.5 million Capital Contribution:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate and Administration, and (IV) $500,000 payable to Caffe Primo International.

275.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

276.   The PPM also represents that the General Partners are fiduciaries: "Under California law, a general partner of a limited partnership is accountable to the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is

required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partners which are set forth in the Limited Partnership Agreement."

277.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management, LP required the investor to acknowledge receipt of the PPM. Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

278.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management, LP instructed the prospective investor to mail all original documents to PDC Capital.

279.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 101, LLC,** a California limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

280.   The Subscription Agreement provides:  "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership.  The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

281.   The Subscription Agreement provides:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

282.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor.  Francisco signed the Subscription Agreements for

68

Caffe Primo Management (Caffe Primo 101) investors, accepting the subscription on behalf of Caffe Primo Management, LP.

283.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management (Caffe Primo 101) did not use the investors' capital contributions as represented.

284.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management (Caffe Primo 101) materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

285.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management (Caffe Primo 101) materially misled investors that their entire capital contribution would be used for the Caffe Primo 101 project.

### Caffe Primo Management 102 Offering

286.   During the period from September 2013 through November 2013, Defendants raised at least $1.09 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 102 offering.

287.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 102 offering. The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 102, LP dated March 11, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 102, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

288.   Francisco approved the offering documents before they were provided to prospective investors. The back cover of the PPM is emblazoned with the logo of PDC Capital.

289.   The PPM states that the offering was for a maximum of 2 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

290.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment"). The Qualifying Investment is one of the job-creating opportunities developed by the General Partners that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21. Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures. The Qualifying Investment will be loaned to the Project Company which is to build and operate a restaurant in California."

291.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and all appeals and options have been exhausted."

292.   The PPM states: "The Capital Contribution Amount tendered by a prospective investor will be held in the Escrow Account until the second unit is sold. The Capital Contribution Amount of each prospective investor will then be released from the non-interest bearing Escrow Account to the Limited Partnership."

293.   The PPM identifies the management of the offering company, Caffe Primo Management 102, as Caffe Primo International, and a non-voting general partner, Primo Hospitality Group Management, Inc.

294.   The PPM states, in a section titled "Other Proceeds," that "Primo Hospitality Group Management, Inc. will contribute Five Hundred Thousand Dollars (USD $500,000)."

295.   The PPM includes a "Use of Proceeds" section that provided a general

outline for how the proceeds shall be used.  The PPM identified five categories for
use of the $1.5 million Capital Contribution:  (I) Build out and Launch; (II) Legal
and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support
(5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo
International.

296.   The PPM provides that the subscription proceeds would be placed in
escrow, and upon acceptance of by the Limited Partnership, "The Capital
Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit
will be released to the Limited Partnership and, subsequently loaned to the Project
Company."

297.   The PPM also represents that the General Partners are fiduciaries:
"Under Delaware law, a general partner of a limited partnership is accountable to the
limited partners as a fiduciary, which means that a general partner has the duties of
loyalty and due care to the limited partnership and the other partners and is required
to exercise good faith and integrity with respect to partnership affairs, all as set forth
the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and
obligations of, and limitations on, the General Partners which are set forth in the
Limited Partnership Agreement."

298.   The Subscription Agreement for Limited Partnership Units of Caffe
Primo Management, LP required the investor to acknowledge receipt of the PPM.
Each investor who subscribed signed a Subscription Agreement and acknowledged
that they received and reviewed the PPM.

299.   The Subscription Agreement for Limited Partnership Units of Caffe
Primo Management 102, LP instructed the prospective investor to mail all original
documents to PDC Capital.

300.   The Subscription Agreement states:  "The Partnership has been formed
for the purpose of investing in Qualifying Investments under the EB-5 Immigration
Investor Program.  This investment is referred to in this Agreement and the

Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment." The Partnership will invest the Qualifying Investment in **Caffe Primo 102, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

301. The Subscription Agreement provides: "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership. The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

302. The Subscription Agreement provides: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

303. The Subscription Agreement has a signature line for the Partnership to accept a prospective investor. Francisco signed the Subscription Agreements for Caffe Primo 102 investors, accepting the subscription on behalf of Caffe Primo Management 102, LP.

304. The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 102 recites that the escrow agent was authorized "to release the relevant Subscriber Investment Monies to be immediately wired to the account of the Company for the investment in theEB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

305. In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 102 did not use the investors' capital contributions as represented.

