1
2
3
4
5
6
7
8
9
10
11
12

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO (BAR NO. 124334)
PETER A. GRIFFIN (BAR NO. 306201)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
          pgriffin@allenmatkins.com

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
EDWARD G. FATES (BAR NO. 227809)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone:  (619) 233-1155
Fax:  (619) 233-1158
E-Mail:  tfates@allenmatkins.com

Attorneys for Receiver
THOMAS A. SEAMAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

      v.

EMILIO FRANCISCO; PDC CAPITAL
GROUP, LLC; CAFFE PRIMO
INTERNATIONAL, INC.; SAL
ASSISTED LIVING, LP; SAL
CARMICHAEL, LP; SAL CITRUS
HEIGHTS, LP; SAL KERN CANYON,
LP; SAL PHOENIX, LP; SAL
WESTGATE, LP; SUMMERPLACE
AT SARASOTA, LP; SUMMERPLACE
AT CLEARWATER, LP;
SUMMERPLACE AT CORRELL
PALMS, LP; TRC TUCSON, LP;
CLEAR CURRENTS WEST, LP;
CAFFE PRIMO MANAGEMENT, LP;
CAFFE PRIMO MANAGEMENT 102,
LP; et al.,

            Defendants.

Case No. 8:16-cv-02257-CJC-DFM

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
MOTION OF RECEIVER,
THOMAS A. SEAMAN, FOR ORDER
ESTABLISHING ALLOWED
CLAIMS; APPROVING OMNIBUS
AND SPECIFIC CLAIM
OBJECTIONS; AND
SUBORDINATION OF
RICHARDSON CLAIMS**

[Notice of Motion and Motion;
Supporting Declaration of Thomas A.
Seaman; and [Proposed] Order submitted
concurrently herewith]

Date:        April 22, 2019
Time:        1:30 p.m.
Ctrm:        7C, 7th Floor
Judge:       Hon. Cormac J. Carney

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................5

II.   RELEVANT PROCEDURAL BACKGROUND..........................................6

III.  CLAIMS ANALYSIS AND PROPOSED TREATMENT OF CLAIMS ........................................................................................7

    A.    Investor Claims ..........................................................................7

    B.    Non-Investor Claims .................................................................8

    C.    Objection to Specific Disputed Non-Investor Claims .......................10

        1.    Objection to WMB Claim..................................................10

        2.    Correll Palms LLC .........................................................13

        3.    Landmark Civil Services, LLC ..........................................13

        4.    Neil Richardson ............................................................14

            (a)    Richardson Was An Insider to The Receivership Entities and Controlled Their Operations..........................................................14

            (b)    Richardson's $2 Million Note and Deed of Trust Were Fraudulent Transfers ...................................17

                (i)    *Constructive Fraudulent Transfer* ......................18

                (ii)    *Actual Fraudulent Transfer* .............................21

            (c)    Mr. Richardson's Claims Are Subject to Equitable Subordination ................................................22

IV.   ARGUMENT ..................................................................................24

    A.    This Court Enjoys Broad Discretion In The Administration Of Claims ..............................................................................24

    B.    The Court Has The Authority And Should Approve The Receiver's Summary Processing Of Claims, The MIMO Calculation And The Proposed Allowed Amount Of Claims .....................................................................................25

V.    CONCLUSION ...............................................................................28

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

Case No.  8:16-cv-02257-CJC-DFM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

CFTC v. Topworth Int'l, Ltd.,
   205 F.3d 1107 (9th Cir. 1999) .................................................................. 25, 26

Donell v. Kowell,
   533 F.3d 762 (9th Cir. 2008) ........................................................................ 18

First Empire Bank-New York v. FDIC,
   572 F.2d 1361 (9th Cir. 1978) ...................................................................... 25

Hansen v. Cramer,
   39 Cal.2d 321 (1952) ...................................................................................... 20

Henry v. Lehman Commercial Paper, Inc. (In re First Alliance
      Mortgage Co.),
   471 F.3d 977 (9th Cir. 2006) ........................................................................ 23

In re Cohen,
   199 B.R. 709 (9th Cir. 1996) ........................................................................ 18

In re Taubman,
   160 B.R. 964 (Bankr. S.D. Ohio 1993) ........................................................ 26

In re Tedlock Cattle Company Inc.,
   552 F.2d 1351 (9th Cir. 1977) ...................................................................... 26

Lundell v. Anchor Constr. Specialists, Inc.,
   223 F.3d 1035 (9th Cir. 2000) ...................................................................... 27

Patterson v. Missler,
   238 Cal.App.2d 759 (1965) ............................................................................ 20

Revere Copper & Brass, Inc. v. Adriance Machine Works, Inc.,
   76 F.2d 876 (2d Cir. 1935) ............................................................................ 27

SEC v. American Board of Trade,
   719 F. Supp. 186 (S.D.N.Y. 1989) ................................................................ 23

SEC v. Capital Consultants, LLC,
   397 F.3d 733 (9th Cir. 2005) .............................................................. 24, 25, 26

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1149549.01/LA

(iii)

Case No.  8:16-cv-02257-CJC-DFM

**Page(s)**

SEC v. Elliot,
  953 F.2d 1560 (11th Cir. 1992) ...................................................................... 25

SEC v. Hardy,
  803 F.2d 1034 (9th Cir. 1986) ................................................................. 24, 25

SEC v. Universal Financial,
  760 F.2d 1034 (9th Cir. 1985) ...................................................................... 24

United States v. Arizona Fuels Corp.,
  739 F.2d 455 (9th Cir. 1984) ............................................................ 23, 25, 26

**Statutes**

Cal. Civ. Code § 3439.04(a)(1) ..................................................................... 21

Cal. Civ. Code § 3439.04(b) .......................................................................... 21

Cal. Civ. Proc. Code § 3439 .......................................................................... 18

Cal. Civ. Proc. Code § 3439.04(a) ................................................................ 18

Cal. Civ. Proc. Code § 3439.04(a)(2) ............................................................ 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Thomas A. Seaman (the "Receiver"), the Court-appointed permanent Receiver for PDC Capital Group, LLC and its subsidiaries and affiliates, (collectively, the "Receivership Entities" or "Entities"), has completed his investigation and analysis of claim forms submitted by investors and others following the claims process previously approved by the Court per the Order Granting Receiver's Motion: (1) Approving Proposed Claim Forms; (2) Setting Claims Bar Date; and (3) Establishing Summary Claims Procedures ("Claim Order").  (Dkt. No. 254.)  By this motion ("Motion") the Receiver requests that the Court approve the allowed amounts for each of the claims set forth on Exhibits "A" and "B" attached to the Declaration of Thomas A. Seaman in Support of Motion for Order Establishing Allowed Claims; Approving Omnibus and Specific Claims Objections; and Subordination of Richardson Claims ("Seaman Decl.") ¶¶ 5-6.  In addition, the Receiver seeks approval to subordinate the claims of Neil Richardson ("Richardson"), if any are allowed, to the payment of all other allowed claims.  Id.

