UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EMILIO FRANCISCO, et al.,<br><br>Defendants. | Case No.: SACV 16-02257-CJC(DFMx)<br><br>ORDER GRANTING RECEIVER'S MOTION FOR ORDER ESTABLISHING ALLOWED CLAIMS, APPROVING OMNIBUS AND SPECIFIC CLAIM OBJECTIONS, AND SUBORDINATING RICHARDSON CLAIMS [Dkt. 323] |

I. INTRODUCTION

This case involves a receivership resulting from an enforcement action brought by the SEC. The SEC alleged that Defendants Emilio Francisco and various entities he controlled defrauded over 130 investors out of approximately $9.5 million in connection

with offerings that purportedly qualified under the EB-5 Immigrant Investor Program. (Dkt. 1 [Complaint, hereinafter "Compl."] ¶ 3.) The Court subsequently appointed Thomas Seaman ("the Receiver") as permanent receiver of the corporate Defendants ("Receivership Entities"). (Dkt. 36.) Before the Court is the Receiver's motion for an order establishing allowed claims, approving omnibus and specific claim objections, and subordinating the claims of Neil Richardson. (Dkt. 323 [hereinafter "Mot."].) For the following reasons, the motion is **GRANTED**.

## II. BACKGROUND

### A. SEC Enforcement Action

According to the Complaint, Defendants engaged in a fraudulent scheme involving offerings that purportedly qualified for the EB-5 Immigrant Investor Program. (Compl. ¶ 3.) The EB-5 Immigrant Investor Program sets aside visas for foreigners who invest in commercial enterprises in the United States that create jobs and meet other conditions. (*Id.* ¶ 22.) Defendants solicited investors, who were primarily in China, to invest in EB-5 projects, such as assisted living facilities, restaurants, and a production facility. (*Id.* ¶¶ 25, 31–32, 43.)

From January 2013 to September 2016, Defendants raised approximately $72.05 million from over 130 investors through offerings in these EB-5 projects. (*Id.* ¶ 26.) Defendants allegedly made a number of misrepresentations associated with these offerings. For instance, Defendants told investors that they would not use capital contributions for operational, administrative, or other expenses. (*Id.* ¶¶ 50–51.) Defendants, however, diverted these funds to other purposes, including allegedly misappropriating at least $9.5 million to finance Francisco's luxury lifestyle. (*Id.* ¶ 56.)

On December 27, 2016, the SEC filed this enforcement action against Emilio Francisco and the Receivership Entities. (Dkt. 1.) The Court issued a temporary restraining order and subsequently granted the SEC's motion for a preliminary injunction. (Dkts. 17, 36.) On September 27, 2018, the SEC filed a related enforcement action against Robert Ferrante, Francisco's partner in the Receivership Entities. *See SEC v. Ferrante, et al.*, No. 18-cv-01758 (C.D. Cal.). On October 4, 2018, the Court entered final judgment against Francisco. (*See* Dkt. 301.)

**B.     Receivership**

In conjunction with the preliminary injunction, the Court appointed the Receiver to take ownership and liquidate the assets of the Receivership Entities to satisfy the claims of investors. (Dkt. 36.) In the last two years, the Receiver has administered the Receivership Entities' assets, including selling properties and settling certain creditor claims. The Receiver has also filed two actions against insiders of the Receivership Entities, including one lawsuit against Neil Richardson, a former employee of the Receivership Entities who had levied a lien on a property owned by one of the Receivership Entities. *See Seaman v. Richardson, et al.*, No. 18-cv-00538-CJC(DFMx) (C.D. Cal.).