306. By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 102 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

307.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 102 materially misled investors that their entire capital contribution would be used for the Caffe Primo 102 project.

### Caffe Primo Management 103 Offering

308.   During the period from February 2014 through September 2014, Defendants raised at least $1.635 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 103 offering.

309.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 103 offering.  The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 103, LP dated August 9, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 103, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

310.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

311.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

312.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to

take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures.  The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

313.   The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 103, LLC, a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D. The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

314.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and all appeals and options have been exhausted."  The PPM further states:  "PDC Capital Group, LLC will maintain $500,000 in a trust account for the express purposes of providing potential refunds. If a refund is paid from the trust account, PDC will restore funds in the trust account within thirty (30) days.  The account will remain funded until all I-526 petitions have been approved."

315.   The PPM states:  "The Capital Contribution Amount tendered by a prospective investor will be held in the Escrow Account until the second unit is sold. The Capital Contribution Amount of each prospective investor will then be released from the non-interest bearing Escrow Account to the Limited Partnership."

316.   The PPM identifies the management of the offering company, Caffe Primo Management 103, as Caffe Primo International, of which PDC Capital Group has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

317.   The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

318.   The PPM includes a "Use of Proceeds" section that provided a general

outline for how the proceeds shall be used.  The PPM identifies five categories for use of the $1.8 million Capital Contribution:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

319.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

320.   The PPM also represents that the General Partners are fiduciaries: "Under California law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

321.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 103, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

322.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 103, LP instructed the prospective investor to mail all original documents to PDC Capital.

323.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the

Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment." The Partnership will invest the Qualifying Investment in **Caffe Primo 103, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

324.   The Subscription Agreement provides: "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership. The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

325.   The Subscription Agreement provides: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

326.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor. Francisco signed the Subscription Agreements for Caffe Primo 103 investors, accepting the subscription on behalf of Caffe Primo Management 103, LP.

327.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 103 recites that the escrow agent was authorized "to release the relevant Subscriber Investment Monies to be immediately wired to the account of the Company for the investment in theEB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

328.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 103 did not use the investors' capital contributions as represented.

329.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 103 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

330.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 103 materially misled investors that their entire capital contribution would be used for the Caffe Primo 103 project.

### Caffe Primo Management 104 Offering

331.   During the period from January 2014 through July 2014, Defendants raised at least $1.635 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 104 offering.

332.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 104 offering. The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 104, LP dated August 9, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 104, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

333.   Francisco approved the offering documents before they were provided to prospective investors. The back cover of the PPM is emblazoned with the logo of PDC Capital.

334.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

335.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment"). The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21. Qualified prospective investors are able to

take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures.  The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

336.    The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 104, LLC a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D. The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

337.    The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and the investor has received a denial decision from the Administrative Appeals Office."  The PPM states that the investor had two options if the I-526 application was denied:  (1) choose to remain an investor and "reap all financial benefits that they are entitled to receive," or (2) get a full refund of their $545,000 original Capital Contribution and Administration Fee.

338.    The PPM identifies the management of the offering company, Caffe Primo Management 104, as Caffe Primo International, of which PDC Capital Group has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

339.    The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

340.    The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used.  The PPM identifies five categories for use of the $1.8 million Capital Contribution:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

341.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

342.   The PPM also represents that the General Partners are fiduciaries: "Under Delaware law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

343.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 104, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

344.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 104, LP instructed the prospective investor to mail all original documents to PDC Capital.

345.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 104, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

346.   The Subscription Agreement provides:  "The subscription Price for that

prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership. The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

347.   The Subscription Agreement provides: "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

348.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor. Francisco signed the Subscription Agreements for Caffe Primo 104 investors, accepting the subscription on behalf of Caffe Primo Management 104, LP.

349.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 104 recites that the escrow agent was authorized to "release the relevant Subscriber Investment funds to be wired to the account of the Company upon the acceptance and approval of the Partnership of the prospective investor as a Limited Partner for the investment in the EB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

350.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 104 did not use the investors' capital contributions as represented.

351.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 104 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

352.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 104 materially misled investors that their entire capital contribution

would be used for the Caffe Primo 104 project.

### Caffe Primo Management 105 Offering

353.   During the period from January 2014 through March 2015, Defendants raised at least $1.635 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 105 offering.