The Receiver has carefully reviewed all of the letters, claim forms and supporting documentation submitted to the Receiver by the EB-5 investors (sometimes, the "Investors") and those claim forms and back-up documentation submitted by non-investor claimants (e.g., trade creditors, vendors, and others that did business with or had claims against the Receivership Entities) (sometimes, the "Non-Investors.")  The Receiver has attempted to verify the amount of each claim, in part, by trying to reconcile the submitted claim amounts with the information contained in the books and records of the Receivership Entities.

The General Information and Instructions that accompanied the Claim Forms mailed to each of the Investors and Non-Investors required that they provide documents to support their claims.  In the case of the Investors, they were not required to submit documentary evidence in support of their claims, unless they

disagreed with amounts reflected in the Notice Letter Regarding Investor Claim ("Investor Letter") sent to each Investor in accordance with the Claim Order. The Non-Investors were obligated to submit evidence with regard to the basis for their claims, such as contracts, invoices, and similar documentation.

The vast majority of Investors accepted the Receiver's statement of their claim as reflected in the Investor Letter. With regard to Non-Investor claims, the Receiver believes that he has successfully resolved all but a few claims, the most significant of which are addressed in detail below. The Receiver respectfully requests that the Court approve the Receiver's recommended treatment of the disputed claims.

This Motion is made solely to define the universe of the claims that will be the subject of the Receiver's proposed distribution plan. Allowance of a claim does not assure payment or any particular treatment under a distribution plan. Based upon recoveries to date, there are not sufficient assets available to pay each Investor's principal claim nor the amounts owed to Non-Investor claimants. The Receiver anticipates that distributions will be less than 10% of the principal amount of allowed claims.

Accordingly, the Receiver requests that the Court grant this Motion and enter an order allowing Investor Claims in the amounts set forth in Exhibit "A" and Non-Investor Claims in the amounts set forth in Exhibit "B". The Receiver also requests the Court grant the Receiver's Motion to subordinate the claim, if any, of Richardson to the payment in full of all other allowed claims.

## II.    RELEVANT PROCEDURAL BACKGROUND.

A permanent receiver for the Receivership Entities was appointed by this Court on January 23, 2017, pursuant to its Preliminary Injunction Against All Defendants ("Appointment Order"). (See Dkt. No. 36.) Pursuant to the terms of the Appointment Order, the Receiver was, among other things, vested with exclusive authority and control over the assets of the Receivership Entities, directed to undertake an investigation and accounting of the Receivership Entities' assets, and

1   empowered to marshal and recover all available assets for the benefit and

2   administration of the Receivership Entities.  On May 4, 2018, the Court entered the

3   Claim Order.  (Dkt. No. 254.)

4   　　　As of the date of this Motion, the Receiver has largely completed his

5   investigation and accounting.  Most of the assets of the Receivership Entities have

6   been sold or abandoned to creditors and the Receiver has pursued all viable claims

7   against third parties.  While the Receiver may recover some additional money from

8   a pending sale transaction and litigation, he has determined that it is now appropriate

9   to conclude the claims process and then make a distribution of the recovered funds

10  to Investors and Non-Investor creditors with allowed claims.

11  　　　The Receiver believes that all Investors and Non-Investor claimants have had

12  a full and fair opportunity to present their claims and have their claims considered

13  by the Receiver and determined by the Court.  Accordingly, the Receiver requests

14  that the Court approve this Motion and the Receiver's recommendations as to

15  allowed claims as set forth on <u>Exhibits "A"</u> and <u>"B"</u>.  <u>Seaman Decl.</u> ¶¶ 5-6.

16  **III.   <u>CLAIMS ANALYSIS AND PROPOSED TREATMENT OF CLAIMS</u>**

17  　　　**A.   Investor Claims.**

18  　　　The Receiver identified 138 unique Investor claims.  <u>Id</u>.  Using the bank

19  statements and other records of the Receivership Entities, the Receiver was able to

20  confirm the amount of each Investor's investment and any refunds or

21  reimbursements.  The Receiver, in accordance with the Claim Order sent the

22  Investor Letter to each potential investor claimant.  The Investor Letter stated the

23  Receiver's proposed allowed claim for each Investor and invited Investors to

24  respond if they disagreed with the Receiver's proposal claim amount.  Through this

25  process the Receiver was able to validate the Investor claims.

26  　　　The Receiver is proposing to allow the Investor claims based upon the

27  amount of money invested by each Investor claimant, less any distribution or refund

28  made to each Investor.  <u>See</u>, <u>Seaman Decl</u>. ¶¶ 5, 7-8, <u>Exhibit "A"</u>.  In other words,

1 | the Receiver is using the so-called "Money In Money Out" or "MIMO" analysis as
2 | to each claimant.

3 |    **B.    Non-Investor Claims.**

4 |    The Receiver reviewed and analyzed claims submitted by each of the Non-
5 | Investor claimants.  In each case, the Receiver looked at the backup documentation
6 | submitted by the claimant as well as the Receivership Entities' records.  Id. at ¶ 9.
7 | The Receiver's proposed treatment of the Non-Investor claims is set forth on
8 | Exhibit "B".  The proposed treatment reflects claim amounts that could be verified
9 | using the company records, as well as contracts, agreements and invoices of trade
10 | creditors, service providers and/or vendors, provided by the claimants.  Id.  The
11 | Receiver also considered whether the services were actually provided and benefitted
12 | the enterprise.  Id.  As with Investor claimants, the Receiver proposes to not allow
13 | any claims for interest, consequential damages, attorneys' fees, and other such
14 | charges or claims unrelated to tangible benefits provided to Receivership Entities.

15 |    The Receiver has compiled his recommendation for the treatment of the Non-
16 | Investor claims in the Non-Investor Claims Summary, attached as Exhibit "B"
17 | hereto.  The Claims Summary identifies:

18 |    • Each claimant;

19 |    • Each claimed amount;

20 |    • The Receiver's proposed allowed amount of each claim; and

21 |    • Information uniquely relevant to each claim, if any.