On May 4, 2018, the Court approved the Receiver's proposed procedure for claim administration. (Dkt. 254.) The Court approved a proposed claim form for non-investor creditors, a proposed notice of claim amount for investors, and a general notice for all claimants. (*Id.*) The Court also authorized the Receiver to establish a claims bar date at least sixty days from the date of the Receiver's first publication of notice. (*Id.*)

In the last year, the Receiver proceeded to verify and validate investor and non-investor creditor claims. First, the Receiver identified and verified the claims of investors

in the Receivership Entities.  Using the Receivership Entities' bank statements and other records, the Receiver identified 138 investor claims and confirmed the amount of each investment.  (Dkt. 323-2 [Declaration of Thomas A. Seaman, hereinafter "Seaman Decl."] ¶ 7.)  For investors, the Receiver calculated the proposed claim amount as the amount of money invested by each investor claimant, minus any distribution or refund made to the investor.  (*Id.* ¶ 8.)  The Receiver then sent each investor a letter, describing the proposed allowed claim and inviting each investor to respond if he or she disagreed with the proposed claim amount.  (*Id.* ¶ 7.)  The 138 investor claims total to $66,340,000.  (*Id.* ¶ 8; *see also id.* Ex. A.)

Second, the Receiver reviewed and analyzed the claims submitted by each of the non-investor claimants.  The Receiver and his staff verified the claims of non-investors by looking at the documentation submitted by claimants as well as reviewing the Receivership Entities' business records.  (*Id.* ¶ 9.)  In evaluating claims, the Receiver considered whether the creditor provided services that benefitted the Receivership Entities.  (*Id.*)  The Receiver disallowed any claims for interest, consequential damages, attorneys' fees, and other similar charges.  (*Id.*)  The non-investor claims fall into two main categories: (1) non-investor vendor or trade creditor claims and (2) tax entity claims.  (*Id.* ¶ 10.)  The total amount claimed is $40,432,024.73.  (*Id.* Ex. B.)  The Receiver objects to $24,688,519.18 of this amount and proposes allowing a total of $147,695.02 of non-investor creditor claims.[1]  (*Id.*)

On March 6, 2019, the Receiver filed the instant motion for an order establishing allowed claims, approving omnibus and specific claim objections, and subordinating the claims of Neil Richardson.  (*See generally* Mot.)  At this point, the Receiver has largely

---

[1] There were duplicate claims submitted for a secured debt of $15,595,810.53.  (*See* Seaman Decl. Ex. B.)  This accounts for the difference between the total amount claimed and the total amount in the Receiver's proposed treatment of claims.

completed his investigation and accounting. (*Id.* at 7.) Most of the assets of the Receivership have been sold or abandoned to creditors. (*Id.*) While the Receiver may recover some additional money from a pending sale transaction and litigation, the Receiver believes it is now appropriate to conclude the claims process and then make a distribution of the recovered funds to investors and non-investor creditors with allowed claims. (*Id.*) In the motion currently pending before the Court, the Receiver asks the Court to determine the allowed claim amount for each investor and non-investor creditor. The Receiver also asks the Court either to deny or subordinate the claims of Neil Richardson. Two claimants, Neil Richardson and CMUF Consultants, LLC ("CMUF"), have filed objections to the Receiver's motion.[2] (Dkts. 328, 331.)

### III.  DISCUSSION

A district court "has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). A primary purpose of equity receiverships is "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Id.* at 1038. To serve this purpose, receivership courts may use summary procedures in allowing, disallowing, and subordinating the claims of creditors. *United States v. Ariz. Fuels Corp.*, 739 F.2d 455, 458 (9th Cir. 1984).

//

---

[2] CMUF filed its opposition late, on April 11, 2019, over a week past the April 1, 2019 deadline to file an opposition. To fully address these issues on the merits, however, the Court continued the scheduled hearing date, ordered further briefing from the Receiver in response to CMUF's opposition, and granted CMUF leave to file a sur-reply. (*See* Dkts. 332, 337.)

A.     **General Treatment of Claims**

The Receiver requests that the Court approve his proposed treatment of claims. First, the Receiver proposes to treat each investor's claim based on "Money In, Money Out" ("MIMO") analysis. (Mot. at 8.) Specifically, the Receiver proposes to allow investor claims based upon the amount of money invested by each investor claimant, minus any distribution or refund made to each investor. (*Id.* at 7.) The Receiver submits a spreadsheet listing the proposed allowed investor claims. (*See id.* Ex. A.)