354.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 105 offering.  The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 105, LP dated August 9, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 105, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

355.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

356.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

357.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures. The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

358.   The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 105, LLC a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D. The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

359.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and the investor has received a denial decision from the Administrative Appeals Office."  The PPM stated that the investor had two options if the I-526 application was denied:  (1) choose to remain an investor and "reap all financial benefits that they are entitled to receive," or (2) get a full refund of their $545,000 original Capital Contribution and Administration Fee.

360.   The PPM identifies the management of the offering company, Caffe Primo Management 105, as Caffe Primo International, of which PDC Capital Group has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

361.   The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

362.   The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used.  The PPM identified five categories for use of the $1.8 million Capital Contribution:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

363.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project

Company."

364.   The PPM also represents that the General Partners are fiduciaries: "Under Delaware law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

365.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 105, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

366.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 105, LP instructed the prospective investor to mail all original documents to PDC Capital.

367.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 105, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

368.   The Subscription Agreement provides:  "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership.  The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

369.   The Subscription Agreement provides:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

370.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor.  Francisco signed the Subscription Agreements for Caffe Primo 105 investors, accepting the subscription on behalf of Caffe Primo Management 105, LP.

371.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 105 recites that the escrow agent was authorized to "release the relevant Subscriber Investment funds to be wired to the account of the Company upon the acceptance and approval of the Partnership of the prospective investor as a Limited Partner for the investment in the EB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

372.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 105 did not use the investors' capital contributions as represented.

373.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 105 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

374.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 105 materially misled investors that their entire capital contribution would be used for the Caffe Primo 105 project.

### Caffe Primo Management 106 Offering

375.   During the period from April 2014 through December 2014, Defendants raised at least $1.635 million in Capital Contributions and Administration Fees from

investors in the Caffe Primo Management 106 offering.

376.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 106 offering.  The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 106, LP dated August 9, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 106, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

377.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

378.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

379.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures.  The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

380.   The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 106, LLC a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D.

The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

381.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and the investor has received a denial decision from the Administrative Appeals Office."  The PPM stated that the investor had two options if the I-526 application was denied:  (1) choose to remain an investor and "reap all financial benefits that they are entitled to receive," or (2) get a full refund of their $545,000 original Capital Contribution and Administration Fee.

382.   The PPM identifies the management of the offering company, Caffe Primo Management 106, as Caffe Primo International, of which PDC Capital Group has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

383.   The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

384.   The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used.  The PPM identifies five categories for use of the $1.8 million capital:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

385.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

386.   The PPM also represents that the General Partners are fiduciaries: "Under Delaware law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and

the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

387.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 106, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

388.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 106, LP instructed the prospective investor to mail all original documents to PDC Capital.

389.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 106, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

390.   The Subscription Agreement provides:  "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership.  The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

391.   The Subscription Agreement provides:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

392.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor.  Francisco signed the Subscription Agreements for

Caffe Primo 106 investors, accepting the subscription on behalf of Caffe Primo Management 106, LP.

393.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 106 recites that the escrow agent was authorized to "release the relevant Subscriber Investment funds to be wired to the account of the Company upon the acceptance and approval of the Partnership of the prospective investor as a Limited Partner for the investment in the EB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

394.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 106 did not use the investors' capital contributions as represented.

395.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 106 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

396.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 106 materially misled investors that their entire capital contribution would be used for the Caffe Primo 106 project.

**Caffe Primo Management 107 Offering**

397.   During the period from December 2013 through July 2015, Defendants raised at least $1.59 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 107 offering.

398.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 107 offering. The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 107, LP dated August 9, 2013 ("PPM"); a Subscription

Agreement for Limited Partnership Units of Caffe Primo Management 107, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

399.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

400.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

401.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures. The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

402.   The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 107, LLC a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D. The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

403.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and the investor has received a denial decision from the Administrative Appeals Office."  The PPM states that the investor

had two options if the I-526 application was denied:  (1) choose to remain an investor and "reap all financial benefits that they are entitled to receive," or (2) get a full refund of their $545,000 original Capital Contribution and Administration Fee.