22 |    In a number of cases, such as the StanShore Trust claim and the Pappas
23 | Arizona and Pappas Gateway claims, the Receiver settled the claims in advance of
24 | filing this Motion by agreement and the obtained a Court order confirming the
25 | settlement.  Aside from those previously satisfied or settled claims, most of the
26 | balance of disputed claims, reflect claims for consequential damages, fees and
27 | claims for which no value was received by the Receivership Entities.

28 |

As reflected in the Non-Investor Claims Summary, the claims fall into the following two general categories:

- Non-Investor Vendor / Trade Creditor Claims:  The Receiver received claims from vendors and other trade creditors (collectively, "Trade Creditors") of the Receivership Entities.  Id. ¶ 10.  The Receiver recommends that the Trade Creditor claims identified in the Non-Investor Claims Summary be allowed in the proposed amounts.  The Receiver requests the Court to approve the Receiver's recommendation to deny claims as also reflected on the Non-Investor Claims Summary. The Receiver has confirmed that all of the proposed allowed Trade Creditor claims reflect goods or services which were of value to the Receivership Entities during the pre-receivership period.  Accordingly, the Receiver recommends that the proposed Trade Creditor claims be allowed in full as stated on Exhibit "B" and paid on the same priority as allowed Investor claims, (on a *pro rata* basis), at such time as the Receiver makes his distribution on allowed claims.  Id.

- Tax Entity Claims:  State and federal taxing entities (collectively, the "Taxing Entities"), submitted claims for pre and post-receivership periods.  The Receiver recommends treating all of the taxing Entities' claims, whether submitted formally or merely as bills for payment, as timely claims, and allowing all such claims in full except as to interest and penalties.  For the reasons identified below, the Receiver also recommends subordinating the Tax Entities' claims until such time as all allowed Investors' and Trade Creditors' claims are paid in full.  Id.

**C.    Objection to Specific Disputed Non-Investor Claims.**

1.    Objection to WMB Claim.

Wallis Murphy Boyington Architects ("WMB") filed 6 Proofs of Claims ("WMB Claims") seeking the total amount of $283,478.74 against the Receiver Entities (collectively the "WMB Claims") as follows:

| | | |
|---|---|---|
| 1. | Orlando-Summerfield Project | $141,404.60 |
| 2. | Correll Palms Project | $3,286.94 |
| 3. | Kissimmee Project | $33,324.43 |
| 4. | Clearwater Project | $51,083.21 |
| 5. | Sarasota Project | $15,083.25 |
| 6. | Sun City Project | $39,296.31 |

Seaman Decl. ¶ 11.

In connection with its claims related to the Orlando-Summerfield Project, WMB, in violation of the Appointment Order, recorded a Claim of Lien seeking $168,404.60 ("WMB Lien Claim"), on April 13, 2017. Id. at ¶ 12. The recording of the WMB Lien Claim was in direct contravention of the prohibition in the Appointment Order against self-help and collections by creditors. See Appointment Order, Section XII. Moreover, the stated amount of the WMB Lien Claim is unsupported and entirely inconsistent with the Proof of Claim submitted under penalty of perjury by WMB concerning the Orlando-Summerfield project. When the Orlando-Summerfield property was sold, the WMB Lien Claim was released from the real property but attached to the sale proceeds pending further order of the Court during the claims process. (See Dkt. No. 293.) The Receiver requests the Court to disallow all 6 of WMB's claims and order that the WMB Lien Claim be released and extinguished as to the proceeds of the Orlando-Summerfield sale.

The Receivership Entities paid $1,121,551 to the WMB prior to the appointment of a Receiver, including $238,000 paid on December 6, 2016, one month prior to the Receiver's appointment. Seaman Decl. ¶ 13. The December 6, 2016, payment to WMB was made using cash raised from secured loans obtained on

four California properties at the direction of KPF.  The payments of $1,121,551 also included retainers of $20,000 for five properties.[1]

Notwithstanding these payments of over $1.2 million, WMB failed and refused to turn over plans and design drawings to the Receiver for use in marketing the Florida projects.  ¶ 14.  It is unclear what value, if any, was received by the Receivership Entities as a result of WMB's work.  Id.  None of the Florida projects were built and there do not appear to have been construction documents prepared which were sufficient to allow for building permits to be issued.  Id.  Having provided no supporting evidence to show that value was received by the Receivership Entities in consideration for the stated amount of each of the WMB Claims, there is no basis to pay the WMB Claims.

Equally important, even if value had been provided, WMB appears to have been overpaid as of the date of the Receiver's appointment.  Seaman Decl., ¶ 15.  Mr. Boyington stated in the July Letter that as of "August 2016…all payments were up to date, and there was no balance owed."  Seaman Decl., ¶ 15, Exhibit "C".  WMB asserts that PDC fell behind on making payments for work performed in the

---

[1]     In a letter dated July 18, 2017 (the "July 18 Letter"), Mr. Boyington refers to the retainers and states that they have not been applied to the unpaid balance.  Seaman Decl., Exhibit "C".  An accounting of the retainers paid is as follows:

| 04/13/2015 | 1029 | Wallis Murphey Boyington Architects, Inc. | Summerplace Dev, LLC-BofA 0863 | 20,000.00 |
| 04/13/2015 | 1030 | Wallis Murphey Boyington Architects, Inc. | Summerplace Dev, LLC-BofA 0863 | 20,000.00 |
| 08/26/2016 | 1022 | Wallis Murphey Boyington Architects, Inc. | SAL Clearwater, LLC-BofA-8299 | 20,000.00 |
| 08/29/2016 | 1015 | Wallis Murphey Boyington Architects, Inc. | SAL Kissimee, LLC-BofA-4449 | 20,000.00 |
| 08/30/2016 | 5017 | Wallis Murphey Boyington Architects, Inc. | Summerplace Dev, LLC-Chase 3255 | 20,000.00 |

fall of 2016 as to the 6 Florida projects.  WMB alleges that those arrearages amounted to $189,481 as of November 30, 2016.  Seaman Decl. ¶ 15, Exhibit "D" (Column 1 – "Amortized Amounts").  As previously noted, WMB received $238,000 in December 2016, which reflects an overpayment of almost $50,000.  Moreover, WMB was holding $100,000 in deposits.  Seaman Decl. ¶ 16, Exhibit "C".