The Court finds the Receiver's proposed treatment of investor claims is reasonable. The Ninth Circuit has endorsed the MIMO formula in fraud cases where, like here, the assets of the estate are insufficient to satisfy all claims in full. *See, e.g.*, *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (describing a net claim calculation as "an administratively workable and equitable method of allocating the limited assets of the receivership"). Using MIMO to establish the amount of investors' claims promotes fairness. *See id.* at 738–39. Here, Defendants often commingled investor funds, placing cash in project accounts based on Defendants' need for cash, rather than the terms of the investment agreement. Treating investors equally based on MIMO, as opposed to treating them differently based on the project in which they invested, ensures equity.

Second, the Receiver proposes to allow non-investor claims that are supported by the Receivership Entities' records and any documentation submitted by the claimant. (Mot. at 8.) The Receiver also proposes to disallow any claims for interest, consequential damages, or attorneys' fees. (*Id.*) The Receiver submits a summary of non-investor claims, identifying each claimant, the claimed amount, the Receiver's proposed allowed amount, and information relevant to each claim. (*See* Seaman Decl. Ex. B.) With respect to non-investor vendor or trade creditor claims, the Receiver proposes allowing claims that reflect goods or services which were of value to the Receivership Entities during the

pre-receivership period. (Mot. at 9.) The Receiver recommends these claims be allowed in full, as stated on Exhibit B to the Declaration of Thomas Seaman. (*Id.*; *see also* Seaman Decl. Ex. B.) With respect to claims by state and federal taxing entities, the Receiver recommends treating all of these claims, whether submitted formally or as bills for payment, as timely, and allowing all such claims in full except as to interest and penalties. (Mot. at 9.)

The Court finds the Receiver's proposed treatment of non-investor claims is reasonable. Disallowing claims for interest, attorneys' fees, consequential damages, and punitive or tort damages places non-investors on the same footing as investors by ensuring that all claimants are limited to their losses of principal. It is also reasonable to require claimants to prove the validity of their claim in a receivership, as courts place this burden on claimants in a similar context in bankruptcy proceedings. *See Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (placing burden on claimant in a bankruptcy proceeding to prove the validity of a claim by a preponderance of the evidence if a party in interest objects to the claim and comes forward with facts suggesting the claim should be disallowed). Overall, these rules promote an orderly, fair, and efficient administration of claims.

**B.     Receiver's Objections to Specific Non-Investor Claims**

The Receiver also objects to several claims asserted by non-investor claimants. The Court looks to bankruptcy law for guidance on how to analyze these objections. In a bankruptcy proceeding, a proof of claim is "*prima facie* evidence of the validity and amount of the claim" and is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3007. If a party files an objection, the dispute must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Fed. R. Bankr. P. 9014. Upon objection, the proof of claim provides "some evidence as to its

validity and amount" and is "strong enough to carry over a mere formal objection without more." *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991). The objector has the "initial burden of proof to demonstrate facts tending to demonstrate" that the claim should be disallowed. *Id.*; *see also Lundell*, 223 F.3d at 1039. If the objector meets this burden, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.* (quoting *In re Consol. Pioneer Mortg.*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995)). "The ultimate burden of persuasion remains at all times upon the claimant." *Id.* Using this framework, the Court now proceeds to address each specific objection.

### 1.   Wallis Murphy Boyington Architects

The Receiver objects to the six claims filed by Wallis Murphy Boyington Architects ("WMB"). WMB seeks a total amount of $283,478.74 for projects on six assisted living facilities in Florida.[3] According to the Receiver, however, WMB has already been paid—or, in fact, overpaid—for its services on these projects. (*See* Mot. at 10–13.) The Receivership Entities paid $1,121,551 to WMB prior to Receivership's appointment, including a $238,000 payment in December 2016, just one month prior to the Receivership's appointment. (Seaman Decl. ¶ 13.) Notwithstanding these payments, WMB failed and refused to turn over plans and design drawings to the Receiver for use in marketing the Florida properties. (*Id.* ¶ 14.) Based on the Receiver's review of the project files, it is unclear what value, if any, was ever received by the Receivership Entities as a result of WMB's work. (*Id.*) None of the Florida projects were built, and it does not appear that WMB prepared any construction documents. (*Id.*)

---

[3] The total amount of $283,478.74 consists of six claims: (1) $141,404.60 for the Orlando-Summerfield Project, (2) $3,286.94 for the Correll Palms Project, (3) $33,324.43 for the Kissimmee Project, (4) $51,083.21 for the Clearwater Project, (5) $15,083.25 for the Sarasota Project, and (6) $39,296.31 for the Sun City Project. (Seaman Decl. ¶ 11.)