404.   The PPM identifies the management of the offering company, Caffe Primo Management 107, as Caffe Primo International, of which PDC Capital Group has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

405.   The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

406.   The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used.  The PPM identifies five categories for use of the $1.8 million capital:  (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

407.   The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

408.   The PPM also represents that the General Partners are fiduciaries: "Under Delaware law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act.  This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

409.   The Subscription Agreement for Limited Partnership Units of Caffe

Primo Management 107, LP required the investor to acknowledge receipt of the PPM.  Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

410.   The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 107, LP instructed the prospective investor to mail all original documents to PDC Capital.

411.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 107, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

412.   The Subscription Agreement provides:  "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership.  The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

413.   The Subscription Agreement provides:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

414.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor.  Francisco signed the Subscription Agreements for Caffe Primo 107 investors, accepting the subscription on behalf of Caffe Primo Management 107, LP.

415.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 107 recites that the escrow agent was authorized to "release the relevant Subscriber Investment funds to be wired to the account of the Company upon the acceptance

and approval of the Partnership of the prospective investor as a Limited Partner for the investment in the EB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

416.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 107 did not use the investors' capital contributions as represented.

417.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 107 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

418.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 107 materially misled investors that their entire capital contribution would be used for the Caffe Primo 107 project.

### Caffe Primo Management 108 Offering

419.   During the period from August 2014 through December 2015, Defendants raised at least $1.635 million in Capital Contributions and Administration Fees from investors in the Caffe Primo Management 108 offering.

420.   Defendant PDC Capital provided offering documents to prospective investors concerning the Caffe Primo Management 108 offering.  The offering documents included a 2013 Confidential Private Placement Memorandum of Caffe Primo Management 108, LP dated August 9, 2013 ("PPM"); a Subscription Agreement for Limited Partnership Units of Caffe Primo Management 108, LP; and an Attorney Trust Fund Escrow Agreement (EB-5), Caffe Primo.

421.   Francisco approved the offering documents before they were provided to prospective investors.  The back cover of the PPM is emblazoned with the logo of PDC Capital.

422.   The PPM states that the offering was for a maximum of 3 limited partnership units at a "Subscription Price" of $500,000 per unit and with an "Administration Fee" of $45,000 per limited partnership unit.

423.   The PPM states that the offering had a specific purpose: "The Limited Partnership was formed for the purpose of making the qualifying investment described below (the "Qualifying Investment").  The Qualifying Investment is one of the job-creating opportunities developed by the General Partner(s) that meets the requirement of 'the EB-5 Investor Program' for obtaining permanent Untied States (the "U.S.") residency status for qualifying foreign individuals, their spouses, and unmarried children under the age of 21.  Qualified prospective investors are able to take advantage of the EB-5 Program by investing in the Limited Partnership and successfully completing the required immigration procedures.  The Qualifying Investment will be loaned to the Project Company, which is to build and operate a restaurant in California."

424.   The PPM states:  "The Qualifying Investment of the Limited Partnership will be loaned to Caffe Primo 108, LLC a Delaware limited liability company (the "Project Company") pursuant to the terms and conditions set forth in the Loan Documents (the "Loan Documents") attached to this Memorandum as Attachment D. The proceeds of the Qualifying Investment will be used by the Project Company to build and operate a restaurant in California."

425.   The PPM states that the investment "will be REFUNDABLE in the event an investor's I-526 application is denied and the investor has received a denial decision from the Administrative Appeals Office."  The PPM states that the investor had two options if the I-526 application was denied:  (1) choose to remain an investor and "reap all financial benefits that they are entitled to receive," or (2) get a full refund of their $545,000 original Capital Contribution and Administration Fee.

426.   The PPM identifies the management of the offering company, Caffe Primo Management 108, as Caffe Primo International, of which PDC Capital Group

has a 50% ownership and Global Restaurant Partners, Inc. has a 50% ownership, and a non-voting general partner, Primo Hospitality Group Management, Inc.

427.    The PPM states, in a section titled "Other Proceeds," that "PDC Capital Group, LLC will contribute Three Hundred Thousand Dollars (USD $300,000)."

428.    The PPM includes a "Use of Proceeds" section that provided a general outline for how the proceeds shall be used. The PPM identifies five categories for use of the $1.8 million capital: (I) Build out and Launch; (II) Legal and Fees; (III) Corporate Operations and Administration, and (IV) Ongoing support (5 Years) and Professional Services, and (V) $500,000 payable to Caffe Primo International.