WMB alleges that in December 2016, the parties agreed to convert the pending contracts for the Florida projects to a "flat fee per month basis", creating an entirely new resulting obligation of $679,000.  Seaman Decl. ¶ 16.  Apparently the terms of this new agreement provided that WMB would receive not only $679,000 in flat monthly fees for future work but also $27,000 per month for nine months [$243,000] to cover the above noted arrearage of $189,481.  These agreements were apparently memorialized in a worksheet sent to the Receiver by WMB entitled, "Summerplace Outstanding Balance Summary Thru Feb 10, 2017."  Seaman Decl. ¶ 16, Exhibit "D".

There is no evidence that any work was performed by WMB that would give rise to an obligation to pay a flat fee or other claim based on work performed after August 2016.  In simplest terms, the Receivership Entities were current as of August 2016; WMB received $238,000 in December 2016 for alleged arrearages for work performed in the fall of 2016; and no material work was performed thereafter.  Accordingly, no amounts are owed to WMB.  Seaman Decl. ¶¶ 16-17.  If one accounts for retainers paid to WMB, it appears that the Receivership Entities overpaid WMB by $146,563.76 as follows:

| | |
|---|---|
| Amount owed to WMB as of November 30, 2016 | $189,481.73 |
| Plus:  Additional work performed in 2017 | $1,954.51 |
| Less:  Payment of December 5, 2016 | ($238,000.00) |
| Less:  application of retainer | ($100,000.00) |
| Equals:  Overpayment by PDC to WMB | [$146,563.76] |

1  Id.

2  The Receiver also objects to WMB's claims for payment of any monthly flat
3  fees because no value was received by the Florida projects.  Such claims reflect
4  consequential damages under their alleged contracts in contrast to value received by
5  the Receivership Entities.

6  Accordingly, the Receiver requests the Court to disallow the 6 WMB Claims
7  and order the release of WMB's Claim of Lien.

8  2.  Correll Palms LLC.

9  Correll Palms LLC (the "Seller") has made a claim for $57,619.50.  This
10  claim arises out of or is related to Summerplace at Correll Palms LLC's
11  ("Summerplace") efforts to purchase land and develop an assisted living project in
12  Correll Palms, Florida.  Seaman Decl. ¶ 19.  Pursuant to the purchase and sale
13  agreement, Summerplace paid $700,000 in non-refundable deposits to Seller.
14  Summerplace failed to close in a timely fashion and Seller retained the $700,000 in
15  deposits.

16  There is no basis for a claim by the Seller for an additional $57,619.50 or any
17  other amount.  Id.  As such, the Receiver respectfully request the Court to deny the
18  claim of the Seller.

19  3.  Landmark Civil Services, LLC

20  Landmark Civil Services, LLC ("Landmark") has made a claim for
21  $175,909.30 arising out of an alleged contract between Landmark and Summerplace
22  related to Correll Palms project.  Seaman Decl. ¶ 20.  As noted above, Summerplace
23  paid deposits to the Seller in excess of $700,000 to secure the purchase of the land.
24  The Receivership Entities subsequently defaulted on the purchase and sale
25  agreement, losing the right to purchase the land and the $700,000 deposit.
26  Landmark's claim is purely one for consequential damages.  Id.  The Receivership
27  Entities never owned the property nor is there evidence that Landmark performed

28

work that was of value to the Receivership Entities.  Id.  Accordingly, the Receiver objects to the entirety of Landmark's claim.

### 4.   Neil Richardson.

Neil Richardson was an insider and the president of various Receivership Entities.  Seaman Decl. ¶¶ 21-23.  He filed two proofs of claims:  (1) a $2,200,000 claim in favor of the Richardson Family Trust, arising out of a $2 million promissory note and deed of trust (the "Lien") encumbering the real property and improvements commonly known as SummerPlace at Westgate, located at 2305 Jefferson Blvd., West Sacramento, California (the "Westgate property") (the "Trust Claim"); and (2) a claim for an unspecified amount for services rendered to the Receivership Entities (the "Personal Claim").  Seaman Decl. ¶ 21.  The Personal Claim should be denied in its entirety because there is no stated amount nor any legal or factual basis for the claim.  As detailed below, the Trust Claim arising out of the promissory note and deed of trust should be denied as a fraudulent transfer, no value was received by the Receivership Entities to account for the Trust Claim and Richardson was an insider whose work, at a minimum, facilitated or aided the fraud upon the Investors.  If and only if Richardson's claims are allowed, then they should be equitably subordinated to the payment of all other allowed claims as a result of Richardson's insider status and activities in aiding and abetting the fraud.

### (a)   Richardson Was An Insider to The Receivership Entities and Controlled Their Operations.

By way of background, PDC was structured with PDC Capital Group, LLC as the umbrella holding entity, which wholly owned Summerplace Management, LLC. Seaman Decl. ¶ 22.  In turn, Summerplace Management LLC held a significant portion of interest in each of the underlying EB-5 Investor related projects through separate limited partnership entities.  Individual EB-5 Investor's money would flow to each of the limited partnership entities, in exchange for which the Investors' would receive a small ownership interest in the limited partnerships.  Id.  The

operation of the enterprise for each project was managed through PDC Partners Management, Inc., a separate management company apparently established for that purpose. A brief illustration of PDC's general organization and management structure is depicted below:

The underlying evidence gathered by the Receiver, including documents produced by Richardson in discovery and those he previously filed in other proceedings, demonstrates that Richardson was an insider and member of the PDC organization who was involved in all aspects of its operations. Not only did Richardson receive several hundred thousand dollars in cash but he also appears to have lived off company credit cards; charging over $200,000 to his company credit card. The evidence also shows:



- Richardson began working for PDC in early December 2013 (First Amended Complaint for Damages and Injunctive Relief, (Seaman Decl. ¶ 23, Exhibit E-1; Orange County Superior Court, Case No. 30-2016-00851862-CU-BC-CJC], ¶ 16);
- Richardson held himself out as the "President" of PDC Capital Group, LLC—the umbrella company—and its related entities in negotiations with third parties and in communications with EB-5 Investors. (Id., Exhibit E-2);

- Richardson was elected as the President of PDC Partners Management, Inc., the management company for PDC's EB-5 development projects (Id., Exhibit E-3);

- Organizational charts produced by Richardson indicate he was also the President of Summerplace Management, LLC, the 90% owner of all PDC development projects, and the President of the related entities Summerplace Development, LLC and PDC Capital Partners, LLC (Seaman Decl., Exhibit E-4);

- Richardson was sending, responding to, and copied on numerous PDC internal emails, including an email arranging for a conference call with EB-5 investors and representatives in offices in Shanghai, Beijing, and Xiamen, China (Id., Exhibit E-5);

- Richardson had a close relationship with PDC's former operator, Robert Ferrante, and guaranteed and signed agreements to allow Ferrante to rent an apartment, and Richardson used his credit to facilitate the purchase of a speed-boat and Ferrari for Ferrante's use. (Id., Exhibit E-1);

- Richardson ultimately leveraged his relationship with PDC's former operators, and his prior lawsuit and unliquidated claims against FCM and Chris Miller to hold PDC projects hostage, and ultimately obtained a sweetheart deal from PDC's former operators that was never disclosed to EB-5 Investors; and

- Richardson's deal with PDC's principals provided that he would receive 10% ownership interest in all PDC projects, 10% of any development related fees, a monthly salary of $8,666, and a secured, guaranteed payment of $2 million.  Seaman Decl., Exhibit E-6.