The Receiver contends that WMB's own statements and records suggest that WMB was overpaid. In a July 18, 2016 letter, the principal of WMB stated that as of "August 2016 . . . all payments were up to date, and there was no balance owed." (*Id.* Ex. C.) WMB asserts that the Receivership Entities fell behind in payments in the fall of 2016 and submits a balance summary indicating these arrearages amounted to $189,481 as of November 30, 2016. (*Id.* Ex. D.) In December 2016, however, the Receivership Entities paid WMB $238,000. (Seaman Decl. ¶ 15.) With this payment, WMB's own records suggest it was overpaid by almost $50,000.

According to WMB, the parties agreed in December 2016 to convert the pending contracts for the Florida projects to a flat fee per month arrangement, apparently creating a new obligation of $679,000, plus $27,000 per month for past due payments. (*Id.* ¶ 16.) But the Receiver could not identify any other material work that WMB performed that would warrant the payment of a flat fee. (*Id.* ¶ 17.) Based on the Receiver's investigation, the Receiver contends that the Receivership Entities overpaid WMB by a total of $146,563.76. (*Id.* ¶ 18.) On this basis, the Receiver requests the Court deny WMB's six claims. WMB has not filed any opposition, so it has failed to meet its burden to prove the validity of its proofs of claim. *See Lundell*, 223 F.3d at 1039. Accordingly, WMB's six claims are **DENIED**.

In addition, the Receiver requests that the Court release WMB's lien on the sale proceeds of real property located at 14000 Del Web Boulevard, Summerfield, Florida ("Summerfield Property"). On April 13, 2017, WMB recorded a claim of lien on the Summerfield Property, seeking $168,404.60 in connection with its claims related to a project on the Summerfield Property. (Seaman Decl. ¶ 12.) This lien contravened the Court's order prohibiting self-help and collections by creditors. (*See* Dkt. 36 at 22–24.) When the Summerfield Property was sold, WMB's lien was released but attached to the sales proceeds, pending further order of the Court. (*See* Dkt. 293.) The Receiver

contends that WMB's lien claim is unsupported and inconsistent with its proof of claim for $141,404.60. (Mot. at 10.) WMB has neither submitted any opposition nor presented any evidence to the contrary. The Court hereby **RELEASES** WMB's lien on the sale proceeds of the Summerfield Property.

### 2. Correll Palms LLC

The Receiver objects to Correll Palms LLC's claim for $57,619.50. This claim arises out of the efforts of one of the Receivership Entities, Summerplace at Correll Palms LLC ("Summerplace"), to purchase land and develop an assisted living project in Correll Palms, Florida. (Seaman Decl. ¶ 19.) Pursuant to the purchase and sale agreement, Summerplace paid $700,000 in deposits to Correll Palms LLC. (*Id.*) After Summerplace failed to close the sale in a timely fashion, Correll Palms LLC retained the $700,000. (*Id.*) On this basis, the Receiver asserts there is no basis for Correll Palms LLC's claim for an additional $57,619.50. (Mot. at 13.) Correll Palms LLC has failed to file any opposition to the Receiver's motion. Correll Palms LLC's claim is **DENIED**.

### 3. Landmark Civil Services, LLC

The Receiver objects to Landmark Civil Services, LLC's claim for $175,909.30. This claim arises out of another alleged agreement related to the Correll Palms project, this time between Summerplace and Landmark Civil Services, LLC. (Seaman Decl. ¶ 20.) As discussed above, Summerplace defaulted on the purchase agreement for the Correll Palms project, losing the $700,000 deposit and the right to purchase the land. (*Id.*) According to the Receiver, Landmark Civil Services, LLC's claim appears to be for consequential damages. (*Id.*) The Receivership Entities never owned the land, and there is no evidence that Landmark Civil Services, LLC performed any work that was of value

to the Receivership Entities. (*Id.*) Landmark Civil Services, LLC has not filed any opposition to the Receiver's motion. Landmark Civil Services, LLC's claim is **DENIED**.