429.    The PPM provides that the subscription proceeds would be placed in escrow, and upon acceptance of by the Limited Partnership, "The Capital Contribution Amount of Five Hundred Thousand Dollars (USD $500,000) per Unit will be released to the Limited Partnership and, subsequently loaned to the Project Company."

430.    The PPM also represents that the General Partners are fiduciaries: "Under Delaware law, a general partner of a limited partnership is accountable to the limited partnership and the limited partners as a fiduciary, which means that a general partner has the duties of loyalty and due care to the limited partnership and the other partners and is required to exercise good faith and integrity with respect to partnership affairs, all as set forth the [sic] Partnership Act. This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the General Partner(s) which are set forth in the Limited Partnership Agreement."

431.    The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 108, LP required the investor to acknowledge receipt of the PPM. Each investor who subscribed signed a Subscription Agreement and acknowledged that they received and reviewed the PPM.

432.    The Subscription Agreement for Limited Partnership Units of Caffe Primo Management 108, LP instructed the prospective investor to mail all original

documents to PDC Capital.

433.   The Subscription Agreement states:  "The Partnership has been formed for the purpose of investing in Qualifying Investments under the EB-5 Immigration Investor Program.  This investment is referred to in this Agreement and the Partnership's Confidential Private Placement Memorandum as the "Qualifying Investment."  The Partnership will invest the Qualifying Investment in **Caffe Primo 108, LLC**, a Delaware limited liability company (the "Project Company") under the EB-5 Program." (emphasis in original).

434.   The Subscription Agreement provides:  "The subscription Price for that prospective Limited Partner, the amount of the Capital Contribution, will be released to the Partnership upon the acceptance of the subscriber as a Limited Partner of the Partnership.  The released funds may then be used by the Partnership in accordance with the Partnership Agreement."

435.   The Subscription Agreement provides:  "The entire amount of the Capital Contribution for each Unit will be loaned to the Project Company by the Partnership."

436.   The Subscription Agreement has a signature line for the Partnership to accept a prospective investor.  Francisco signed the Subscription Agreements for Caffe Primo 108 investors, accepting the subscription on behalf of Caffe Primo Management 108, LP.

437.   The Attorney Trust Fund Escrow Agreement (EB-5) for Caffe Primo 108 recites that the escrow agent was authorized to "release the relevant Subscriber Investment funds to be wired to the account of the Company upon the acceptance and approval of the Partnership of the prospective investor as a Limited Partner for the investment in the EB-5 project and the relevant Subscriber's Administration Fee as the Attorney may direct."

438.   In fact, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 108 did not use the investors' capital contributions as represented.

439.   By misappropriating a substantial portion of the investors' capital contributions, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 108 materially misled investors that the entire capital contribution would be used to fund the specific project, provide the promised returns, and create the requisite ten jobs.

440.   By misappropriating a substantial portion of the investors' capital contributions to pay the business expenses of PDC Capital and the personal expenses of Francisco, Defendants Francisco, PDC Capital, CPI, and Caffe Primo Management 108 materially misled investors that their entire capital contribution would be used for the Caffe Primo 108 project.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against all Defendants)

441.   The SEC realleges and incorporates by reference paragraphs 1 through 440 above.

442.   As alleged above, Defendants engaged in a scheme to defraud investors by making false statements concerning the limitation on use of proceeds, as well as the manner in which proceeds would be used, including engaging in transactions designed to obscure the diversion of funds, to enrich themselves at the expense of investors.

443.   As alleged above, Defendants obtained money by means of untrue statements of material fact concerning the use of proceeds of the Assisted Living LPs, Clear Currents West LP and Caffe Primo LPs offering.

444.   As alleged above, Defendants engaged in transactions and a course of business obtained money from investors by means of false statements in the PPMs about the use of investor proceeds and limitations on the use of investors' capital contributions.

445.   At all relevant times, Defendant Francisco acted with scienter to enrich
himself at the expense of the defrauded investors.  In the alternative, Defendant
Francisco was negligent.  Defendant Francisco's state of mind is imputed to the
entities he controlled, including PDC Capital, CPI, and the Assisted Living LPs,
Clear Currents West LP, and Caffe Primo LPs.