Richardson was not just a third-party advisor or independent contractor, he was intimately involved in all aspects of the Receivership Entities' business.  In his

role as President, he signed agreements, authorized payments, participated in the recruitment of EB-5 Investors, and had close relationships to PDC's operators. Seaman Decl. ¶ 24.  Richardson unjustly leveraged his insider position to extract benefits for himself at the direct expense of EB-5 Investors, including commitments from PDC's former operators to provide Richardson ownership interest in *all* projects, a guaranteed salary, and secured an agreement to be paid $2 million to resolve Richardson's personal disputes with his former partner, Chris Miller and FCM.  (Id.)

Under such circumstances, it would be inherently unjust and inequitable to allow Richardson to retain any claims or to maintain a priority or equal creditor status to other, unknowing victims of the fraudulent enterprise.  Accordingly, Richardson's claims should be denied.  If, and only if, they are allowed, they must be subordinated to all other allowed  Investor and Non-Investor claims.

(b)     Richardson's $2 Million Note and Deed of Trust Were Fraudulent Transfers.

As noted above, the Trust Claim involves a $2 million note and deed of trust (the "Lien") encumbering the Westgate Property.  After the Receiver sold the Westgate Property, per the Order of the Court, the Lien attached to the sale proceeds.

SAL Westgate, LLC ("Westgate LLC") owned the Westgate Property.  In 2015, Richardson, through his family trust, was granted the Lien on the Westgate Property, however, Westgate LLC did not reasonably receive equivalent value in exchange.  Seaman Decl. ¶¶ 25-27.  Rather, the Lien was given to Richardson [the "Family Trust"] by the Receivership Entities as a gift in order to facilitate Richardson's settlement of personal disputes with his former business partner, Christopher Miller, in connection with Richardson's purported investments in Miller's companies, including First Capital Mortgage Properties, LLC ("FCM").  Id. Since Westgate LLC received no value in exchange for the Lien, the transfer is

1  subject to avoidance pursuant to California's Uniform Voidable Transactions Act,

2  Cal. Code Civ. Proc. §§ 3439, et seq. ("CUVTA").

3      Under the CUVTA, there are two types of transfers subject to avoidance and

4  recovery.  Specifically, a transfer is subject to avoidance and recovery when made

5  with (1) actual intent to defraud, or (2) constructive fraudulent intent based on the

6  lack of reasonably equivalent value provided in exchange.  See Cal. Civ. Code

7  § 3439.04(a); see also, Donell v. Kowell, 533 F.3d 762, 770-771 (9th Cir. 2008); In

8  re Cohen, 199 B.R. 709, 715-716 (9th Cir. 1996).  When seeking recovery of funds

9  fraudulently transferred under the CUVTA, "fraud, in the sense of morally culpable

10  conduct, need not be present in either category of fraudulent transfer.  [Rather,] [a]n

11  actually fraudulent transfer could, in principle, occur without genuine fraud."  In re

12  Cohen, 199 B.R. at 716.  Thus, "[t]he focus in the inquiry into the actual intent is on

13  the state of mind of the debtor.  Neither malice nor insolvency are required.

14  Culpability on the part of the dealer transferees is not essential."  Id.

15      The evidence shows that the imposition of the Lien provided no benefit to

16  Westgate LLC and the Lien is subject to avoidance as a constructive or actual

17  fraudulent transfer.

18          *(i)*    *Constructive Fraudulent Transfer*

19      Pursuant to section 3439.04(a)(2) of the CUVTA, a transfer is deemed

20  constructively fraudulent and subject to avoidance where the transferor makes the

21  transfer without receiving reasonably equivalent value in exchange and either:

22      (A) Was engaged or was about to engage in a business or a

23  transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. [or,]

24  (B) Intended to incur, or believed or reasonably should

25  have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

26

27      Here, the Lien encumbering the Westgate Property is subject to avoidance

28  because Westgate LLC received no value in exchange for the encumbrance.  Rather,

the Lien was given to Richardson in order to resolve his prior disputes with Miller and FCM, and to remove a *lis pendens* encumbering property held by a unrelated development project, SummerPlace at Carmichael, located at 7411 Fair Oaks Blvd., Carmichael, CA (the "Carmichael Property").  Seaman Decl. ¶¶ 28-31.  All of the foregoing only benefitted Miller and FCM, not Westgate LLC or its Investors.  (Id., Aug. 5, 2014 Lis Pendens, Sacramento County Doc. No. 20140805.)

The *lis pendens* on the Carmichael Property was recorded by Richardson based on his prior disputes with Miller and FCM.  The Carmichael Property was apparently being developed by FCM, but was later purchased by SAL Carmichael, LLC, ostensibly so SAL Carmichael, LLC could continue the development of the project. (Jul. 11, 2015 Settlement Agreement.)  Importantly, the development of the Summerplace at Carmichael by SAL Carmichael LLC had no relation whatsoever to the development of the Westgate Property.  Seaman Decl. ¶ 35.  Each project was a separate and distinct development project funded by different investors pursuant to the EB-5 Immigrant Investor Visa Program.  The EB-5 Program provides strict guidelines and restrictions on the use of investor funds and a transaction such as this would completely undermine the EB-5 Investors' interests.  Seaman Decl. ¶¶ 34-35.

Notwithstanding the lack of any financial connection between the projects and the lack of any liability owed by PDC to Richardson, the former operators of PDC entered into an agreement with Richardson in 2015 to remove the *lis pendens* against the Carmichael Property.  Id.  Seaman Decl., Exhibit E, Jul. 11, 2015 Settlement Agreement.  Westgate LLC was not even a party to the Settlement Agreement, which was between Richardson and his entities, on the one hand, and PDC and SAL Carmichael, on the other.  (Id.)  The Settlement Agreement provided that the Lien would be placed on the Carmichael Property, however after the Settlement Agreement was signed, PDC's all granted Richardson the Lien on the Westgate Property, to the direct detriment of Westgate LLC and its EB-5 Investors.