### 4. CMUF

CMUF asserts a claim for $149,618.78. On May 26, 2017, the Receiver seized this sum in the checking account of MPoint Capital Management, LLC ("MPoint").[4] MPoint is controlled by Ferrante, one of the principals in Defendant Francisco's EB-5 scheme. Chris Fox, another principal in the scheme, is the vice president and chief financial officer of MPoint.

CMUF argues the $149,618.78 seized by the Receiver actually belongs to CMUF. CMUF's sole member is Hongmei Lu, who is Ferrante's wife. In 2014, Lu purchased property at 15401 Alsace Circle, Irvine, California ("Alsace Property"). (Dkt. 331-1 [Declaration of Hongmei Lu] ¶ 4; *id.* Ex. A.) In December 2016, Lu obtained a revolving line of credit from East West Bank. (*Id.* ¶ 9.) The line of credit was secured by the Alsace Property. (*Id.* Ex. B.) On May 23, 2017, Lu, on behalf of CMUF, apparently agreed to lend up to $1,000,000 to MPoint, with $200,000 to be advanced immediately. (Lu Decl. ¶¶ 12–13.) On May 25, 2017, $200,000 was wired into CMUF's bank account at East West Bank, purportedly based on Lu's line of credit. (*Id.* ¶ 11.) On the same day, Lu wired the $200,000 to MPoint's account. (*Id.* ¶ 14.) Shortly thereafter, the Receiver seized these funds.

The Receiver asks the Court to disallow CMUF's claim. The Receiver asserts that the records of the Receiverships Entities and those submitted by CMUF do not support

---

[4] After the Receiver froze MPoint's assets, MPoint filed an *ex parte* application for relief from the asset freeze. (*See* Dkt. 75.) The Court denied the application, finding MPoint was an affiliate of the Defendants within the meaning of the injunction. (Dkt. 80 at 5–6.)

CMUF's claim. (Dkt. 334 [Supplemental Reply to Opposition of CMUF Consultants, LLC] at 3.) And even if CMUF had a basis for its claim, the Receivership Entities' records indicate CMUF has already been paid $229,882.06 using EB-5 investor funds. (*Id.* at 5.) The Receiver also contends that CMUF's claim should be disallowed because CMUF is an insider. (*Id.* at 6–7.) Not only is Lu married to Ferrante, but she also maintained an office at the former MPoint offices. (*Id.* at 7.)

The Court agrees with the Receiver that CMUF's claim should be disallowed. CMUF has failed to provide sufficient evidence to support its claim. The records show that Lu transferred the $200,000 from her personal account, not from CMUF's account. And the two promissory notes that form the basis for CMUF's claim were purportedly executed four months *after* the Receivership's appointment. Accordingly, these notes are not the obligations of the receivership estate. Rather, these notes appear to be part of a scheme by Fox and Ferrante to continue the EB-5 investor scheme after the Receiver's appointment. In addition, based on the Receiver's accounting, Lu and CMUF received a total of $229,882.06 from the Receivership Entities, meaning that Lu and CMUF received a net gain of $80,263.28 even if CMUF purportedly loaned the full $149,618.78 to MPoint.[5] Finally, as the Court noted in its earlier order, "Lu's choice to use her LLC to make a loan to . . . Ferrante's LLC and secure that money with her (and presumably his) personal residence was the conscious decision of a sophisticated actor; [the receivership] will not be undercut simply to artificially and unnecessarily shield her from the consequences of that decision." (Dkt. 80 at 6.) The same logic applies here. With her insider status and marriage to Ferrante, Lu appears to have benefitted financially from the fraud perpetrated by Defendants. It would be inequitable to allow her to share in

---

[5] In its sur-reply, CMUF disputes these calculations and asserts these payments constitute wages, reimbursed expenses, and transactions before the loan. (*See* Dkt. 338.) This does not change the fact, however, that CMUF has failed to substantiate the basis for its claim, particularly since the $200,000 was transferred directly from Lu's bank account rather than CMUF's account.

distributions from the receivership estate with the defrauded EB-5 investors. CMUF's claim is **DENIED**.