446.   By engaging in the conduct described above, Defendants Francisco and
PDC Capital, with regard to the Assisted Living LPs and Clear Currents West LP,
directly or indirectly, in the offer or sale of securities, and by the use of means or
instruments of transportation or communication in interstate commerce or by use of
the mails directly or indirectly:  (a) employed devices, schemes, or artifices to
defraud; (b) obtained money or property by means of untrue statements of a material
fact or by omitting to state a material fact necessary in order to make the statements
made, in light of the circumstances under which they were made, not misleading; and
(c) engaged in transactions, practices, or courses of business which operated or would
operate as a fraud or deceit upon the purchaser.

447.   By engaging in the conduct described above, Defendants Francisco and
PDC Capital, and CPI, with regard to the Caffe Primo LPs, directly or indirectly, in
the offer or sale of securities, and by the use of means or instruments of transportation
or communication in interstate commerce or by use of the mails directly or indirectly:
(a) employed devices, schemes, or artifices to defraud; (b) obtained money or
property by means of untrue statements of a material fact or by omitting to state a
material fact necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and (c) engaged in
transactions, practices, or courses of business which operated or would operate as a
fraud or deceit upon the purchaser.

448.   Each of the Defendants knew, or was reckless in not knowing, that he or
it employed devices, schemes and artifices to defraud.  Each of the Defendants knew,
or was reckless or negligent in not knowing, that he or it obtained money or property

by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

449.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rules 10b-5(a) and 10b-5(c) Thereunder**

**(against all Defendants as primary violators, and,**

**alternatively, against Francisco as a control person**

**under Section 20(a) of the Exchange Act)**

450.   The SEC realleges and incorporates by reference paragraphs 1 through 440 above.

451.   As alleged above, Defendants engaged in a scheme to defraud investors by making false statements concerning the limitation on use of proceeds, as well as the manner in which proceeds would be used, including engaging in transactions designed to obscure the diversion of funds, to enrich themselves at the expense of investors.

452.   As alleged above, Defendants engaged in transactions and a course of business obtained money from investors by means of false statements in the PPMs about the use of investor proceeds and limitations on the use of investors' capital contributions.

453.   At all relevant times, Defendant Francisco acted with scienter to enrich

himself at the expense of the defrauded investors.  Defendant Francisco's state of mind is imputed to the entities he controlled, including PDC Capital, CPI, and the Assisted Living LPs, Clear Currents West LP, and Caffe Primo LPs.

454.   By engaging in the conduct described above, Defendants Francisco and PDC Capital, with regard to the Assisted Living LPs and Clear Currents West LP, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

455.   By engaging in the conduct described above, Defendants Francisco and PDC Capital, and CPI, with regard to the Caffe Primo LPs, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

456.   Each of the defendants knew, or was reckless in not knowing, that he or it employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

457.   By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

458.   Defendant Francisco was a control person of Defendants PDC Capital and CPI because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.  Accordingly,

pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant

Francisco is liable to same extent as each of these Defendants for those Defendants'

violations of Section 10(b) and Rules 10b-5(a) and (c) thereunder.

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5(b) Thereunder**

**(against Defendants Francisco, PDC Capital, the Assisted Living LPs (SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson), Clear Currents West LP, and the Caffe Primo LPs (Caffe Primo Management, and Caffe Primo Management 102-108) as primary violators, and, alternatively, against Francisco as a control person under Section 20(a) of the Exchange Act)**

459.   The SEC realleges and incorporates by reference paragraphs 1 through 440 above.

460.   As alleged above, Defendants obtained money by means of untrue statements of material fact concerning the use of proceeds of the Assisted Living LPs and Caffe Primo LPs offering.

461.   At all relevant times, Defendant Francisco acted with scienter to enrich himself at the expense of the defrauded investors.  Defendant Francisco's state of mind is imputed to the entities he controlled, including PDC Capital, and the Assisted Living LPs, Clear Currents West LP, and Caffe Primo LPs.

462.   Defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson, Clear Currents West LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management

104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

463.   Defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson, Clear Currents West LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and each of them, knew, or was reckless in not knowing, that he or it made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

464.   By engaging in the conduct described above, defendants Francisco, PDC Capital, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson, Clear Currents West LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108 violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

465.   Defendant Francisco was a control person of defendants, PDC Capital,

SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson, Clear Currents West LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108  because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant Francisco is liable to same extent as each of the entity Defendants for those Defendants' violations of Section 10(b) and Rule 10b-5(b) thereunder.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

### (Defendants Francisco and PDC Capital)

466.   The SEC realleges and incorporates by reference paragraphs 1 through 440 above.

467.   Defendants Francisco and PDC Capital provided substantial assistance to the Assisted Living LPs, the Caffe Primo LPs, and Clear Currents West LP in their violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in connection with the securities offerings of the Assisted Living LPs, the Caffe Primo LPs, and Clear Currents West LP.