1   Indeed, Richardson's own sworn declaration (Dkt. 154, Declaration of Neil

2   Richardson, Feb. 5, 2018, Par.11.) reflects his complete disregard as to the existence

3   of the separate corporate entities and that the Lien was provided solely in exchange

4   for a release of his claims against FCM and the *lis pendens* placed on the

5   Carmichael Property:

> In consideration of the promissory note and the deed of
> trust executed by the President of PDC Capital Group LLC
> (hereinafter "PDC"), I released my claim for $2,000,000
> against FCM Capital which was a partner of PDC and
> Emilio Francisco.  I also release my lien against
> Carmichael property which was another property
> purchased by PDC.

10   Neither PDC nor SAL Carmichael (and certainly not Westgate LLC) owed

11   anything to Richardson at the time the Lien was granted.  Richardson's claims were

12   against Miller/FCM, as Richardson has admitted.  Richardson recorded the *lis*

13   *pendens* against the Carmichael Property because it was owned by FCM at the time.

14   The consideration given by Mr. Richardson for the Lien – the release of claims

15   against Miller/FCM – was entirely for the benefit of Miller and FCM.  The *lis*

16   *pendens* was simply security for those claims – once the underlying claims against

17   FCM were released, the *lis pendens* could have been expunged (the claims

18   supporting it having been released).  Therefore, neither PDC, SAL Carmichael, nor

19   Westgate LLC, received any value in exchange for the Lien.

20   As is well-established in California under the CUVTA, whether reasonably

21   equivalent value was provided is to be determined from the vantage of the

22   transferors' creditors.  See Hansen v. Cramer, 39 Cal.2d 321, 324 (1952) ("What

23   constitutes 'a fair equivalent' or 'a fair consideration' under the Fraudulent

24   Conveyance Act must be determined from the stand point of creditors."); see also,

25   Patterson v. Missler, 238 Cal.App.2d 759, 766 (1965) (citing Hansen).  Here, all of

26   the evidence, including Mr. Richardson's own sworn declaration and signed

27   agreements, demonstrate that Westgate LLC's investors and creditors received *zero*

28   value in exchange for the Lien given to Mr. Richardson.  As Westgate LLC's and its

1  Investors and creditors received no value for the Lien, the lack of reasonably

2  equivalent value prong is clearly met here.

3       Further, at the time the Lien was placed on the Westgate Property in 2015,

4  Westgate LLC owed $4 million in liability to its defrauded EB-5 Investors while

5  holding assets worth, at best, approximately $2.9 million in value.  Westgate LLC's

6  EB-5 Investors are treated as creditors because PDC and Westgate LLC had

7  represented to them that their funds would be used for the development and

8  operation of the Westgate Property, as required by the EB-5 Program.  Instead,

9  however, their funds were commingled with funds raised from Investors in other

10  projects and a substantial portion was used for purposes unrelated to the Westgate

11  Property.  Accordingly, Westgate LLC's liabilities well-exceeded its available assets

12  at the time of the imposition of the Lien, which clearly satisfies the insolvency

13  prong of the Receiver's constructive fraudulent transfer claim.

14                   *(ii)*    *Actual Fraudulent Transfer*

15       Under the actual fraud theory, a transfer is subject to avoidance if the transfer

16  was made "[w]ith actual intent to hinder, delay, or defraud any creditor of the

17  debtor."  Cal. Civ. Code § 3439.04(a)(1).  To find fraudulent intent, courts consider

18  the facts and circumstances underlying the transfer including those factors

19  enumerated in the Section 3439.04(b) as follows: whether the transfer was to an

20  insider, whether the transfer was concealed; the value of consideration given, and

21  whether the debtor was insolvent or would become insolvent post-transfer.

22       Richardson was an insider to PDC and its related entities, including Westgate

23  LLC.  Richardson was president of many Receivership Entities and was intimately

24  involved in the operations of the entities as well as fundraising activities involving

25  EB-5 Investors.  Westgate LLC received no consideration in exchange for the Lien,

26  and the imposition of the Lien for the benefit of Richardson was never disclosed to

27  Westgate LLC's EB-5 Investors.  Westgate LLC was rendered insolvent by the

28

1  transfer as it had liabilities well in excess of its assets at the time the Lien was

2  granted.

3      Richardson was certainly aware that the use of Investor funds in each of the

4  project was restricted per the EB-5 program guidelines and the terms of the offering.

5  That is funds invested in Westgate LLC were to be used solely for the development

6  of the Westgate Property.  The granting of the Lien by Westgate LLC for the benefit

7  of an unrelated project was not permitted and further harmed Westgate LLC's

8  Investors.  In short, the imposition of the Lien substantially encumbered the sole

9  asset available to Westgate LLC to the direct detriment of Westgate LLC's EB-5

10  Investors and creditors, who received no benefit in return.  The only parties who

11  benefitted from this transaction were Richardson and perhaps Miller/FCM.

12      In light of the foregoing, the Receiver requests that the Court find that the

13  Trust Claim is denied as a fraudulent conveyance and that both the Personal Claim

14  and Trust Claim be disallowed based upon Richardson's insider status and the lack

15  of any value received by the Receivership Entities attributed to Richardson's work.

16              (c)    Mr. Richardson's Claims Are Subject to Equitable

17                         Subordination.

18      Richardson submitted two proofs of claim, the Trust Claim and the Personal

19  Claim.  With respect to the Trust Claim, the claim is based entirely on the Lien on

20  the Westgate Property which, as explained above, is subject to avoidance as a

21  fraudulent transfer.

22      The basis for the Personal Claim remains entirely unclear as the claim form

23  failed to provide any description for the claim and simply referred to a copy of a

24  First Amended Complaint for Damages and Injunctive Relief, filed September 21,

25  2016.  As such, the Personal Claim is based on the allegations in a complaint with

26  no supporting evidence.  Richardson failed to present evidence supporting the claim,

27  and the claim is subject to equitable subordination to the payment of all allowed

28

1 claims of other Investors and creditors of the Receivership Entities based on

2 Richardson's status as an insider who was involved in inequitable conduct.

3     The District Court has the power to use "summary procedures in allowing,

4 disallowing, and subordinating claims of creditors . . ." United States v. Arizona

5 Fuels Corp., 739 F.2d 455, 458 (9th Cir. 1984).  The Court has the power to

6 subordinate one claim to another if it finds "the creditor's claim, while not lacking a

7 lawful basis, nevertheless results from inequitable behavior on the part of that

8 creditor."  SEC v. American Board of Trade, 719 F. Supp. 186, 196 (S.D.N.Y.