### 5. Neil Richardson

The Receiver objects to the claims of Neil Richardson, who purportedly was an insider and the president of various Receivership Entities. (Seaman Decl. ¶¶ 21–23.) In the receivership, Richardson filed two proofs of claims: (1) a $2,200,000 promissory note and deed of trust encumbering the real property and improvements at Summerplace at Westgate in West Sacramento, California ("Westgate Property") (collectively, "the Trust Claim") and (2) a claim for an unspecified amount for services rendered to the Receivership Entities ("the Personal Claim"). (*Id.* ¶ 21.) With respect to the Personal Claim, Richardson failed to submit any supporting documents or evidence. He also failed to submit any supporting evidence or articulate any legal or factual basis for the Personal Claim in response to the Receiver's objection. Accordingly, Richardson's Personal Claim is **DENIED**. The Court proceeds to address the remaining issues with respect to Richardson's Trust Claim.

As a preliminary matter, Richardson argues the claims process does not afford him due process and is an "abuse of [his] right to have his day in court on the merits." (Dkt. 328 [Opposition of Creditor/Claimant Neil Richardson, hereinafter "Richardson Opp'n"] at 8.) He requests the Court withhold any decision as to his proofs of claim pending the outcome of the Receiver's fraudulent conveyance and quiet title action against him. (*Id.* at 10.) The Court disagrees. The claims process provided Richardson with adequate due process protections, including notice and an opportunity to be heard. The claims process allows for consideration of the merits. As discussed above, the Court considers supporting evidence in analyzing an objection, with the initial burden of proof on the Receiver to offer facts to create a dispute before the burden shifts to the claimant to

provide supporting evidence for his claim. *See Lundell*, 223 F.3d at 1039. In the claim form, Richardson and all other claimants were instructed to submit all documents and evidence to substantiate their claims. A claimant's failure to present sufficient evidence to support a claim is not a denial of due process.

The Receiver objects to the Trust Claim on the basis that the $2 million note and deed of trust were fraudulent transfers. Looking to bankruptcy law, as receivership courts frequently do, the Bankruptcy Code provides that courts "shall disallow any claim of any entity . . . that is a transferee" of a fraudulent transfer. 11 U.S.C. § 502(d). Under the California Uniform Voidable Transfers Act ("CUVTA"), a transfer is fraudulent if it is made with (1) actual intent to defraud or (2) constructive fraudulent intent based on the lack of reasonably equivalent value provided in exchange. Cal. Civ. Code § 3439.04(a); *see also Donell v. Kowell*, 533 F.3d 762, 770–71 (9th Cir. 2008). A transfer is constructively fraudulent if the debtor did not receive reasonably equivalent consideration and either "(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, [or] (B) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Cal. Civ. Code § 3439.04(a)(2).

The Court finds that the $2 million note and deed of trust were constructive fraudulent transfers. First, the Receivership Entities did not receive reasonably equivalent consideration for the promissory note and deed of trust. In 2013, Richardson began working for PDC Capital Partners, LLC ("PDC"), the umbrella organization of the Receivership Entities. (Seaman Decl. ¶ 23.) He played a significant role in the EB-5 projects, including signing agreements, authorizing payments, and participating in the recruitment of EB-5 investors. (*Id.* ¶ 24.) In 2014, Richardson sued a company called First Capital Mortgage Local Corporation ("FCM"), and recorded a *lis pendens* on

property that FCM owned in Carmichael, California ("Carmichael Property"). (*Id.* ¶¶ 27–28.) In July 2015, PDC purchased the Carmichael Property from FCM. PDC then entered into an agreement with Richardson to remove the *lis pendens* against the Carmichael Property. (*Id.* ¶ 29.) In exchange, Richardson received a $2 million note and deed of trust encumbering a separate property owned by SAL Westgate, LLC ("Westgate Property"). (*Id.* ¶ 25.) SAL Westgate, LLC, however, was wholly independent from SAL Carmichael, LLC, the company that owned the Carmichael Property. (*Id.* ¶ 26.) There is no evidence that Richardson invested any money or had anything to do with SAL Westgate, LLC. (*Id.*) And the Receiver's investigation found that SAL Westgate, LLC did not receive any value in exchange for Richardson's lien. (*Id.* ¶ 27.) Second, SAL Westgate, LLC had unreasonably small assets in relation to its business and no ability to pay its debts at the time Richard received the lien. At the time of the lien, SAL Westgate, LLC owed $4 million to its EB-5 investors while holding assets that were worth, at best, approximately $2.9 million. (*Id.* ¶ 32.) SAL Westgate, LLC's liabilities well exceeded its available assets at the time of the lien. (*Id.* ¶ 33.)