468.   Be engaging in the conduct described above, Defendants Francisco and PDC Capital aided and abetted, and unless enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(b), pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily and permanently enjoining Defendants Francisco, PDC Capital, CPI, SAL Assisted Living, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Phoenix, SAL Westgate, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, TRC Tucson, Clear Currents West LP, Caffe Primo Management, Caffe Primo Management 102, Caffe Primo Management 103, Caffe Primo Management 104, Caffe Primo Management 105, Caffe Primo Management 106, Caffe Primo Management 107, and Caffe Primo Management 108, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## III.

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily and permanently enjoining Defendants Francisco, PDC Capital, CPI, SAL Carmichael, SAL Citrus Heights, SAL Kern Canyon, SAL Assisted Living, SAL Westgate, SAL Phoenix, TRC Tucson, Summerplace at Sarasota, Summerplace at Clearwater, Summerplace at Correll Palms, Clear Currents West LP, Caffe Primo Management, LP, Caffe Primo Management 102, LP, Caffe Primo Management 103, LP, Caffe Primo Management

104, LP, Caffe Primo Management 105, LP, Caffe Primo Management 106, LP, Caffe Primo Management 107, LP, Caffe Primo Management 108, LP, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, from, directly or indirectly, participating in the offer or sale of any security which constitutes an investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service ("USCIS").

## IV.

Issue in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the funds and assets of Defendants; ordering repatriation of any funds or assets transferred overseas; prohibiting each of the Defendants from destroying documents; permitting expedited discovery, ordering accountings by each of the Defendants, and appointing a receiver over the Defendant entities.

## V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, and to repatriate any funds or assets they caused to be sent overseas.

## VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

1

## VIII.

2      Grant such other and further relief as this Court may determine to be just and

3 necessary.

4

5 Dated:  May 4, 2017

6                                                    */s/ John B. Bulgozdy*
                                                     John B. Bulgozdy
7                                                    Adrienne D. Gurley
                                                     Attorneys for Plaintiff
8                                                    Securities and Exchange Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 4, 2017, I caused to be served the document entitled **FIRST AMENDED COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 4, 2017                                    /s/ John B. Bulgozdy

John B. Bulgozdy

**SEC v. Emilio Francisco, et al.**
**United States District Court—Central District of California**
**Case No. 8:16-cv-02257-CJC-DFM**

## SERVICE LIST

Christopher L. Walters **(served by CM/ECF only)**
Walters Law Group
1901 First Avenue, 2nd Floor
San Diego, CA 92101
Email: clw@walters-law-group.com
*Attorney for Defendant Emilio Francisco*

David R. Zaro, Esq. **(served by CM/ECF only)**
Edward G. Fates, Esq. **(served by CM/ECF only)**
Allen Matkins Leck Gamble Mallory & Natsis LLP
865 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017
Email: dzaro@allenmatkins.com
*Attorney for Receiver Thomas A. Seaman, Receiver for: Defendant PDC Capital Group, LLC; Defendant Caffe Primo International, Inc.; Defendant SAL Assisted Living, LP; Defendant SAL Carmichael, LP; Defendant SAL Citrus Heights, LP; Defendant SAL Kern Canyon, LP; Defendant SAL Phoenix, LP; Defendant SAL Westgate, LP; Defendant Summerplace at Clearwater, LP; Defendant Summerplace at Correll Palms, LP; Defendant Summerplace at Sarasota, LP; Defendant TRC Tucson, LP; Defendant Clear Currents West, LP; Defendant Caffe Primo Management, LP; Defendant Caffe Primo Management 102, LP; Defendant Caffe Primo Management 103, LP; Defendant Caffe Primo Management 104, LP; Defendant Caffe Primo Management 105, LP; Defendant Caffe Primo Management 106, LP; Defendant Caffe Primo Management 107, LP; Defendant Caffe Primo Management 108, LP*