9 1989).  Equitable subordination is appropriate where a claimant has engaged in

10 inequitable conduct to advantage himself or herself to the disadvantage of other

11 claimants.  See Henry v. Lehman Commercial Paper, Inc. (In re First Alliance

12 Mortgage Co.), 471 F.3d 977, 1006 (9th Cir. 2006).  Equitable subordination is

13 particularly appropriate where the claimant involved is an insider of the debtor.  Id.

14     Here, the evidence shows that Richardson was an insider to the Receivership

15 Entities and its various related companies, including Westgate LLC.  Richardson

16 was President of PDC and many of its affiliated entities, signed contracts on their

17 behalf (including as "President" of numerous entities), and purported to have an

18 ownership interest in the assisted living projects, including Westgate LLC.  Seaman

19 Decl. ¶ 23, Ex. E-1 (First Amended Complaint for Damages and Injunction Relief,

20 ¶¶ 14-22; Dkt. 154, Declaration of Neil Richardson, Feb. 5, 2018.)  Richardson

21 further claims the services he provided included "the acquisition, the engineering,

22 the architect, the environmental studies, land surveyor, market study, and all

23 aspect[s] related to properties under development …."  (Richardson Resp. to Special

24 Interrogatories, Nov. 19, 2018.)  Mr. Richardson was clearly an insider of PDC and

25 its affiliates, including Westgate LLC, and had access to extensive information

26 about PDC and Westgate LLC that was not available to Investors and creditors.

27     Richardson also had a close personal relationship with PDC's former

28 operators.  Richardson helped Robert Ferrante and Emilio Francisco purchase a

1   Ferrari automobile and a yacht under Richardson's name. (<u>Seaman Decl</u>. ¶ 23.)
2   Richardson has admitted that he allowed his credit to be used to fund the "lavish
3   lifestyles" of Francisco and Ferrante. Richardson's conduct reflects a strong bond of
4   trust and friendship with Ferrante, and Francisco.

5        As an insider and personal friend, Richardson took advantage of his position
6   to obtain the Lien on the Westgate Property, purporting to place himself in a
7   superior position to Westgate LLC's Investors and creditors. The conveyance of the
8   Lien transformed Richardson's original, unsecured and unliquidated clams against
9   FCM into a priority, secured lien against valuable real property to the detriment of
10  Westgate LLC's non-insider Investors and creditors. Richardson's role as an insider,
11  his acquisition of the undisclosed Lien, and the resulting harm to Westgate LLC's
12  Investors and creditors demonstrate that his Trust Claim and Personal Claim for
13  general damages are subject to equitable subordination.

14  **IV.**   <u>**ARGUMENT.**</u>

15      **A.**    **This Court Enjoys Broad Discretion In The Administration Of**
16           **Claims.**

17       It is well settled that District Courts supervising federal equity receiverships
18  have broad discretion to adopt Than appropriate procedures to administer the assets
19  of and claims asserted against receivership estates. <u>See</u>, <u>e.g.</u>, <u>SEC v. Capital</u>
20  <u>Consultants, LLC</u>, 397 F.3d 733, 738 (9th Cir. 2005); <u>SEC v. Hardy</u>, 803 F.2d 1034
21  (9th Cir. 1986); <u>SEC v. Universal Financial</u>, 760 F.2d 1034, 1037 (9th Cir. 1985).
22  The Ninth Circuit has explained that:

23          A district court's power to supervise an equity receivership
24          and to determine the appropriate action to be taken in the
25          administration of the receivership is extremely broad. The
26          district court has broad powers and wide discretion to
27          determine the appropriate relief in an equity receivership.
28          The basis for this broad deference to the district court's

1          supervisory role in equity receiverships arises out of the

2          fact that most receiverships involve multiple parties and

3          complex transactions.

4 Capital Consultants, 397 F.3d at 738 (citations omitted); see also CFTC v. Topworth

5 Int'l, Ltd., 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference'

6 to the court's supervisory role, and 'we generally uphold reasonable procedures

7 instituted by the district court that serve th[e] purpose' of orderly and efficient

8 administration of the receivership for the benefit of creditors").  Accordingly, this

9 Court has discretion to approve the claims as recommended here by the Receiver,

10 and the Receiver respectfully requests that it do so.

11        **B.**      **The Court Has The Authority And Should Approve The Receiver's**

12               **Summary Processing Of Claims, The MIMO Calculation And The**

13               **Proposed Allowed Amount Of Claims.**

14       Receivership courts have the general power to employ summary procedures

15 in allowing, disallowing, and subordinating the claims of creditors.  United States v.

16 Arizona Fuels, 739 F.2d 455, 458 (9th Cir. 1984); Hardy, 803 F.2d at 1040

17 (summary proceeding to approve categorization scheme for investors' claims was

18 reasonable; fair notice and a reasonable opportunity to respond was given); SEC v.

19 Elliot, 953 F.2d 1560, 1571 (11th Cir. 1992) (summary claim determinations upheld

20 where claimants cannot demonstrate their rights would have been better protected

21 by an extended proceeding).

22       In overseeing a receivership, the court may "make rules which are practicable

23 as well as equitable."  Hardy at 1039, quoting First Empire Bank-New York v.

24 FDIC, 572 F.2d 1361, 1368 (9th Cir. 1978).  The Receiver requests the Court set the

25 following rules and procedures in the interests of fairly and efficiently administering

26 claims against the receivership estate:

27       First, all claims should be resolved via summary proceedings.  District Courts

28 have the power to use "summary procedures in allowing, disallowing, and

subordinating claims of creditors . . ." United States v. Arizona Fuels Corp., 739 F.2d 455, 458 (9th Cir. 1984). Plenary proceedings to resolve a claim would unduly delay the administration of the case and consume receivership estate resources.

Second, all claims should be calculated using a simple, money-in/money-out formula that limits claims to each investor's net loss from the Receivership Entities. The money-in/money-out or "MIMO" formula has been endorsed by the Ninth Circuit Court of Appeals and other courts in fraud cases where, like here, the assets of the estate are insufficient to satisfy all claims in full. See Capital Consultants, 397 F.3d at 738 (describing a net claim calculation as "an administratively workable and equitable method of allocating the limited assets of the receivership"); Topworth, 205 F.3d at 1116; In re Tedlock Cattle Company Inc., 552 F.2d 1351, 1354 (9th Cir. 1977); In re Taubman, 160 B.R. 964, 980-82 (Bankr. S.D. Ohio 1993).

Disputes over the use of MIMO often arise in the context of a distribution plan. Here, the Receiver believes that establishing the amount of claims using MIMO is an issue of fundamental fairness. In this case, Investor money was often commingled such that Investor funds placed in project accounts based upon the defendants needs for cash at the time rather than the terms of the agreements with the Investors. Even if cash were placed into the appropriate account, the defendants then used Investor's money on an as needed basis for personal and business uses wholly unrelated to the project that was the subject of Investor's investment. In other words, the money was used for projects that needed funding regardless of whether the Investor had any interest in the subject project. Therefore, allowed investor claims should be based upon the Receiver's analysis as to the amounts invested by and distributed to investors in the Receivership Entities.

As to non-investor claimants, the Receiver proposes that all claims for accrued or unpaid interest, late fees, attorney fees, consequential damages or lost

1  profits arising from non-payment, and punitive or tort damages be disallowed.  This
2  proposed treatment places Investors and Non-Investors on similar footing limiting
3  all claims to what amounts to their losses of principal verses consequential damages.

4      Third, as in a bankruptcy case, it should be a claimant's burden to establish a
5  valid claim against the receivership estate.  See Lundell v. Anchor Constr.
6  Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000); Revere Copper &
7  Brass, Inc. v. Adriance Machine Works, Inc., 76 F.2d 876, 878 (2d Cir. 1935)
8  (claimants failed to sustain burden of proving claims against receivership).  Here,
9  creditors who failed to provide sufficient support and whose claims could not be
10  validated via company records should be disallowed.

11      The Receiver is aware that some investors or creditors may assert that their
12  claims should be allowed in full and paid out of the specific investment or project in
13  which they participated.  In light of the commingling of funds by the defendants,
14  such a claims scheme would reward the lucky few to the detriment of the many.
15  Use of the MIMO approach attempts to fairly address the unfairness resulting from
16  the timing of each investment.

17      Overall, these rules promote an orderly, fair, and efficient administration of
18  claims.  Indeed, considering the commingling of funds and the amount available for
19  distribution, the proposed rules and procedures for determining claims are fair and
20  equitable to all claimants.  Without them, it would not be possible to determine
21  claims in a consistent, fair, and efficient manner and to distribute receivership estate
22  funds to those with allowed claims.

23      Thus, as described above, the Receiver requests only the amounts invested by
24  and distributed to Investors in the Receivership Entities be used to determine
25  Investors' allowed claim amounts and that all additional amounts claimed by
26  Investors be disallowed.  Similarly, the Receiver proposes that any claims for
27  accrued or unpaid interest, late fees, attorneys' fees, consequential damages or lost

28

profits arising from non-payment, and punitive or tort damages asserted by Non-Investor Claimants be disallowed.

## V.    CONCLUSION.

For the foregoing reasons, the Receiver respectfully requests that this Court enter an order:

1.    Granting the Motion in its entirety;

2.    Approving allowance of claims as set forth on Exhibits "A" and "B" to the Seaman Declaration;

3.    Denying the WMB Claims;

4.    Releasing the WMB Lien upon the Orlando-Summerfield sale proceeds;

5.    Denying the Correll Palms LLC and Landmark claims;

6.    Denying Richardson's Personal Claim and Trust Claim;

7.    Releasing the Lien on the sales proceeds from the sale of the Westgate Property; and

8.    Subordinating Richardson's claims, if any are allowed, to the payment in full of all other claims.

Dated:  March 6, 2019

ALLEN MATKINS LECK GAMBLE
    MALLORY & NATSIS LLP
DAVID R. ZARO

By:_____/s/____David R. Zaro_____
    DAVID R. ZARO
    Attorneys for Permanent Receiver
    THOMAS A. SEAMAN

# PROOF OF SERVICE

*Securities and Exchange Commission v. Emilio Francisco; PDC Capital Group, LLC, et al.,*
USDC, Central District of California – Case No. 8:16-cv-02257-CJC-DFM

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 865 S. Figueroa Street, Suite 2800, Los Angeles, California 90017-2543.

On **March 6, 2019**, I caused to be served the document entitled: **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER, THOMAS A. SEAMAN, FOR ORDER ESTABLISHING ALLOWED CLAIMS; APPROVING OMNIBUS AND SPECIFIC CLAIM OBJECTIONS; AND SUBORDINATION OF RICHARDSON CLAIMS** on all the parties to this action addressed as stated on the attached service list.

☒ **OFFICE MAIL**:    By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with the firm's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **OVERNIGHT DELIVERY**:    I deposited in a box or other facility regularly maintained by express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document(s) in sealed envelope(s) or package(s) designed by the express service carrier, addressed as indicated on the attached service list, with fees for overnight delivery paid or provided for.

☐ **HAND DELIVERY**:    I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **ELECTRONIC MAIL**:    By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING**: By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX**: By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on **March 6, 2019** at Los Angeles, California.

/s/  *Martha Diaz*
_____
Martha Diaz

# SERVICE LIST

*Securities and Exchange Commission v. Emilio Francisco; PDC Capital Group, LLC, et al.,*
USDC, Central District of California – Case No. 8:16-cv-02257-CJC-DFM

Michael S. Provenzale, Esq.                      Attorneys for Claimant
Lowndes, Drosdick, Doster, Kantor & Reed P.A.    WALLIS MURPHY BOYINGTON
215 N. Eola Drive                                ARCHITECTS
Orlando, FL  32801

407.418.6294  DID  |  407.843.4444  F
michael.provenzale@lowndes-law.com


Wallis Murphy Boyington Architects, Inc.
c/o Michael S. Provenzele, Esq.
110 S. Kentucky Avenue
Lakeland, FL  33801

Brad A. Mokri, Esq.                              Attorneys for Claimant
Jennifer N. Harris, Esq.                         NEIL RICHARDSON; RICHARDSON
Law Offices of Mokri & Associates                FAMILY TRUST
1851 E. First Street, Suite 900
Santa Ana, CA  92705

714.619.9395  P | 714.619.9396
mokrilaw@yahoo.com

Landmark Civil Services, LLC
c/o Gilles Oullette
5578 Commercial Boulevard
Winter Haven, FL  33880

Correll Palms, LLC
c/o Gilles Oullette
505 Ariana Avenue
Auburndale, FL  33823