Richardson raises several theories as to why there was reasonably equivalent consideration. First, he argues that he received the claim in exchange for releasing claims he had against PDC, evidenced by the lawsuit that he filed against PDC in 2016. He filed this lawsuit, however, only after he received the lien. In addition, Richardson explicitly testified that he acquired the lien on the Westgate Property in exchange for his agreement to expunge the *lis pendens* against the unrelated Carmichael Property, not to release his claims against PDC. (*See* Dkt. 330-1 [Deposition of Neil Richardson] at 153:3–154:7.) Second, Richardson argues that PDC was the general partner of both SAL Carmichael, LLC and SAL Westgate, LLC, so PDC benefitted from Richardson's release of the *lis pendens*. But this ignores the separate interests of the EB-5 investors in each LLC. SAL Carmichael, LLC and SAL Westgate, LLC were separate and distinct entities. The EB-5 investors' immigration goals were tied to specific projects. By ignoring these corporate

formalities, PDC and Richardson destroyed the EB-5 investors' prospects for immigration. Even assuming *SAL Carmichael, LLC* received some value from the expungement of the *lis pendens*, this action did not benefit *SAL Westgate, LLC* and its EB-5 investors. Third, Richardson argues that SAL Westgate, LLC benefitted from Richardson's expungement of the *lis pendens* "because the Receiver was then able to sell the property." (Richardson Opp'n at 22–23.) The Receiver's ability to sell the Westgate property, however, had nothing to do with the release of Richard's *lis pendens* on the unrelated Carmichael property.

The Court concludes it must disallow Richardson's Trust Claim. There is compelling evidence that the $2 million note and deed of trust were constructive fraudulent transfers, and Richardson has failed to present evidence to genuinely dispute this finding. It also would be inequitable to allow Richardson's Trust Claim because he was an insider to the Receivership Entities and controlled their operations. Richardson apparently held himself out as the "President" of PDC and its related entities in negotiations with third parties and in communications with EB-5 investors. (Seaman Decl. ¶ 23; *see id.* Ex. E-2.) He signed agreements, authorized payments, participated in the recruitment of EB-5 investors, and maintained close relationships to PDC's operators. (Seaman Decl. ¶ 24.) He leveraged this position to extract a sweetheart deal with PDC's principals: 10% ownership interest in all PDC projects, 10% of any development related fees, a monthly salary of $8,666, and the $2 million note. (*Id.* Ex. E-6.) The records of the Receivership Entities show that Richardson received over $350,000 in cash and charged almost $300,000 to his company credit card for personal expenses. (*Id.* ¶ 23.) It would be inequitable to allow Richardson to continue to benefit from the fraudulent scheme he helped operate. Accordingly, Richardson's Trust Claim is **DENIED**. The Court hereby **RELEASES** Richardson's lien from the sale proceeds of the Westgate Property.

## V. CONCLUSION

For the foregoing reasons, the Receiver's motion is **GRANTED**. The Court hereby:

1. **APPROVES** the allowance of claims as set forth on Exhibits A and B to the Declaration of Thomas A. Seaman, located at Dkt. 323-2;

2. **DENIES** the WMB Claims;

3. **RELEASES** the WMB's lien upon the sale proceeds of the Summerfield Property;

4. **DENIES** the Correll Palms LLC and Landmark claims;

5. **DENIES** the CMUF claim;

6. **DENIES** Richardson's Personal Claim and Trust Claim; and

7. **RELEASES** Richardson's lien upon the sale proceeds of the Westgate Property.

DATED:   May 13, 2019

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE